IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| DENNIS SAGEZ, DEAN AND BARB BUESING, DON AND ELIZABETH BUESING, DOUGLAS G. FINSTROM, CHRISTIAN FISHER, FOUR WAY FARMS, LLC, SUSAN GUGE, WALLY AND JODI HELGET, JR FARMS, INC, DENNIS AND KAREN KASPARBAUER TRUST, KASSEL FARMS, INC., GREAT OAKS FARMS, INC., GEORGIA KASSEL, JIM KIBBIE, JOHN KIBBIE, PATRICK KIBBIE, NICK KILL, TODD LUNDGREN, EDWARD NOONAN, JOSEPH NOONAN, JACK REICHERT, HAROLD SCHROEDER, CATHERINE TIESZEN, CRAIG TIESZEN, ERIC AND AMY TIESZEN, REED AND MARY TIESZEN, DEAN AND AMY VER MULM, PETER VER MULM, WEBER FAMLY FARM INVESTMENTS, LLC,<br>     Plaintiffs,<br>v.<br><br>GLOBAL AGRICULTURAL INVESTMENTS, LLC, TYLER BRUCH, BRUCHSIDE, INC, ART A. HALL, ARTAH HOLDINGS, L.L.C., POPULAR SECURITIES, INC., BOL, LLC, ALAN KLUIS, ELIA TASCA,<br>    Defendants. | Case No. 3:11-CV-03059-DEO<br><br><br><br>**AMENDED COMPLAINT<br>AND JURY DEMAND** |

**COME NOW**, the Plaintiffs, and in support of their Complaint against the Defendants,

hereby states as follows:

## NATURE OF THE ACTION

1.    This cause of action arises from Defendants' fraudulent offer and sale of

unregistered securities to the Plaintiffs in violation of the Securities Act of 1933 and the

Securities Exchange Act of 1934.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa as this cause of action arises from the Defendants' violation of 15 U.S.C. §§ 77e(a) and (c) (Sections 5(a) and (c) of the Securities Act of 1933); and the Defendants' violation of 15 U.S.C. § 78j(b) (Sections 10(b) of the Securities Exchange Act of 1934) and 17 C.F.R. Section 240.10b-5 (Rule 10-5)).

3.      Further, this Court has supplemental jurisdiction over the Plaintiffs common law causes of action pursuant to 28 U.S.C. § 1367 as those causes of action arise out of the same common nucleus of operative fact as the federal securities violations.

4.      Venue is proper in the Northern District of Iowa pursuant to 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa because Defendants transacted business in this District and the offer and/or sale of securities relevant to this cause of action took place in this District.

## PARTIES

### Plaintiffs

5.      Plaintiff Dennis Sagez ("**Sagez**") was at all time material to this action a resident of St. Louis, Missouri.  Sagez invested $50,000 in Bruchside Fund II.

6.      Plaintiffs Dean and Barb Buesing were at all times material to this action resident of Granite Falls, Minnesota.  Dean and Barb Buesing invested $250,000 in Bruchside Fund III and $250,000 in BOL Fund.

7.      Plaintiffs Don and Elizabeth Buesing were at all times material to this action resident of Granite Falls, Minnesota.  Don and Elizabeth Buesing invested $250,000 in Bruchside Fund III and $250,000 in BOL Fund.

8. Plaintiff Douglas G. Finstrom ("**Finstrom**") was at all times material to this action a resident of Kerkhoven, Minnesota. Finstrom invested $100,000 in Bruchside Fund I.

9. Plaintiff Christian Fisher ("**Fisher**") was at all times material to this action a resident of Alton, Iowa. Fisher invested $75,000 in Bruchside Fund I and $131,000 in Bruchside Fund II.

10. Plaintiff Four Way Farms, LLC ("**Four Way Farms**") was at all times material to this action a resident of Manilla, Iowa. Four Way Farms invested $150,000 in Bruchside Fund II and $50,000 in Bruchside Fund III.

11. Plaintiff Susan Guge ("**Guge**") was at all times material to this action a resident of Estherville, Iowa. Guge invested $100,000 in Bruchside Fund III.

12. Plaintiffs Wally and Jodi Helget (the "**Helgets**") were at all times material to this action residents of Wind Lake, Wisconsin. The Helgets invested $50,000 in Bruchside Fund III.

13. JR Farms, Inc. ("**JR Farms**") was at all times material to this action a resident of Emmetsburg, Iowa. JR Farms invested $25,000 in Bruchside Fund I and $35,750 in Bruchside Fund II.

14. Plaintiff Dennis and Karen Kasparbauer Trust ("**Kasparbauer Trust**") whose beneficiaries are Dennis and Kasparbauer were at all times material to this action a resident of Manning, Iowa. The Kasparbauer Trust invested $100,000 in Bruchside Fund I, $100,000 in Bruchside Fund II, $125,000 in Bruchside Fund III and $10,000 in the Cotton Gin Fund.

15. Plaintiffs Kassel Farms, Inc. ("**Kassel Farms**") and Great Oaks Farm, Inc. ("**Great Oak Farms**") were at all times material to this action, residents of Emmetsburg, Iowa. Kassel Farms and Great Oak Farms invested $250,000 in Bruchside Fund I, $550,000 in Bruchside Fund II and $600,000 in Bruchside Fund III.

3

16.     Plaintiff Georgia Kassel ("**Kassel**") was at all times material to this action a resident of Emmetsburg, Iowa.  Kassel invested $50,000 in Bruchside Fund II and $160,000 in Bruchside Fund III.

17.     Plaintiffs Jim Kibbie, John Kibbie, Patrick Kibbie (the "**Kibbies**") were at all times material to this action residents of Emmetsburg, Iowa.  The Kibbies invested $100,000 in Bruchside Fund II and $90,000 in Bruchside Fund III.

18.     Plaintiff Nick Kill ("**Kill**") was at all times material to this action a resident of Morris, Minnesota.  Kill invested $350,000 in Bruchside Fund II, $370,000 in Bruchside Fund III, $30,000 in BOL Fund and $100,000 in the Cotton Gin Fund.

19.     Plaintiff Todd Lundgren ("**Lundgren**") was at all times material to this action a resident of Emmetsburg, Iowa.  Lundgren invested $50,000 in Bruchside Fund II and $50,000 in the Cotton Gin Fund.

20.     Plaintiff Edward Noonan and Joseph Noonan (the "**Noonans**") were at all times material to this action residents of Ayrshire, Iowa.  The Noonans invested $200,000 in Bruchside Fund II and $100,000 in Bruchside Fund III.

21.     Plaintiff Jack Reichert ("**Reichert**") was at all time material to this action a resident of Winter Park, Colorado.  Reichert invested $50,000 in Bruchside Fund II.  Reichert also invested $25,000 in the Global Ag Biodiesel Fund.

22.     Plaintiff Harold Schroeder ("**Schroeder**") was at all time material to this action a resident of Becker, Minnesota.  Schroeder invested $50,000 in Bruchside Fund III and $10,000 in BOL Fund.

23.     Plaintiff Catherine Tieszen was at all time material to this action a resident of Canistota, South Dakota.  Catherine Tieszen invested $100,000 in Bruchside Fund II and $100,000 in Bruchside Fund III.

24.     Plaintiff Craig Tieszen was at all time material to this action a resident of Rapid City, South Dakota.  Craig Tieszen invested $50,000 in Bruchside Fund II and $15,000 in Bruchside Fund III.

25.     Plaintiffs Eric and Amy Tieszen were at all time material to this action residents of Canistota, South Dakota.  Eric and Amy Tieszen invested $100,000 in Bruchside Fund I, $178,000 in Bruchside Fund II, $5,000 in the Cotton Gin Fund and $100,000 in Global Ag Biodiesel Fund.

26.     Plaintiffs Reed and Mary Tieszen were at all time material to this action residents of Canistota, South Dakota.  Reed and Mary Tieszen invested $200,000 in Bruchside Fund II, $200,000 in Bruchside Fund III and $50,000 in Global Ag Biodiesel Fund.

27.     Plaintiffs Dean and Amy Ver Mulm were at all time material to this action residents of Emmetsburg, Iowa.  Dean and Amy Ver Mulm invested $75,000 in Bruchside Fund I and $125,000 in Bruchside Fund II.

28.     Plaintiff Peter Ver Mulm was at all time material to this action a resident of Sioux Center, Iowa. Peter Ver Mulm invested $50,000 in Bruchside Fund II, $15,000 in Bruchside Fund III and $30,000 in the Cotton Gin Fund.

29.     Plaintiff Weber Family Farm Investments, LLC ("Weber Family Farm") was at all time material to this action a resident of Sioux Falls, South Dakota.  Weber Family Farm invested $100,000 in Bruchside Fund II and $300,000 in Bruchside Fund III.

5

Defendants

30.     Defendant Global Agricultural Investments, LLC ("**GAI**") was at all times material to this action a Texas limited liability company who sold securities to Plaintiffs.  GAI offered, sold or made representations about the securities at issue in this case to Plaintiffs.

31.     Defendant Tyler Bruch ("**Bruch**") was at all times material to this action a resident of Emmetsburg, Iowa.  Bruch offered, sold or made representations about the securities at issue in this case to Plaintiffs.

32.     Defendant Bruchside, Inc. was at all time material to this action a Texas Corporation.  Bruch is the President and part owner of Bruchside, Inc.

33.     Defendant Art A. Hall ("**Hall**") was at all times material to this action a resident of San Antonio, Texas.  Hall offered, sold or made representations about the securities at issue in this case to Plaintiffs.

34.     Defendant Artah Holdings, LLC ("**Artah Holdings**") was at all times material to this action a Texas limited liability company.  Hall owns Artah Holdings.

35.     Defendant Popular Securities, Inc., ("**Popular Securities**") was at all times material to this action a Texas corporation.  Popular Securities employed Hall at all time material to this action.

36.     Defendant BOL, LLC ("**BOL**") was at all times material to this action a Iowa limited liability company.  Bruch owned BOL at all time material to this action.

37.     Defendant Alan Kluis ("**Kluis**") was at all times material to this action a resident of Minneapolis, Minnesota.  Bruchside Fund II, LP's Form D filing with the Securities and Exchange Commission; Bruchside Fund III, LP's Form D filing with Securities Exchange

6

Case 3:11-cv-03059-DEO   Document 96   Filed 01/15/13   Page 6 of 78

Commission; and Global Ag Biodiesel, LLC's Form D filing with the Securities Exchange

Commission each list Kluis as a promoter.

38.     Defendant Elia Tasca ("**Tasca**") was at all times material to this action a resident

of Rio de Janeiro, Brazil.  Global Ag Biodiesel, LLC's Form D filing with the Securities

Exchange Commission lists Tasca as a promoter.

Other Individuals and Entities

39.     BOL Fund II, LLC (BOL II) was registered as a limited liability company in Iowa

on April 26, 2010.  BOL II promissory notes were offered to investors but not purchased by

investor Plaintiffs.  The purpose of BOL II was to receive additional monies from investors.

Bruch owns BOL II.

40.     Don and Jane Bruch ("Bruchs"), are Tyler Bruch's parents and farmers in

Emmetsburg, Iowa.  Funds were transferred from GAI Brazil to Jane Bruch.

41.     Justin Bruch is Tyler Bruch's brother.  Justin Bruch has operated farms in the

Ukraine called Bruchside Farms Ukraine.  GAI loaned money from investor contributions to

Bruchside Farms Ukraine.

42.     Bruchside Farms, Inc. is a farming corporation, owned by the Bruchs', operating

Iowa farms.

43.     Global Agricultural Investments Brazil ("GAI Brazil") also known as Brazil Co.

and Global AG Agropecuaria do Brazil Ltda is the Brazilian company Bruch initially formed to

do business for the GAI farming operations in Brazil.

44.     Global Ag Investimentos Do Brazil LTDA is another Brazilian company Bruch

formed to do business in Brazil.

45.    <u>Iowa Trust and Savings Bank</u> is the bank where investors' funds were deposited and then transferred to Brazil.

46.    <u>Kathy Gunderson</u> is the secretary of GAI who collected monies from certain Plaintiff investors.

## BACKGROUND FACTS

### EARLY FARMING OPERATIONS IN BRAZIL

47.    In January of 2003, Bruch travelled to Brazil to get college credit in agriculture by studying Brazilian agriculture and working on Brazilian farms. He worked for farm operators, and finished his bachelor's degree online in August of 2003.

48.    In August of 2003, Bruch's parents, Don and Jane Bruch, farmers from Emmetsburg, Iowa, visited Bruch in Brazil.

49.    Bruch's family helped Bruch contract to purchase 2,000 acres of land which Bruch called Bruchside Farm. Payment was due in less than two years. The farm reportedly could not be mortgaged because of Brazilian banking rules.

50.    The Brazilian farmland the Bruchs purchased was rough ground covered with scrub trees and brush.

51.    In the fall of 2003, Bruch cleared the land of brush, and in November of 2003, Bruch planted a rice crop.

52.    The crop was harvested in the spring of 2004 which Bruch later referred to as "a disaster."

53.    In the fall of 2004, Bruch planted soybeans to be harvested in the spring of 2005.

54.    Complete payment for the Bruch farm in Brazil was due by March of 2005.

8

## FORMATION OF ENTITIES TO SELL SECURITIES

55.     On December 1, 1999, Hall registered Artah Holdings as a Texas corporation.

56.     On January 20, 2005, Hall, as Bruch's attorney, registered Bruchside, Inc. as a Texas corporation.  Bruch was listed as the only director.

57.     On February 16, 2005, Hall registered GAI in Texas.  Hall and Bruch formed GAI to be the general manager of the limited partnerships for which Bruch and Hall planned to sell securities.

58.     Artah Holdings and Bruchside, Inc., were partners of GAI when it was formed.

59.     Initially, Bruch and Hall owned 85% of GAI and operated GAI; and Alan Kluis owned 15%.

60.     Since September 7, 2007, Bruch and Hall have owned 100% of GAI.

61.     On July 24, 2009, Bruch registered BOL as an Iowa limited liability company.

62.     On April 26, 2010, Bruch registered BOL II LLC as an Iowa limited liability company.

## SECURITIES OFFERED AND SOLD -  IN ORDER OF OFFERING

63.     Bruchside Fund I, LP Hall registered Bruchside Fund I LP in Texas on February 26, 2005.  Bruchside Fund I LP limited partnership interests were first offered to investor in 2005.  Total investments were $1.39 million.  Plaintiffs' investments totaled $625,000.

64.     Global Ag Biodiesel, LLC (sometimes referred to as "**Biodiesel Fund**") Hall registered Global Ag Biodiesel, LLC in Texas on February 12, 2007.  Global Ag Biodiesel's equity interests were offered to several investors in 2007.  Plaintiffs' investments totaled $175,000.

65.     Bruchside Fund II, L.P.  Hall registered Bruchside Fund II, LP in Texas on June 17, 2007.  Bruchside Fund II L.P limited partnership interests were first offered to investors in February of 2007.  Total investments were $5,819,475.  Plaintiffs' investments totaled $2,619,750.

66.     Cotton Gin Investments, L.P. (sometimes referred to as "**Gin Fund**") Hall registered Cotton Gin Investments, L.P. in Texas on April 15, 2008.  Cotton Gin Investments, L.P. promissory notes, which Defendants represented would pay 15% annually, were offered beginning October 1, 2007 and continued to July 2008.  Total investments were $1,045,000.  Plaintiffs' investments totaled $195,000.

67.     Bruchside Fund III, L.P. Hall registered Bruchside Fund III, LP in Texas on April 28, 2008.  Bruchside Fund III., L.P.'s limited partnership interests were offered to investors 2008.  Total investments were $9,574,500.  Plaintiffs' investments totaled $2,975,000.

68.     BOL Fund I, LLC Bruch registered BOL, LLC in Iowa on July 24, 2009.  BOL Fund I LLC's promissory notes were sold to investors in 2009.  Total investments were $750,000.  Plaintiffs' investments totaled $540,000.

(sometimes collectively referred to as "**GAI Funds**" or "**Funds**").

DEFENDANTS GAI AND BOL SECURITIES SALES PRACTICES

69.     In early 2005, when Defendants sought investors, they represented that Brazil's had a lower cost of farming operations because the cost of renting land was $25 to $40 per acre which was 30% of the cost of the U.S. At that time, land had not been rented.

70.     The Defendants represented that farming operations in Brazil would be highly profitable for investors.

71.     Bruch prepared complex excel spreadsheets to compute and justify expectations of the high profits he projected.  The spreadsheets detailed low costs and high returns from sale of crops.

72.     The major factor used to sell investment in GAI funds was the Defendants' projection of large returns from profits.

73.     The Defendants used power-point presentations which emphasized their projected profits from farming in Brazil with their excel spreadsheets showing expected low costs and calculations of high profits.  The validity of the inputted figures was not supported and the risks were downplayed by the Defendants.

74.     The Defendants prepared and printed offering documents which did not include complete and detailed disclosures of the risks of farming operations in Brazil, or the past farming losses of Bruch's operations.

75.     According to one employee of the Defendants, Bruch projected low costs without having contracts in place for farming operations and/or having purchased needed materials, especially needed amounts of fertilizer which was crucial to the rough land areas being farmed.

76.     Hall drafted over a hundred pages of documents to be given to GAI Fund offerees.  The documents included detailed private placement memoranda, subscription agreements and management agreements.  ("**printed offering documents**").  However, investors were not given independent legal opinion letters regarding the offerings.

77.     Further, investors were not provided with audited financial statements, balance sheets or financial statements prepared on the basis of Federal income tax requirements and examined in accordance with generally accepted auditing standards by an independent public or certified accountant.

78.     The offering documents were complex boilerplate documents with cover pages referencing a GAI Fund but with virtually no disclosure of the risks of investment in the Funds' farming operations in Brazil.

79.     Although the documents were predominately boilerplate, in some cases Hall had changed terms to protect GAI.  For instance, some documents permitted GAI to engage in transactions that may presents conflicts of interest without legal liability to investors.

80.     Several of the Plaintiffs were given offering documents *after* investing or right at the time they delivered checks to GAI's Secretary, Kathy Gunderson, in Emmetsburg, Iowa.

81.      Defendants represented that they paid investors 40% Returns on investments from profitable farming in Brazil.  Representations regarding such returns served as the main enticements for potential investors to invest and for Plaintiffs, who were already invested, to continue to investing in GAI Funds.

FAILURE TO PROVIDE FINANCIAL DISCLOSURES AND REPORTS

82.     In GAI Fund securities offerings, the Defendants represented that investors would be provided with audited quarterly and annual financial reports.

83.     The Bruchside Fund I power-point indicated that RSM McGladrey would be the Fund's public accountancy firm.  To the contrary, RSM McGladrey never prepared an audited financial statement.

84.     Because Defendants failed to provide audited financial statements, investor Plaintiffs were not aware that Defendant's farming operations in Brazil were not profitable.

85.     By failing to notify Plaintiffs of the Funds' financial practices and financial condition, the Defendants were able to further mislead Plaintiffs into investing in, and/or continuing to invest in GAI Funds.

12

86.     Audited financial statements have never been prepared for any GAI Fund by any public accountancy firm.  This is includes audited incomes statements and audited balance sheets.

87.     In 2009, Price Waterhouse attempted a complete audit of GAI Funds, but was unable to complete the audit because of GAI's inadequate record keeping.  Consequently, Price Waterhouse only conducted a "limited" review.

88.     Despite the limited nature of the review, Price Waterhouse's was able to report certain information.  Price Waterhouse determined that in years 2007 and 2008 GAI Funds' farming operations in Brazil had operated at a loss.

89.     The Price Waterhouse review revealed that the farming operations in Brazil intended to generate profits and returns for Bruchside Fund I in 2007, and the Bruchside Fund II in 2008 had not been profitable.

90.     Only after the Price Waterhouse information became available, could anyone other than the Defendants learn the true source of the Returns paid to Bruchside Fund I investors.  Based on the Price Waterhouse review, it became clear that Defendants had misrepresented the source of the 40% returns as profits from the farming operations in Brazil.

91.     Only after the Price Waterhouse information became available, could anyone other than the Defendants learn the true source of the Returns paid to Bruchside Fund II investors.  Based on the Price Waterhouse review, it became clear that Defendants had misrepresented the source of the alleged 25% profit from farming operations.

## BANKING AND USE OF PROCEEDS

92.     Investments in Bruchside Fund I were initially placed in a separate account intended only for Bruchside Fund I.   However, the funds were thereafter transferred GAI's bank account.

93.     Some investments in GAI Funds were either placed in a designated bank account for a particular fund and then transferred to a GAI account, or directly placed in the GAI account upon investment.

94.     The majority of the monies from Plaintiffs were placed in the GAI bank account in Iowa and were transferred to the bank accounts of one of two GAI Brazilian entities—either Global AG Agropecuaria do Brazil Ltda. or Global Ag Investimentos Do Brazil Ltda.

95.     Bruch did not disclose to the Plaintiffs that their investment monies would be commingled with monies from other GAI Funds.

96.     Further, Bruch did not disclose to Plaintiffs that he used investor monies, for various Funds' farming operations - without segregation; that he used investor monies for his own personal expenses; and the he used investor monies for financial transactions with Bruch family members.

## OFFER AND SALE OF BRUCHSIDE FUND I SECURITIES

97.     GAI's began an aggregate offer of $5 to $10 million of Bruchside Fund I securities in February 2006.  The offering reportedly ended in December 2006.

98.     GAI's power-point described Bruchside Fund I as "an international real estate and agriculture private equity investment opportunity."   The power-point stated that GAI's goal was to be "optimizing profitability" with a primary purpose "to establish and operate a profitable farming operation in Brazil…and generate excellent annual returns…"

14

99.     Bruch and Hall, as GAI partners, sold the limited partnership interests in Bruchside Fund I to Iowa residents.  Several of the Bruchside Fund I investors were farmers from the area of Emmetsburg Iowa—Bruch's hometown.  Bruchside Fund I investors were comprised, predominately, of the Bruch family's friends, neighbors and other acquaintances who trusted Bruch because of his family.

100.     The Bruchside Fund I offering goal, according to the GAI power-point, was for $5 to $10 million in limited partnership interests.

101.     In the offer and sale of the Bruchside Fund I interests, Bruch and Hall used a power-point and excel spreadsheets.  They handed out printed copies to potential purchasers.

102.     The risks Bruch and Hall disclosed were: political risk, currency fluctuation, and weather.  However, the Bruchside Fund I power-point minimized these risks by stating that: (1) Brazil was stable and pro-agriculture; (2) Brazil actively controlled currency fluctuations; and (3) temperature was never a factor because of the region's location. Among other issues, there was no discussion of weather factors other than temperature, although rain was a risk factor.

103.     The Bruchside Fund I power-point stated that GAI was currently managing its own 4,000 acre farm. However, information obtained to date indicates that the only Brazilian farm operated by Bruch was not rented land, but rather was land purchased by the Bruch family.

104.     The GAI power-point also included a reference to "current commitments" of $2.5 million of the Bruchside Fund I.  However, Defendants did not disclose what those "commitments" were, or the financial effect of the commitments.

105.     The Bruchside Fund I Amended and Restated Agreement of Limited Partnership also stated that the offering would permit the withdrawal Limited Partner; however, this document did not disclose the identity of the partner, the amount that was being paid to the

withdrawing partner or its financial impact on funds needed for farming operations when that withdrawing partner was paid.

106.     Neither GAI documents, nor representations by Bruch or Hall provided information regarding the past negative results of Bruch's Brazilian farming operations, or regarding Bruch's lack of successful farm management experience.

107.     The Bruchside Fund I power-point projected an expected return on investment of 25% to 40%.

108.     Thirteen investors invested a total of $1.3 million in the Bruchside Fund I offering between February 2006 and December 2006.  Plaintiff investors invested a total of $625,000.

109.     Cost and profit calculation were based upon an offering that would raise between $5-$10 million.

110.     In total disregard for the representations made to Plaintiffs and other investors, Bruch began farming operation in Brazil, using investors' funds with limited capital, despite the fact that only $1.3 million had been raised.

111.     The Defendants continued to project high profits without a basis for such projections after the Bruchside Fund I offering was completed.  In a letter dated February 19, 2007, prior to harvest, Hall projected a 40% profit on investor Plaintiffs' Bruchside Fund I investments.

112.     In June 2006, Bruch stated that he was confident that investors would see a projected return of profits of 25% to 40% despite the fact that, at that time, there had been no accounting for the expenses of the farming operations funded by Bruchside Fund I.

113.     In September 2007, the Defendants paid Bruchside Fund I investors what they represented to be a 40% return of profit on their investments.  In 2008, the Defendants paid

16

Bruchside Fund I, what Defendants represented to be 25% of a 24% return of profit to be paid to them by Bruchside Fund I.  After 2008, however, Bruchside Fund I investors were not paid any returns and Bruchside Fund I investors' principal was not returned.

<u>OFFER AND SALE BRUCHSIDE FUND II SECURITIES</u>

114.    Before, during and after the crop harvest from farming operations funded by investments in Bruchside Fund I, Hall and Bruch raised funds for a second GAI fund - Bruchside Fund II.

115.    The harvest was in April 2007, but the Bruchside Fund II offering began in February 2007 and ended in December 2007.

116.    In a letter dated February 19, 2007, Hall enticed investors to invest in Bruchside Fund II by projecting a 40% profit in Bruchside Fund I.  Even prior to the 2007 spring harvest, Hall asked for Bruchside Fund I investors to invest in Bruchside Fund II.  Hall also flew to Iowa to assist Bruch in the sale of the interests in Bruchside Fund II.

117.    The majority of the limited partnership interests in the Bruchside Fund II were sold to Bruchside Fund I investors or to Bruchside Fund I investors' families, friends and associates.

118.    The Bruchside Fund II power-point stated that the amount of investment which the fund "needed" was $2.8 million.

119.    As with Bruchside Fund I, the projected return of profits on investment for Bruchside Fund II was 40%.  Most of the investors in Bruchside Fund II invested because of the projections or the payment of the 40% Returns to Bruchside Fund I investors.

120.    The Bruchside Fund II power-point also stated that Bruchside Fund II had the possibility of an additional 10% profit which would result in a 50% annual payout. This was based on the stated expectation of capital costs decreasing by $425,000.

121.    Defendants did not disclose to potential Bruchside Fund II investors that GAI regularly placed investor's funds in GAI's bank account and that GAI regularly moved assets as a loan to GAI Brazil.

122.    Defendants did not disclose to potential Bruchside Fund II investors that GAI, rather than the Bruchside Fund II, owned the assets, particularly the farming equipment, that were purchased with funds invested in Bruchside Fund II.

123.    Total investments in the Bruchside Fund II were $5,819,475; four times the amount raised for the Bruchside Fund I. Plaintiff investors invested a total of $2,619,750 in Bruchside Fund II.

124.    In the fall of 2008, Bruchside Fund II investors were told that the total "payout" of profit would be 25%. At that time, Bruchside Fund II investors were paid a 5% return on investment with the understanding that the remainder would be paid by December 30. Defendants never made these additional payments.

125.    At the time that returns were being paid on Bruchside Fund I and Bruchside Fund II, the Defendants were actively soliciting investor for other GAI Funds. In fact when Bruch and Hall promised the 25% return, they were conducting an offering of Bruchside Fund III. Bruch and Halls' promised 25% return enticed investors to invest in Bruchside Fund III.

## OFFER AND SALE OF GAI COTTON GIN SECURITIES

126.    In 2007 and 2008, the Defendants offered promissory notes for the Cotton Gin Investments, L.P. which were to pay 15% annually beginning on October 1, 2007. The offering

18

continued with the last sale in July 2008. Total investments were $1,045,000. Plaintiffs' investments totaled $195,000.

127.    Defendants represented that the promissory notes were issued to purchase a cotton gin, in Brazil, for ginning cotton raised by GAI's farming operations.

128.    This offering occurred during the same time period that GAI was raising money for Bruchside Fund II and Bruchside Fund III.

OFFER AND SALE OF BRUCHSIDE FUND III SECURITIES

129.    Bruch and Hall began offering and selling Bruchside Fund III securities in 2008.

130.    The offering began in April 2008 and reportedly ended in December 2008. However, three investors wired monies into funds in January 2009.

131.    Bruchside Fund III's total investments amounted to $9,574,500, more than twice that in Bruchside Fund II.

132.    Plaintiff investors invested a total of $2,975,000 in the Bruchside Fund III.

133.    In the fall of 2008, Hall and Bruch offered Bruchside Fund III securities to Bruchside Fund II investors.

134.    At the time that the Defendants were offering securties in Bruchside Fund III, Hall and Bruch were enticing investors by stating that Bruchside Fund II was going to pay a 40% return on investment.

135.    Soon after the 40% profit projection, Bruchside Fund II investors received a portion of a 25% return. Defendants represented that each investor would received the remainder of their payment at a later date. After this payment, numerous investors invested in Bruchside Fund III, as did their acquaintances who were also enticed by the profit payments.

19

136.     Defendants told investors in Bruchside Fund III that their investment would not only provide a return on operations, but would also give them an interest in the cotton gin because some of their money would be used to purchase the gin.

137.     Defendants represented that approximately 20% of the funds raised from the Bruchside Fund III would be invested in the Cotton Gin Investment Fund.

138.     Defendants did not disclose GAI's regular practice of commingling investor funds, integration of farming operations, or GAI ownership of assets.

OFFER AND SALE OF GLOBAL AG BIODIESEL SECURITIES

139.     The Defendants offered and sold interests of Global Ag Biodiesel in the fall of 2007.

140.     The Defendants represented that they planned to get all approvals from Brazil and then to sell their Biodiesel company.

141.     The Defendants represented that investors's prinicipal would be returned in two years and that investors would ultimately received double the money invested as a return on their investment.

142.     Plaintiffs invested because of the returns promised.  They believed that they would be paid those returns because of the 40% return paid to Bruchside Fund I investors in 2007.

143.     Plaintiffs who did not sign documents before investing were not provided with subscription agreements.

144.     Defendants represented that land was purchased in a Brazilian industrial park for biodiesel operations; however, Defendants never began a biodiesel operation.

145.     Plaintiff investors invested a total of $175,000 in Global Ag Biodiesel Fund.

146.    Contrary to Defendants representations, not only have investors not received any returns of profit from their investments; Defendants have failed to return each investor's principal.

<u>OFFER AND SALE OF BOL, LLC SECURITIES</u>

147.    Defendants sold BOL, LLC's promissory notes to investors in 2009.  Total investments were amount to $750,000.  Defendants represented that BOL, LLC's notes would pay 18% annually.  Plaintiffs' investments in BOL, LLC totaled $540,000.

148.    GAI Fund investors provided the investor base for BOL, LLC investments.

149.    Bruch told BOL, LLC investors that he needed cash in order to be profitable and then promised cash paying investors priority on the profits he obtained.

150.    Plaintiffs who invested in BOL, LLC have not received any returns or a return of principal.

<u>PROMISE AND PAYMENT OF RETURNS "FROM PROFITS"<br>BRUCHSIDE FUND I "RETURN"</u>

151.     Bruchside Fund I's original investors were induced to invest by Defendants' representations that the fund would provide returns of 25% to 40% annually.

152.    Defendants told investors in Bruchside Fund I to expect a high returns from the first year of Brazilian farming operations and for four years thereafter before their principal was to be returned.

153.    The first of Bruch's crops—for Bruchside Fund I—was to be harvested in the spring of 2007.  In a February 19, 2007 letter, before the harvest, Hall stated "…we are estimating a 36% or more return on your investment this year."

154.    Bruchside Fund I investors were paid 40% returns on their investment which Defendants represented as profits from the farming operations in Brazil.  Plaintiffs who invested

21

in the GAI funds following Bruchside Fund I have stated that they invested because of this return received by early investors.

155.    On August 19, 2007, Bruch wrote investors and informed them that the payout for Bruchside Fund I was going to be 40%.  He said: "Our first year success has been above expectations and as long as we can continue to produce good crops our success should continue for the next several years."

156.    By the end of August 2007, while projecting high profits for Bruchside Fund I, Bruch and Hall had raised $2.5 million for Bruchside Fund II - predominantly from prior investors and their contacts.   In August, alone, Bruch and Hall raised $1.4 million.

157.    On September 15, 2007, Bruch and Hall kept their promise of a 40% return.  GAI paid Bruchside Fund I investors a 40% return on their investments.

158.    As a result of the 40% return, potential investors invested an additional $4.4 million in Bruchside Fund II.  This amount is almost three times the amount the Defendants had raised for Bruchside Fund I.

159.    In a September 19, 2007 letter, Bruch stated: "I hope that you feel, as I do, that 40% ROI (rate of income) is a good rate of return.  I hope it is the first of many and that is the smallest one you will see."  Bruch wrote the September 19, 2007 letter to investors after the 40% "return" was paid, but without any review or report of the accurate financial condition of Bruchside Fund I.

<u>BRUCHSIDE FUND II'S "RETURN" OF 25% BUT 5% PAID</u>

160.    Defendants told Bruchside Fund II investors, in the fall of 2008, that investors in the fund would receive a 25% return on their investment.

161. The power-point for Bruchside Fund II also projected return on investment of 40%. In the fall of 2008, Bruch informed investors that Bruchside Fund II would be paying a 25% return on investment.

162. After being promised a 25% expected profit payment, and, in some cases, receiving 20% of that payment, investors invested in Bruchside Fund III.

163. One year after the 40% return was paid to Bruchside Fund I investors, a payment was made to Bruchside II investors. Bruchside II investors received a portion of the projected 25% return that they were promised.

164. Investors have indicated that GAI's promise, and their payment of the 40% return on investment in the first GAI Fund, Bruchside Fund I, was the main reason for their investing in Bruchside II, and later, in other GAI securities offerings.

<u>PONZI SCHEME - SOURCE OF PROFITS PAID AS RETURNS BRUCHSIDE FUND I</u>

165. Bruchside Fund I paid the 40% profit, one month after Bruch and Hall raised $1.4 million for Bruchside Fund II. Although Defendants represented that the $520,000 paid to Bruchside Fund I investors was a return on their investment, Defendants had not completed an accounting for the expense of crop production.

166. Those payments that Defendants claimed to be returns from Bruchside Fund I were actually monies from the investments made by Bruchside Fund II investors.

167. Investors have indicated that Defendants' promises, and Defendants' payment of the 40% return on investment in the first GAI fund, Bruchside Fund I, was the main reason for their investing in Bruchside II, and later, in other GAI securities offerings.

23

168.     The limited accounting review conducted by Price Waterhouse in 2009 indicates that year 2007 began with a deficit which indicates that Bruchside Fund I, in 2006, had an operating loss and, therefore, no profits were available to investors.

169.     At least one source of the funds for the returns paid on investment in Bruchside Fund II were the monies invested in Bruchside Fund II.

BRUCHSIDE FUND II

170.     GAI partners projected a return on investment of 27% to 40% from an investment in Bruchside Fund II.

171.     GAI's promise, and partial payment of a 25% return to Bruchside Fund II investors, was a reason for investor Plaintiffs' investment in Bruchside Fund III.

172.     The limited accounting review conducted by Price Waterhouse, in 2009, indicates that 2007 began with a deficit which indicates that the Bruchside Fund I, in 2006, had an operating loss and, therefore, no profits available for payment to investors.

173.     Payment of returns on Bruchside Fund II were made from investments in Bruchside Fund III.

**PLAINTIFF INVESTORS - REPRESENTATIONS,
RELIANCE, INVESTMENT AND LOSS**

DEAN AND DON BUESING

174.     Dean Buesing and Don Buesing (the "**Buesings**") are brothers.  They invested in Bruchside Fund III and BOL, LLC in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, and segregation and ownership of Fund assets.

24

Bruchside Fund III

175.    Together, the Buesings invested $500,000 in Bruchside Fund III in April 2008.

176.    The Buesings decided to invest in Bruchside Fund III after they heard from an investor, during a meeting of about 20 investors in a café in Hankcock, MN on or about March 2008, that Bruchside Fund I and Bruchside Fund II paid high returns.

177.    During that meeting, the Buesings learned that Bruchside Fund I had paid a 40% return and Bruchside Fund II was expected to pay a 25% return.

178.    In April 2008, the Buesings received their prescription agreements from GAI.

179.    Defendants represented that Bruchside Fund I had paid a 40% return and Bruchside Fund II was expected to pay a 25% return.

180.    Defendants told the Buesings that each GAI Fund had its own real and personal property (i.e. land and farming equipment) and bank accounts.

181.    Defendants also told the Buesings that 20% of their investment would be applied to purchase a cotton gin machine for which they would be part owners.

182.    The Buesings never received any audited financial information to support any of the investment accountings for Bruchside Funds I, II or II.

BOL, LLC.

183.    Together, the Buesings invested $500,000 in BOL, LLC., in December of 2009.

184.    The Buesings invested because Defendants to them that they would receive an 18% return.  Defendants also told the Buesings that BOL, LLC., needed to raise three to four million dollars.

185.    Defendants told the Buesings that there was security for the loan which was the crops, and that payment for their BOL investment would have a priority over payments to the other GAI Fund investors.

186.    Defendants told the Buesings that they would receive their first BOL, LLC, interest payment no later than December 30, 2010.  They did not sign any paperwork prior to investing in BOL Fund I.

187.    The Buesings relied on Bruch's promise that they would receive high returns.

188.    The Buesings have not received any returns on their investment in BOL, LLC or a return of the principal.

## DOUGLAS G. FINSTROM

### Bruchside Fund III

189.    Finstrom invested $100,000 in Bruchside Fund III in April 2008.

190.    Finstrom invested in Bruchside Fund III after attending a meeting of investors near Hancock, MN, in February or March 2008, where he learned that Bruchside Fund I had paid a 40% Return on investments.

191.    Defendants never provided Finstrom with audited financial statements.

192.    Finstrom repeatedly asked to review financial statements, but he never received them.  Rather, Defendants told him that there would be future quarterly and annual financial statements.

193.    Defendants represented to Finstrom that Bruchside Fund III would own the crop in which the fund invested; but he was not told that some of his investment would be used to purchase a cotton gin.

26

194.    Defendants never told Finstrom that GAI regularly commingled investor funds across GAI funds.

195.    In June 2009, Defendants told Finstrom that his investment had been changed from equity to a loan.  Defendants never told Finstrom, prior to June 2009, that his investment was involuntarily changed from an equity interest to a loan.

196.    Finstrom invested with GAI Funds in reliance on Defendants representations regarding Bruchside Fund I Returns; Defendants promises of returns for Bruchside Fund III; and Defendants promises regarding financial statements.

197.    Finstrom never received any return on his investment or a return of his principal.

## CHRISTIAN FISHER

198.    Fisher invested in Bruchside Fund I and II in reliance on representations regarding: past or expected farming successes of Bruch in Brazil, expected  returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets.

Bruchside Fund I

199.    Fisher invested $75,000 in Bruchside Fund I in March 2006.

200.    Fisher invested because Defendants represented that the offering for Bruchside Fund I was large - $5 to $10 million for farming operations on a farm covering 5,000 hectares (2,000 acres).

201.    Fisher also invested because documents that Defendants provided to Fisher projected return of 36% to 40%.

202.    Fisher relied on the fact that RSM McGladrey was Bruchside Fund I's public accountant and the fact that McGladrey had experience with U.S. agricultural companies in Brazil.

203.    Defendants also represented that they had a Brazilian account, Ciel Accounting, who provides accounting services to numerous other American individual and fund investors in agriculture.

204.    Defendants further represented that Art Hall, as the domestic attorney, and Josue Campos, as their foreign attorney, represented over 145 foreign and domestic farm and business clients.

205.    Defendants never told Fisher that they would begin farming operations in Brazil after raising only $1.3 million rather than the full $5-$10 million that they had represented. Fisher invested in reliance on the fact that farming operations would not begin until the $5-$10 million offering amount had been achieved.

206.    In September 2007, Fisher received a 40% return on his investment -- $34,206. Prior to investing, Defendants represented, that returns would be non-taxable as a return **of** his investment. However, when Fisher received the 40% Return, he was told it was a return **on** his investment.

Bruchside Fund II

207.    Fisher invested $131,000 in Bruchside Fund II, through three wire transfers beginning in April 2007.

208.    Fisher invested after receiving a letter from Art Hall that projected a 40% Return on Fisher's Bruchside Fund I investment. The letter asked for investment in Bruchside Fund II.

209.     In October 2008, Defendants told Fisher that he would receive a 22.43% return on his investment but instead received 25% of that promised return - $6,035.

210.     Fisher has not receive any additional returns since he received the $6,035 payment.

211.     Defendants never told Fisher investment monies from the respective GAI Funds would be commingled until a meeting in late 2008 nearly two years after his initial investment.

212.     Fisher lost his principal and the use of monies he invested.

<u>FOUR WAY FARMS, LLC</u>

213.     Terry Schechinger, Randy Halbur, Dale Schechinger, and Dan Schechinger, through Four Way Farms, invested in Bruchside Fund II and Bruchside Fund III in reliance on representations regarding: prior success or expected success of farming in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, and the segregation of Fund operations and ownership of assets.

<u>Bruchside Fund II</u>

214.     Four Way Farms invested $150,000 in the Bruchside Fund II in November 2007.

215.     Four Way Farms invested after learning that Bruchside Fund I paid investors 40% returns.

216.     Four Way Farms relied on Defendants' representations in the Bruchside Fund II booklet statement that the Fund would pay 25% to 40% returns on their investment.

217.     Defendants told Four Way Farms that they would receive 25% to 40% for five years and then their principal would be repaid.

218.     In 2008, Defendants told Four Way Farms that they would receive a $27,000 return for their investment in Bruchside Fund II.

219.     Defendants told Four Way Farms that they would receive quarterly financials and a yearly audit.

220.     Defendants told Four Way Farms that every GAI Fund would be segregated and have its own administration fees.

221.     Four Way Farms received $6,911 in October 2008 as a return on their investment in Bruchside Fund II.

222.     Defendants represented that this was 25% of a 24% return.  Further, Defendants represented that Four Way Farms would receive the remainder of their 24% return by December 2008.  However, Four Way Farms, has not received any further returns on their Bruchside Fund II investment.

Bruchside Fund III

223.     Four Way Farms invested $50,000 in Bruchside Fund III in May 2008.

224.     Four Way Farms invested in Bruchside Fund III in May 2008 Defendants represented that Four Way Farm would receive 20% returns and the money would be used to purchase a cotton gin.

225.     Four Way never received a return on their Bruchside Fund III investment.

SUSAN GUGE

226.     Guge invested in Bruchside Fund III in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on GAI investments, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets.

Bruchside Fund III

227.     Guge invested $100,000 in the Bruchside Fund III on or about July 21, 2008.

30

228.     Guge invested after learning about the high Returns that Defendants paid investors in Bruchside Fund I..

229.     Defendants provided Guge with documents which represented that part of the money she invested would be used to purchase a cotton gin and that she would receive income from the gin.

230.     Defendants also represented that she would receive a 40% return on her investment in Bruchside Fund III.

231.     Defendants represented that Guge would have a priority payment of 15% interest because of Bruchside Fund III's investment in the gin.

232.     Defendants never told Guge that GAI regularly commingled investor's money across GAI Funds.

233.     Guge never received any return on her investment in Bruchside Fund III or the return of the principal she invested.

WALLY AND JODI HELGET

Bruchside Fund III

234.     The Helgets invested $50,000 in the Bruchside Fund III in April 2008 in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets.

235.     The Helgets invested because after learning that GAI Funds had paid high returns.

236.     Documents that the Defendants provided to the Helgets represented high returns of 20% to 40% for five years.  Those documents also represented that the Helgets would be paid back their principal after five years.

31

237.     Defendants told to the Helgets that each GAI Fund would be segregated and have its own management fee.  Defendants never told the Helgets that investment monies from the respective funds would be commingled.

238.     Defendants told the Helgets that GAI would manage the Bruchside Fund III, but the Fund would own its crops and equipment.

239.     Defendants told the Helgets that they would get quarterly statements and annual audited reports but have never received them.

240.     The Helgets have never received any income or the return of their capital.

## J.R. FARMS, INC.

241.     Rich and Julie Elberts (the "Elberts"), through J.R. Farms, invested in Bruchside Fund I and Bruchside Fund II in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets.

### Bruchside Fund I

242.     The Elberts invested in a total of $25,000 in Bruchside Fund I.

243.     The Elberts invested because Defendants told them that the return on their investment would be from 40% to 60%.

244.     Defendants told the Elberts that each fund was separate because the assets of each fund were supposed to be liquidated after five years.

245.     Defendants also told the Elberts that each fund would have separate management fees.

246.     Defendants told the Elberts that they would be provided with quarterly financials and a yearly audit.

247.     The Elberts received a 40% return on their investment in Bruchside Fund I ($10,000) in September of 2007.  They received an additional return of $1,401.88 on Bruchside Fund I in October 2008.

Bruchside Fund II

248.     The Elberts invested twice in Bruchside Fund II.  They first invested $18,750 in April 2007 and they invested $17,000 in September 2007.

249.     Defendants' representations regarding promised returns induced the Elberts to make their first investment.  The Elberts made second investment after receiving what Defendants represented to be a 40% return on their Bruchside Fund I investment.

250.     In a letter dated October 3, 2008, Defendants told the Elberts that they would receive a 22.43% return on their Bruchside Fund II investment.  Instead, the Elberts received $1,401.88 - only a portion of what Defendants had promised.  Defendants told the Elberts that the remainder of their 22.43% return would be paid at a later date, but the Elberts have never received it.

251.     The Elberts lost their principal and the use of the monies they invested in the GAI Funds.

DENNIS AND KAREN KASPARBAUER

252.     The Kasparbauers, through the Dennis and Karen Kasparbauer Trust, invested in the Bruchside Fund I, the Bruchside Fund II, the Bruchside Fund III and the GAI Cotton Gin Fund in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements,

33

segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets.

Bruchside Fund I

253.    The Kasparbauers invested $100,000 in the Bruchside Fund I in March 2006.

254.    The Kasparbauers invested because of the high return that Defendants represented they would receive from their investment.  Defendants told the Kasparbauers that they would receive 40% to 60% return on their investment for five years and then they would be repaid their principal.

255.    Defendants told the Kasparbauers that they would receive quarterly financials and a yearly audit.

256.    Defendants told the Kasparbauers that all aspects of the respective GAI Funds would be segregated.

257.    Defendants told the Kasparbauers that the return for Bruchside Fund I was not taxable until the return was more than the amount they had invested.

258.    Defendants told the Kasparbauers that GAI would manage the GAI Funds but that the each GAI Fund would own the crops and equipment for the Fund.

259.    The Kasparbauers received $40,000 as a Return on their investment in Bruchside Fund I in September 2007.

260.    In October 2008, they received $5,608 which they were told was 25% of a 22.43% return.  Defendants represented that the Kasparbauers would be receive the remainder of their 22.43% return by December 2008.

261.    The Kasparbauers have not received the remainder of their 22.43% return.

34

<u>Bruchside Fund II</u>

262.    The Kasparbauers invested $100,000 in the Bruchside Fund II in May and August 2007.

263.    The Kasparbauers invested in Bruchside Fund II because of the returns on investment that Defendants had promised for their investment in Bruchside Fund I.

264.    The Kasparbauers received $4,608 which was 25% of the 24% return they were to receive that year.

265.    Defendant represented that the Kasparbauers would be paid the remainder of their 25% return in December 2008.

266.    The Kasparbauers have not received the remainder of the 25% return.

<u>Bruchside Fund III</u>

267.    The Kasparbauers invested $125,000 in Bruchside Fund III in April 2008.

268.    The Kasparbauers invested in Bruchside Fund III because of the 40% Return they received on their Bruchside Fund I investment

<u>GAI Cotton Gin Fund</u>

269.    The Kasparbauers invested $10,000 in the GAI Cotton Gin Fund in November 2007.

270.    The Kasparbauers invested in the GAI Cotton Gin Fund because of the 40% Return they received from their investment in Bruchside Fund I.

271.    Defendants told the Kasparbauers that they would own part of the cotton gin purchased with their investment monies and that they would receive 18% per year in income.

272.    In January 2009, the Kasparbauers received $1,543 as an interest payment on their investment in the GAI Cotton Gin Fund.

273.    The Kasparbauers not received any additional returns on their investment or the return of their principal.

## CRAIG AND DEBORAH KASSEL

274.    Craig and Deborah Kassel invested in Bruchside Fund I, II, and III, through Kassel Farms, Inc. and Great Oaks Farms, Inc., in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations and ownership of assets, and taxation of returns.

Bruchside Fund I

275.    Craig and Deborah Kassel invested $250,000 in Bruchside Fund I because Defendants represented that they would receive 40% to 60% returns each September after the harvest.

276.    Craig and Deborah Kassel invested because Defendants told them that they would receive high returns for five years, that the Fund would close in five years, and that, after the five years, they would be repaid their principal.

277.    Craig and Deborah Kassel also invested because Defendants told them that they would receive quarterly financials and a yearly audit for the Fund.

278.    Defendants told Craig and Deborah Kassel that the returns they would receive would not be taxable until the amount of their return was more than the amount of their original investment.

279.    Defendants told Craig and Deborah Kassel that each Fund would own its crops and equipment.

36

280.     Craig and Deborah Kassel received a 40% return on their investment ($100,000) in October of 2007.

281.     Craig and Deborah Kassel also received $14,019 on the Bruchside Fund I investment in 2008.  They were told that this payment was only 25% of the 22.43%.  Defendant had promised that Craig and Deborah Kassel would receive then entire 22.43% by December 31, 2008.  Craig and Deborah Kassel have not receive the remainder of this promised return.

282.     Craig and Deborah Kassel have not received any income from their investment since 2008, nor have they been repaid their principal.

Bruchside Fund II

283.     Craig and Deborah Kassel invested a total of $550,000 in the Bruchside Fund II.

284.     Craig and Deborah Kassel invested in Bruchside Fund II because Defendants promised and Craig and Deborah Kassel had received a 40% return on their investment in Bruchside Fund I.  Defendants told Craig and Deborah Kassel that they would receive the same return on Bruchside Fund II as they had received from Bruchside Fund I.

285.     Defendants told Craig and Deborah Kassel that each Fund would be segregated from others and have its own administration fee.  Defendants did not tell Craig and Deborah Kassel, before they invested, that the monies invested in the respective GAI Funds had been or would be commingled.

286.     Craig and Deborah Kassel received $25,341 from their investment in Bruchside Fund II in October of 2008 which was represented to be 25% of the return they would receive.  They never received a further return on this investment.

Bruchside Fund III

287.     Craig and Deborah Kassel invested $600,000 in Bruchside Fund III in April 2008.

37

288.    Craig and Deborah Kassel invested in Bruchside Fund III because of the returns that they had received from, or the returns that Defendant promised that they would received from, Bruchside Fund I and Bruchside Fund II.

289.    Craig and Deborah Kassel have not received returns on any investment since October 2008, nor have they received a return of their principal.

## GEORGIA KASSEL

290.    Kassel invested in Bruchside Fund II and Bruchside Fund III in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets, and taxation of returns.

### Bruchside Fund II

291.    Kassel invested $50,000 in Bruchside Fund II in October 2007.

292.    Kassel invested because the documents that Defendants provided to her represented that Bruchside Fund I had paid investors high Returns.

293.    Defendants also represented that she would receive the same return on her investment in Bruchside Fund II as received by investors in Bruchside Fund I.

294.    Defendants told Kassel that she would receive a 40% return for five years and then, after five years, her principal investment would be returned.

295.    Kassel invested because Defendants told her that she would receive quarterly financial statements and a yearly audit.

296.     Defendants told Kassel that they would segregate the investment monies and assets for each GAI Fund.  Defendants never told Kassel that they would commingle or had been commingling investment monies and assets from each GAI Fund.

297.     Kassel's Bruchside Fund II investment paid a return of $2,304 in October 2008. Defendants told her that this amount was 25% of a 24% return.  Defendants promised that she would receive the balance of the 24% return by December 2008.

298.     Kassel has not received the balance of the Bruchside Fund II return.

Bruchside Fund III

299.     Kassel invested $160,000 in Bruchside Fund III in September 2008.

300.     Kassel invested in Bruchside Fund III because the documents that Defendants provided to her represented high returns for Bruchside Fund I investors and Bruchside Fund II investors.

301.     Kassel also invested because Defendants told her that she would receive a 20% to 40% return on her investment for five years, and that payments would begin in September 2009.

302.     Defendants told Kassel that her principal would be returned in five years.

303.     Kassel has never received any return on her investment in Bruchside Fund III.

304.     Kassel has not been repaid the principal on her investments in Bruchside Fund II or Bruchside Fund III and has not received a return on any GAI investment since October 2008.

PATRICK KIBBIE, JIM KIBBIE AND JOHN KIBBIE

305.     The Kibbies invested in GAI Funds together and separately in reliance on representations regarding: prior success or expected success of farming in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, and the segregation of Fund operations and ownership of assets.

39

306.    The Kibbies made their investments after learning about returns that investors had

been paid and based on the returns Defendants promised from Bruchside Fund II and Bruchside

Fund III.

Bruchside Fund II

307.    The Kibbies, collectively, invested $100,000 in the Bruchside Fund II in June

2007 after an investor meeting they attended that month.  At the meeting, Tyler represented that

the 2005-2006 crop had been great.

308.    The Kibbies invested because Defendant told them that Bruchside Fund I had

made a 60% profit the first year and would be receiving a return of 40% only because some

moines were being reinvested in the company.

309.    Defendants told the Kibbies that their return on Bruchside Fund II would be 25%

and 40%.  Further, Defendants told the Kibbies that they would receive such 20% to 40% returns

on their investment every September for five years and, after the five years, their principal would

be returned.

310.    In October 2008, the Kibbies received $4,607, which was part of the 25% return

that Defendants promised on Bruchside Fund II.  Defendants told the Kibbies that the remainder

of the 28% return would be paid later; however, they never received any further returns from this

investment.

Bruchside Fund III

311.    The Kibbies, individually, invested $30,000 ($90,000 collectively) in the

Bruchside Fund III in May 2008.

312.    The Kibbies invested because of the Returns that Bruchside Fund I investors had

received.

313.    The Kibbies never received any returns on their investment in Bruchside Fund III.

NICK KILL

314.    Kill invested in Bruchside Fund II, Bruchside Fund III, the Cotton Gin Fund, and BOL, LLC in reliance on representations regarding: prior success or expected success of farming in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, and the segregation of Fund operations and ownership of assets.

315.    Kill made every investment based on Defendants' representations regarding the Return paid to Bruchside Fund I investors.

Bruchside Fund II

316.    Kill invested $350,000 in the Bruchside Fund II in September and October 2007.

317.    Defendants told Kill that he would receive 40% return on his investment because he would receive the same payout that Bruchside Fund I had received.

318.    Defendants told Kill that he would receive 40% for five years and then, after five years, his principal would be returned.

319.    Defendants told Kill that each Fund would be segregated.

320.    Defendants told Kill that each Fund would own its crops and equipment.

321.    Defendants told Kill that he would receive quarterly financial statements and a yearly audit.

322.    Kill received $16,126.25 in October 2008 as a return on his investment.

323.    Defendants represented this payment to be 25% of a 24% return that he would receive that year.

324.    Further, Defendants represented that the remaining return was to be paid by December of 2008.  However, he never received any further return on this investment.

41

Bruchside Fund III

325.     Kill invested $370,000 in the Bruchside Fund III in April and October 2008.

326.     Defendants told Kill that Fund III would pay 20% to 40% returns on his investment for five years with payments to begin in September 2009 after the spring harvest.

327.     Kill never received any returns on his Bruchside Fund III investment and Kill's principal has not been returned.

Cotton Gin Fund

328.     Kill invested $100,000 in the Cotton Gin Fund in November 2009.

329.     Defendants told Kill that his investment would pay annual returns of 18%.

330.     Defendants told Kill that he would be part owner of the cotton gin as an investor.

331.     Defendants told Kill that when the cotton gin was sold, his principal investment in the Cotton Gin Fund would be returned.

332.     Kill received $17,515.46 from his investment in January of 2009, but has not received any further return on his investment or a return of his principal.

BOL Fund

333.     Kill invested $30,000 in the BOL Fund I in November of 2009.

334.     Defendants told Kill that this fund would raise $3 to $4 million.

335.     Defendants told Kill that he was guaranteed an 18% return on his investment because the security was the first priority on the funds from the sale of crops.

336.     Defendants told Kill that the monies were necessary in order for other GAI Funds to be successful.

337.     Kill relied Defendants representations because Bruchside Fund I had paid investors a 40% return.

42

338.    Kill never received any interest from his investment in the BOL Fund I.

TODD LUNDRGEN

339.    Lundgren invested in the Bruchside Fund II and the GAI Cotton Gin Fund.

Bruchside Fund II

340.    Lundgren invested $50,000 in the Bruchside Fund II in June 2007.

341.    Defendants told Lundgren that Bruchside Fund II would pay a 20% to 40% annual return on investment for five years and then after five years he would be repaid his principal.

342.    Defendants told Lundgren that he would receive quarterly financial statements and a yearly audit.

343.    Defendants also told Lundgren that each Fund would be segregated and would have its separate administrative fees.

344.    Further, Defendants told Lundgren that GAI would manage the Fund, but the Fund would own the crops and equipment.

345.    Lundgren received $2,303.75 in October of 2008 which Defendant represented to be 25% of a 24% return he would receive on his investment in the Bruchside Fund II.

346.    Defendants told him that he would receive the remainder of the return by December 2008, but never received the remaining amount.

GAI Cotton Gin Fund

347.    Lundgren invested $50,000 in the Cotton Gin Fund in January 2008.

348.    Defendants told Lundgren that he would be paid 18% per year.

349.    Lundgren relied on Defendants representations for the returns that Bruchside Fund I had paid its investors.

43

350.     Defendants told Lundgren that he would be part owner of the gin machine and that when the cotton gin was liquidated, his principal would be returned.

351.     Lundgren's Cotton Gin Fund investment paid $6,882.65 in January 2009, but he has not received any further interest on his investment or a return of his principal.

### EDWARD G. NOONAN & JOSEPH NOONAN

352.     The Noonans invested in Bruchside Fund II and in Bruchside Fund III in reliance on representations regarding: prior success or expected success of farming in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, and the segregation of Fund operations and ownership of assets.

Bruchside Fund II

353.     The Noonans invested $200,000 in the Bruchside Fund II in July 2007.

354.     The Noonans invested because after they learned about the expected returns for Bruchside Fund I.

355.     Defendants told the Noonans that they would receive a 40% return for five years and that at the close of the five year period their principal would be returned.

356.     Defendants told the Noonans that each Fund would be segregated and have its own administration fees.

357.     Defendants told the Noonans that each Fund would own its crops and equipment.

358.     The Noonans, individually, received $4,607.50 from their investments in Bruchside Fund II.  Defendants represented that this payment was 25% of a 24% investment in Bruchside Fund II.

359.     Defendants told the Noonans that they would be paid the remainder of the funds in December 2008.  However, they never received the rest of the return they were promised.

44

Bruchside Fund III

360. The Noonans invested $100,000 in Bruchside Fund III in April 2008.

361. Defendants told the Noonans that they would receive 20% to 40% returns on their investment for five years which would begin in September 2009 and, after five years, their principal would be returned to them.

362. The Noonans invested in Bruchside Fund III after learning about the returns that Bruchside Fund I paid its investors.

363. Defendants told the Noonans that they would receive an annual audit and quarterly financial statements.

364. Defendants told the Noonans that the Funds would be segregated and that each Fund would pay a separate administration fee.

365. The Noonans never received a return on their investments in Bruchside Fund III.

JACK REICHERT

366. Reichert invested $50,000 in the Bruchside Fund II, and $25,000 in the Biodiesel Fund in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets.

Biodiesel Fund

367. Reichert invested $25,000 in the Biodiesel Fund in December 2007.

368. Reichert invested because Defendants represented that Global Ag was going to start up a biodiesel company and there was a large market for Biodiesel fuel in Brazil.

369. Defendants told Reichert that Biodiesel would "break ground" in a month.

45

370. Defendants told Reichert that he would receive his principal back in two years and that he would receive double that amount as a return on his investment.

371. Reichert did not receive his principal or a return on his investment.

Bruchside Fund II

372. Reichert invested $50,000 in Bruchside Fund II in January 2008.

373. Reichert invested because after he learned that the investors in Bruchside Fund I had received a 40% return on their investment.

374. Reichert invested because Defendants represented that he would receive a 40% return for five years and that the end of five years he would be repaid his principal.

375. Defendants represented to Reichert that the money each Fund's would be segregated and would pay separate administrative fees.

376. Defendants represented that Reichert would receive quarterly financials and a yearly audit.

377. In October 2008, Reichert received $2,304 which Defendants represented to be 25% of a 24% return from Bruchside Fund II.

378. Defendants represented that Reichert would receive the remainder of his return by December 2008. However, he never received any further return on his investment.

DENNIS SAGEZ

379. Sagez, a farmer, invested $50,000 in Bruchside Fund II in July 2007.

380. Sagez invested after the spring crop harvests in 2006 and 2007.

381. Sagez wanted to buy farmland in Brazil but Bruch convinced Sagez to invest in a GAI Fund.

46

382.    Defendants told Sagez that farming operations in Brazil for the 2006 and 2007 years had been profitable.

383.    Sagez invested because Defendants told him that Bruchside Fund I investors received a 40% profit.

384.    Defendants told Sagez he would be paid 30% to 40% returns on his investment each year for three years and that his principal would be returned in the fourth year.

385.    Defendants promised Sagez quarterly and annual audited reports.

386.    Sagez received $2,303.75 in October of 2008 which Defendants represented was a return of capital.  He had expected $24,000 as a return of his capital for the first year.

387.    Sagez has received no further funds either as a return of principal or a return on investment.

388.    Sagez has repeatedly asked for financial information but has never received any information.

389.    Defendants did not disclose to Sagez that the farming operations in Brazil were not profitable in 2006 and 2007 or that GAI regularly commingled investors' monies across GAI funds.

## HAROLD SCHROEDER

390.    Schroeder invested in the Bruchside Fund III and BOL, LLC in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets, and taxation of returns.

### Bruchside Fund III

47

391.    In April 2008, Schroeder invested $50,000 in the Bruchside Fund III.

392.    Schroeder invested after learning about the returns that Bruchside Fund I had paid its investors.

393.    Schroeder never received any return on his Bruchside Fund III investment.

BOL, LLC

394.    In November 2009, Schroeder invested $10,000 in BOL, LLC.

395.    Schroeder invested after learning about the returns that Bruchside Fund I had paid its investors.

396.    Schroeder invested because Defendants told him that he would receive an 18% annual return.

397.    Defendants told Schroeder that BOL, LLC., needed to raise three to four million dollars.

398.    Defendants also told Schroeder that crops would provide for the loan and that payment for his BOL investment would have a priority over payments to the other GAI Fund investors.

399.    Defendants told Schroeder that he would receive his first BOL interest payment no later than December 30, 2010.

400.    Schroeder has not received income on his investment in BOL, LLC.

CATHERINE TIESZEN

401.    Catherine Tieszen invested in the Bruchside Fund II and the Bruchside Fund III in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation

of Fund monies, segregation of Fund operations, segregation and ownership of assets, and taxation of returns.

Bruchside Fund II

402.    In August 2007, Catherine Tieszen invested $100,000 in the Bruchside Fund II.

403.    Catherine Tieszen is Reed Tieszen mother and Eric Tieszen's grandmother.

404.    Catherine Tieszen currently lives in a nursing home.

405.    When Catherine Tieszen invested her husband was still alive.

406.    All investment decisions and information pertaining to her investments were provided to Catherine Tieszen through her son, Reed Tieszen.

407.    Catherine Tieszen invested because Defendants represented that Bruchside Fund I had made 60% the first year and would be receiving a return of 40% only because some funds were being reinvested in the company.

408.    Catherine Tieszen invested because Defendants represented that the return on Bruchside Fund II would be between 25% and 40%.

409.    Catherine Tieszen invested because, in a letter of October 3, 2008, Defendants represented that she would receive a 22.43% return on Bruchside Fund II but, instead, she received $4,607.50.  Although Defendants promised Catherine Tieszen that they would pay her the remaining amount of the return, she has never received it.

410.    Catherine Tieszen lost her principal and the use of her funds invested in the GAI Funds.

Bruchside Fund III

411.    In April 2008, Catherine Tieszen invested $100,000 in the Bruchside Fund III.

412.    Catherine Tieszen received all of her information from her son.

49

413.   Catherine Tieszen invested because of the returns that Bruchside Fund I paid its investors.

414.   Catherine Tieszen invested because Defendants represented that she would receive high returns from Bruchside Fund II.

415.   Catherine Tieszen never received any return on her investments in Bruchside Fund III.

## CRAIG TIESZEN

416.   Craig Tieszen invested in the Bruchside Fund II and the Bruchside Fund III in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets, and taxation of returns.

### Bruchside Fund II

417.   In September 2007, Craig Tieszen invested $50,000 in the Bruchside Fund II.

418.   Craig Tieszen invested because Defendants told him that Bruchside Fund I had made 60% the first year and would be receiving a return of 40% only because some funds were being reinvested in the company.

419.   Defendants also told Craig Tieszen that the return on Bruchside Fund II would be between 25% and 40%.

420.   Defendants told Craig Tieszen that he would receive a 40% yearly return for five years and then, at the close of the five year, period his principal would be returned.

421.   In a letter dated October 3, 2008, Defendants told Craig Tieszen that he would receive a 22.43% return on Bruchside Fund II but, instead, Craig Tieszen received $2,303.75.

50

Although Defendants promised that he would receive the remaining amount of the return, he has never received it.

422.    Craig Tieszen lost his principal and the use of his funds invested in the GAI Funds.

Bruchside Fund III

423.    In April 2008, Craig Tieszen invested $15,000 in the Bruchside Fund III.

424.    Craig Tieszen invested after he learned about the returns that Bruchside Fund I paid its investors.

425.    Craig Tieszen invested because Defendants told him about the high returns that he would received from Bruchside Fund II.

426.    Craig Tieszen never received any return on his investments in Bruchside Fund III.

427.    Craig Tieszen lost his principal and the use of his funds invested in the GAI Funds.

ERIC AND AMY TIESZEN

428.    The Tieszens invested in the Bruchside Fund I and II, and the Biodiesel Fund in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets, and taxation of returns when they invested in Bruchside Fund I, II and the Biodiesel Fund.

Bruchside Fund I

429.    In April 2006, the Tieszens invested $100,000 in the Bruchside Fund I.

430.    The Tieszens invested because Defendants told them that the returns on their investment would be 25% to 40%.

51

431.     Defendants told the Tieszens that each fund was separate because the assets of each fund were supposed to be liquidated after five years and also that each fund would have separate management fees.

432.     Defendants told the Tieszens that they would be provided with quarterly financials and a yearly audit.

433.     The Tieszens received a 40% return on their investment in Bruchside Fund I, $15,000, in September of 2007.  They received a return of $5,607.50 in October of 2008 on Bruchside Fund I.

Bruchside Fund II

434.     In April and August 2007 the Tieszens invested a total of $178,000 in Bruchside Fund II.

435.     The Tieszens invested in the Bruchside Fund II because of the returns Defendants promised on their Bruchside Fund I investment.

436.     In a letter dated October 3, 2008, Defendants represented to the Tieszens that they would receive a 22.43% return on Bruchside Fund II, but, instead, the Tieszens received $8,201.35.  Although Defendants promised the Tieszens that they would receive the remaining amount of the return, they have never received it.

437.     The Tieszens lost their principal and the use of their funds invested in the GAI Funds.

Biodiesel Fund

438.     In October 2007 the Tieszens invested $100,000 in the Global Ag Biodiesel Fund.

439.     The Tieszens invested because Defendants told them that Global Ag was going to start up a biodiesel company and there was a large market for Biodiesel fuel in Brazil.

52

440.     Bruch told the Tieszens that the goal of Global Ag Biodiesel was to acquire and execute all of necessary "legal approvals, permits and documents" in Brazil so as to sell the operation to another organization.

441.     Defendants told the Tieszens were told that Biodiesel would "break ground" in a month.

442.     Defendants told the Tieszens that they would receive their principal back in two years and then they would receive double that amount as a return on their investment.

443.     The Tieszens never signed any documents prior to investing.

444.     Eric Tieszen worked for Global Ag in Brazil as an agronomist.

445.     At no time was Eric given information regarding company financials, accounting, and book keeping methods.

446.     The Tieszens have repeatedly inquired as to the status of the Biodiesel Fund and have been given no answer as to the status of the operation.

447.     The Tieszens did not receive their principal or a return on their investment and have heard that the Biodiesel operation never even broke ground.

<u>REED AND MARY TIESZEN</u>

448.     Reed and Mary Tieszen invested in the Bruchside Fund II, the Bruchside Fund III, and the Biodiesel Fund in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets, and taxation of returns.

<u>Bruchside Fund II</u>

449.     In June and August 2007 Reed and Mary Tieszen invested a total of $200,000 in the Bruchside Fund II.

450.     Reed and Mary Tieszen invested because Defendants told them that Bruchside Fund I had made 60% the first year and would be receiving a return of 40% only because some funds were being reinvested in the company.

451.     Defendants told Reed and Mary Tieszen that the return on Bruchside Fund II would be between 25% and 40%.

452.     In a letter of October 3, 2008, Defendants told Reed and Mary Tieszen that they would receive a 22.43% return on Bruchside Fund II but, instead, Reed and Mary Tieszen received $11,518.75. Although Defendants promised Reed and Mary Tieszen that they would be paid the remaining amount of the return, they have never received it.

453.     Reed and Mary Tieszen lost their principal and the use of their funds invested in the GAI Funds.

Bruchside Fund III

454.     In April 2008, Reed and Mary Tieszen invested $200,000 in the Bruchside Fund III.

455.     Reed and Mary Tieszen invested after they learned about the return that Bruchside Fund I paid its investors.

456.     Reed and Mary Tieszen invested because of the returns that Defendants represented Bruchside Fund II would pay.

457.     Reed and Mary Tieszen never received any return on their investments in Bruchside Fund III.

Biodiesel Fund

54

458.    In October 2007, Reed and Mary Tieszen invested $50,000 in the Global Ag Biodiesel Fund.

459.    Reed and Mary Tieszen invested Defendants represented that Global Ag was going to start up a biodiesel company and there was a large market for Biodiesel fuel in Brazil.

460.    Defendants told Reed and Mary Tieszen that the goal of Global Ag Biodiesel was to acquire and execute all of the necessary "legal approvals, permits and documents" in Brazil so as to sell the operation to another organization.

461.     Defendants told the Tieszens that Biodiesel would "break ground" in a month.

462.    Defendants told the Tieszens that they would receive their principal back in two years and then they would receive double that amount as a return on their investment.

463.    Reed and Mary Tieszen never signed any documents prior to investing.

464.    Reed and Mary Tieszen have heard from their son, who worked for Bruch, that the Biodiesel Fund owns property in Brazil.

465.    Reed and Mary Tieszen have repeatedly inquired as to the status of the Biodiesel Fund and have not been given any answer regarding the status of the operation.

466.    Reed and Mary Tieszen have not received their principal or a return on their investment.

## DEAN AND AMY VER MULM

467.    Dean and Amy Ver Mulm invested in Bruchside Fund I and Bruchside Fund II in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets, and taxation of returns.

55

Bruchside Fund I

468.    In March 2006, Dean and Amy Ver Mulm invested $75,000 in the Bruchside Fund I.

469.    Dean and Amy Ver Mulm invested because Defendants told them that the return on their investment would be 40% to 60%.

470.    Defendants told Dean and Amy Ver Mulm that each fund was separate because the assets of each fund were supposed to be liquidated after five years and also that each fund would have separate management fees.

471.    Defendants also told Dean and Amy Ver Mulm that they would be provided with quarterly financials and a yearly audit.

472.    Dean and Amy Ver Mulm received a 40% return on their investment in Bruchside Fund I, $30,000, in September of 2007.  They received a return of $5,607.50 in October of 2008 on Bruchside Fund I.

Bruchside Fund II

473.    In April, August, and September 2007 the Dean and Amy Ver Mulm invested a total $125,000 in the Bruchside Fund II.

474.    Dean and Amy Ver Mulm invested in the Bruchside Fund II because Defendants promised certain returns on their Bruchside Fund I investment.

475.    They invested the third time in Bruchside Fund II because they had received the 40% return on their Bruchside Fund I investment.

476.    In a letter dated October 3, 2008, Defendants told Dean and Amy Ver Mulm that they would receive a 22.43% return on Bruchside Fund II but, instead, Dean and Amy Ver Mulm

56

received $5,607.50. Although Defendants promised Dean and Amy Ver Mulm that they would

pay the remaining amount of the return, Dean and Amy Ver Mulm have never received it.

477. Dean and Amy Ver Mulm lost their principal and the use of their funds invested

in the GAI Funds.

PETER VER MULM

478. Peter Ver Mulm invested in the Bruchside Fund II, the Bruchside Fund III, and

the Cotton Gin Fund in reliance on representations regarding: prior or expected farming

successes of Bruch in Brazil, expected or received returns on investment, promised receipt of

financial statements, segregation of Fund monies, segregation of Fund operations, segregation

and ownership of assets, and taxation of returns when he invested in Bruchside Fund II, III and

the Cotton Gin Fund.

Bruchside Fund II

479. In October 2007 Peter Ver Mulm invested $50,000 in the Bruchside Fund II.

480. Defendants did not provide Peter Ver Mulm with any documents prior to

investing.

481. Peter Ver Mulm relied on his son, Dean Ver Mulm, for information.

482. Peter Ver Mulm never signed any documentation before investing in the

Bruchside Fund II.

483. Defendants represented that Peter Ver Mulm would receive the same return on his

investment as his son, Dean Ver Mulm, had received from Fund I.

484. Defendants represented that Peter Ver Mulm would receive a 40% yearly return

for five years and then at the close of the five year period his principal would be returned.

57

485.    Defendants represented that Peter Ver Mulm would receive a 22.43% return on Bruchside Fund II in a letter of October 3, 2008, but instead received $2,304.00 Although he was promised the remaining amount of the return, he has never received it.

486.    Peter Ver Mulm lost his principal and the use of his funds invested in the GAI Funds.

Bruchside Fund III

487.    In April 2008 Peter Ver Mulm invested $15,000 in the Bruchside Fund III.

488.    Peter Ver Mulm invested after learning about the returns that Bruchside Fund I paid its investors.

489.    Peter Ver Mulm invested because Defendants projected and represented that he would receive high returns from Bruchside Fund II.

490.    Peter Ver Mulm never received any return on his investments in Bruchside Fund III.

491.    Peter Ver Mulm lost his principal and the use of his funds invested in the GAI Funds.

GAI Cotton Gin Fund

492.    In December 2007, Peter Ver Mulm invested $30,000 in the GAI Cotton Gin Fund.

493.    Peter Ver Mulm invested in the Gin Fund only months after his son received his 40% return from the Bruchside Fund I.

494.    Defendants represented that Peter Ver Mulm would own part of the cotton gin and that he would receive 18% per year in income.

58

495.     In January 2009, Peter Ver Mulm received $4,692 as an interest payment on his investment in the GAI Cotton Gin Fund.

496.     Since January of 2009 Peter Ver Mulm has received no further interest payment for his investment in the GAI Cotton Gin Fund.

## GEORGE AND LINDA WEBER

497.     George and Linda Weber (the "Webers"), as Weber Family Farm Investments invested in the Bruchside Fund II, and the Bruchside Fund III in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund monies, segregation of Fund operations, segregation and ownership of assets, and taxation of returns.

Bruchside Fund II

498.     In September 2007, the Webers invested $100,000 in the Bruchside Fund II.

499.     The Webers received all of their information from their son-in-law who worked for Bruch.

500.     The Webers invested based on representations by Defendants that Bruchside Fund I had made 60% the first year and would be receiving a return of 40% only because some funds were being reinvested in the company.

501.     Defendants represented that the return on Bruchside Fund II would be between 25% and 40%.

502.     In a letter of October 3, 2008, Defendants represented that the Webers would receive a 22.43% return on Bruchside Fund II but, instead, the Webers received $4,607.50. Although Defendants promised the Webers that they would received the remaining amount of the return, they have never received it.

59

503. The Webers lost their principal and the use of their funds invested in the GAI Funds.

Bruchside Fund III

504. In March 2008, the Webers invested $300,000 in the Bruchside Fund III.

505. The Webers received all of their information from their son-in-law who worked for Bruch.

506. The Webers invested because of the returns which had been paid to Bruchside Fund I investors.

507. The Webers invested based on Defendants' projections and representations of the high returns from Bruchside Fund II.

508. The Webers never received any return on their investments in Bruchside Fund III.

## ALLEGATIONS COMMON TO ALL COUNTS

509. Defendants GAI, BOL, Bruch and Hall sold the unregistered securities of at least six different issuers:

    a. Limited partnership interests in four Texas limited partnerships called Bruchside Fund I, Bruchside Fund II, and Bruchside Fund III, and the Cotton Gin Fund, respectively;

    b. Equity interests in a Texas limited liability company called Global Ag Biodiesel Fund; and

    c. Promissory notes of an Iowa corporation, BOL, LLC.

510. The Defendants represented to the Plaintiffs that the proceeds from their investments, in the Funds, were to be used in Brazil for farming, farming equipment and/or farming product processing (sometimes collectively referred to as "farming operations").

60

511.    The Plaintiffs include individuals and entities who invested a total of $7,129,750 in the Funds in reliance on representations made by the Defendants.

512.    The Plaintiffs were not informed that the monies they invested in the Funds were not segregated into separate bank accounts or into separate farming operations.

513.    The Plaintiffs were not informed that the assets purchased with their investment monies would be the property of the respective fund, but would become the assets of GAI.

514.    The Defendants knowingly or with reckless disregard for the truth represented to Plaintiffs that the respective farming operations in Brazil, supporting each of the Funds, would be highly profitable and projected high returns to induce Plaintiffs to investment in the Funds.

515.    The Defendants did not disclose to the Plaintiffs that their prior farming operations in Brazil had been unprofitable and the Defendants did not disclose the true nature of the risks involved in the respective farming operations in Brazil.

516.    The Brazilian Department of Agriculture ("BDOA") is a governmental agency that functions similarly to the United States Department of Agriculture ("USDA") in that the BDOA collects historical data to assist Brazilian farmers in estimating future costs of production and estimating net profit for future farming operations in Brazil.

517.    Brazilian farmers regularly rely upon the BDOA information and estimates to budget and manage their own farming operations.

518.    BDOA estimates contemplate a number of expenses that must be incorporated into any information provided to investors considering investments involving Brazilian farming operations.

519.    The expenses contemplated by the BDOA for inclusion in investment information include:

61

a.  Insurance;

b.  Handling, cleaning, drying, storage;

c.  Interest on operating loans;

d.  Depreciation of machinery;

e.  Depreciation of improvements and infrastructure;

f.  Technical assistance;

g.  Interest;

h.  Maintenance of machinery;

i.  Social charges; and

j.  Insurance of the fixed capital.

520.    The Defendants failed to incorporate these necessary and essential expenses into the net profit projections which they provided to potential investors.

521.    In addition to ignoring all of the expenses above, the Defendants' computations failed to disclose that rent would be paid as an expense. This omission is material because the BDOA does not recognize this expense as it presumes the costs associated with farming are for Brazilian farmers who own their land.

522.    The Defendants paid rent through a yield crop share arrangement whereby Defendants would deliver a specific number of bags to the landlord in exchange for rent.

523.    The Defendants included the bags used for rent as profit and did not deduct the bags from its computation of yield as profit.

524.    The Defendants knowingly paid substantial Returns (a 40% return on investment), on Bruchside Fund I, to certain investors, which the Defendants falsely represented were from profits from farming operations in Brazil.

525.     The Defendants also knowing paid Returns to investors in Bruchside Fund II representing that said Returns were a 25% return on their investment.

526.     The Defendants represented to investors that the aforementioned returns from Bruchside Fund I and Bruchside Fund II were from farming operations in Brazil, but the Defendants failed to disclose the true source of the Returns which they paid to investors.

527.     The Defendants' payment of high Returns, which they represented as profits, induced certain Plaintiffs to continue purchasing the Funds' securities and to recommend the Funds' securities to other individuals.

528.     The high Returns also induced certain Plaintiffs to make their first investments in certain GAI Fund securities.

529.     The Defendants did not disclose that there was no factual basis for representing that the Funds' farming operations in Brazil had been profitable.

530.     The Returns that Defendants paid to investors were not profits from the Defendants' farming operations in Brazil.  Rather those Returns were paid with the investments of new investors.

531.     The Plaintiffs lost approximately $7.5 million in reliance on Defendants representations.

532.     On or about December 22, 2010, the Plaintiffs met with legal counsel regarding concerns about the status of their investments.  At that meeting, the Plaintiffs authorized legal counsel to begin investigating questions shared by all Plaintiffs that had not been adequately addressed by the Defendants.

533.     After the December 22, 2010 meeting, legal counsel retained a private forensic investigative firm to investigate Defendants and ascertain the legitimacy of GAI's operation.

63

534.     As a result of that investigations and additional information received by the Plaintiffs, the Plaintiffs have filed this Complaint against the Defendants.

535.     Moreover, the Defendants have continued to make material misrepresentations to the Plaintiffs as evidenced by the K-1's that the Plaintiff have received for tax year 2010.

536.     The Defendants represented to the Plaintiffs that GAI had no significant assets, but the K-1's that the Defendants provided to the Plaintiffs for Bruchside Fund III show interest income.

## COUNT I

### DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, HALL, ARTAH HOLDINGS, ., BOL, LLC, KLUIS AND TASCA ARE LIABLE TO PLAINTIFF PURSUANT TO SECTIONS 12(a)(1) AND (2) OF SECURITIES ACT OF 1933

537.     Plaintiffs hereby replead and reassert Paragraphs 1 through 549 as though fully set forth herein.

### Section 12(a)(1) of the '33 Act

538.     The GAI Funds offerings at issue in this case are securities as defined by 15 U.S.C. § 77b(a)(1).

539.     Defendants offered and sold GAI Funds securities to the Plaintiffs.

540.     Defendants did not file registration statements for the securities that Defendants sold to the Plaintiffs and registration statements were not in effect for the securities that Defendants sold to the Plaintiffs.

541.     Defendants used the mails or facilities of interstate commerce in connection with the securities Defendants sold to Plaintiffs.

542.     Defendants conduct was a proximate cause of the Plaintiff's damages.

543.    The GAI Funds at issue in this case are securities as defined by 15 U.S.C. § 77b(a)(1).

544.    Defendants offered and sold GAI Funds securities to the Plaintiffs.

545.    Defendants made untrue statements of fact or omitted material facts in connection with the securities that it sold to the Plaintiffs.

546.    Defendants used the mails or facilities of interstate commerce in connection securities Defendants sold to Plaintiffs.

547.    Defendants conduct was a proximate cause of the Plaintiff's damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs, compensatory damages including but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT II

### DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, ART A. HALL, ARTAH HOLDINGS, L.L.C., BOL, LLC'S, KLUIS AND TASCA VIOLATION OF SECTION 10(b) OF THE 1934 ACT AND RULE 10b-5 THEREUNDER

548.    Plaintiffs hereby replead and reassert Paragraphs 1 through 549 as though fully set forth herein.

549.    The GAI Funds at issue in this case are securities as defined by 15 U.S.C. § 78c(a)(10).

550.    Defendants offered and sold GAI Funds securities to the Plaintiffs.

65

551.     Defendants used the mails or facilities of interstate commerce in connection with the securities Defendants sold to Plaintiffs.

552.     Defendants, in connection with the sale of the aforementioned securities to Plaintiffs, employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted material facts; and engaged in acts, practices and courses of business which operated as a fraud and deceit upon the Plaintiffs.

553.     Defendants engaged in the aforementioned conduct knowingly or with reckless disregard for the truth.

554.     Defendant intended to deceive the Plaintiffs

555.     Plaintiffs purchased the aforementioned securities in reliance on the truth of the representations made by Defendants and was justified in relying on those representations.

556.     Defendants' conduct was a cause of Plaintiffs' damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs compensatory damages including but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT III

## PROFESSIONAL NEGLIGENCE OF DEFENDANT HALL

557.     Plaintiffs hereby replead and reassert Paragraphs 1 through 549 as though fully set forth herein.

558.     Defendant Popular Securities employed Hall from July 2006 until the present.

66

559.     As Defendant Hall's employer, Defendant Popular Securities is vicariously responsible for the Hall's professionally negligent acts committed within the scope of his employment.

560.     Hall was negligent in the one or more of the following practices:

    a.  Failure to determine the validity of misrepresentations of expense and profit projections for farming operations in Brazil;

    b.  Failure to keep the investments of the investors in GAI funds segregated in separate bank accounts and separate farming operations;

    c.  Failure to fill all of the required Reg D forms and/or to ascertain whether the GAI offerings complied with Reg D in order to be exempt from registration;

    d.  Failure to determine the source of funds paid to investor Plaintiffs as Returns from profitable farming operations in Brazil;

    e.  Failure to provide quarterly and annual audited financial statements to investors; and

    f.  This negligence continued throughout all of the GAI offerings.

561.     Defendant Art Hall was negligent and such negligence was a cause of Plaintiffs' damages.

562.     The conduct of Defendant Hall was willful and wanton. As result the Plaintiffs are entitled to punitive damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment against Defendant Hall, awarding the Plaintiffs recovery of compensatory damages including but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, punitive damages, and any and other such relief the court may deem equitable.

67

## COUNT IV

## BREACH OF FIDUCIARY DUTY OF DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, HALL, ARTAH HOLDINGS, INC., BOL, LLC, KLUIS AND TASCA

563.     Plaintiffs hereby replead and reassert Paragraphs 1 through 549 as though fully set forth herein.

564.     At all time material to this action, a fiduciary relationship existed between the Plaintiffs and Defendants.

565.     Defendants breached that fiduciary duty by providing Plaintiffs with false or misleading information regarding GAI Funds.

566.     The breach of fiduciary duty was a cause of damages to the Plaintiffs.

567.     The conduct of Defendants was willful and wanton. As result the Plaintiffs are entitled to punitive damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of compensatory damages including but not limited to: loss of initial investment, loss of return of past, present, and future investments, punitive damages, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT V

## CONVERSION OF DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, HALL, ARTAH HOLDINGS, INC., BOL, LLC, KLUIS AND TASCA

568.     Plaintiffs hereby replead and reassert Paragraphs 1 through 549 as though fully set forth herein.

68

569.     Defendants obtained money and equity from the Plaintiffs and used said monies in a manner which was not intended or represented to the Plaintiffs.

570.     Defendants exercised control over the Plaintiffs' money in a manner that was inconsistent with and in derogation of the uses for which the Plaintiffs agreed that their money should be used.

571.     Defendants' conversion of Plaintiffs investment monies was a cause of the Plaintiffs' actual financial loss and it was done with willful and wanton disregard for the Plaintiffs rights and property.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of compensatory damages including but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, punitive damages, and any and other such relief the court may deem equitable.

## COUNT VI

## NEGLIGENT MISREPRESENTATIONS & NONDISCLOSURES OF DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, HALL, ARTAH HOLDINGS, INC., BOL, LLC, KLUIS AND TASCA

572.     Plaintiffs hereby replead and reassert Paragraphs1 through 549 as though fully set forth herein.

573.     Defendants negligently supplied information and failed to disclose material information about the GAI Funds' financial condition, status, business endeavors, contracts and customers.

69

574.    Defendants had a financial interest in supplying or not disclosing information about the respective GAI Funds.

575.     Defendants intended to supply or refrain from supplying information about the GAI Funds for their own benefit and to the detriment of the Plaintiffs; and/or Defendants knew that the recipients of such information about the GAI Funds intended to supply it for the benefit and guidance of Plaintiffs.

576.    Defendants intended the information about the GAI Funds to influence Plaintiffs to invest in GAI Funds;

577.    The Plaintiffs acted in reliance on the truth of the information about GAI Funds supplied by Defendants and Plaintiffs were justified in relying on the information about GAI.

578.    The negligently supplied information or lack thereof was a proximate cause of Plaintiffs' damages.

579.    The conduct of Defendant Hall was willful and wanton. As result the Plaintiffs are entitled to punitive damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants and award the Plaintiffs recovery of compensatory damages including but not limited to: loss of initial investment, loss of return of past, present, and future investments, punitive damages, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT VII

### <u>FRAUDULENT MISREPRESENTATIONS AND OMISSIONS OF DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, BOL, LLC, ART A. HALL, ARTAH HOLDINGS, L.L.C., KLUIS AND TASCA</u>

70

580. Plaintiffs hereby replead and reassert Paragraphs 1 through 549 as though fully set forth herein.

581. Defendants intentionally conspired to make misrepresentations and conspired to intentionally omit material information set forth in the proceeding paragraphs.

582. Defendants misrepresented and omitted information regarding GAI's financial condition, status, business, endeavors, contracts, and customers.

583. Each such representation identified above was false.

584. Each such representation or omission identified above was material.

585. Defendants knew the representations were false.

586. Defendants intended to deceive the Plaintiffs and induce the Plaintiffs to invest money in the GAI Funds.

587. Plaintiffs were induced and did invest substantial sums in reliance upon Defendants' repeated misrepresentations and Plaintiffs were justified in relying on those misrepresentations.

588. Defendants' misrepresentations and omissions were a proximate cause of Plaintiffs' damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment against these Defendants awarding the Plaintiffs recovery of compensatory damages including but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, punitive damages, and any and other such relief the court may deem equitable.

## COUNT VIII

## POPULAR SECURITIES' NEGLIGENT SUPERVISION

589. Plaintiffs hereby replead and reassert Paragraphs 1 through 549 as though fully set forth herein.

590. From July 2006 to the present, Defendant Hall was an employee and/or agent of Defendant Popular Securities, Inc.

591. Although the securities were not offered through Popular as the brokerage house, the securities were sold by an employee and/or agent of Popular.

592. That the duty to train and supervise its employees includes but is not limited to training the employee to fully and correctly explain to any investor the characteristics, risks, and rewards of any product presented to the investor.

593. As an employer, Popular has a duty to train and supervise its employees and Popular knew or should have known that its employee and/or agent was conducting himself in the manner described above.

594. In addition to Popular Securities' common law duty to supervise, hire, and train its employees, FINRA has implemented guidelines regarding the duty of a FINRA member to conduct the adequate oversight of all employees.

595. FINRA, in promulgating guidelines to its members, recognizes the need for training and supervision.

596. FINRA has issued notices to members (NTB) numbers 03-71, 5-18, 5-48, and 10-22 that require employers to supervise its employees so that employees do not misrepresent or overstate to an investor the risk or rewards of an investment.

597. Defendant Popular Securities has violated its common law duty and violated the standards set forth in the notice to members by FINRA that require adequate supervision and training.

72

598. Defendant Popular Securities was negligent in not reasonably supervising Hall and such negligence was a proximate cause of the damages to the Plaintiffs.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment against Defendant Popular Securities, awarding the Plaintiffs recovery of compensatory damages including but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT IX

### DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, HALL, ARTAH HOLDINGS, INC., BOL, LLC'S, KLUIS AND TASCA VIOLATION OF IOWA UNIFORM SECURITIES ACT (IUSA) §502.501A

599. Plaintiffs hereby replead and reassert Paragraphs 1 through 549 as though fully set forth herein.

600. In violation of IUSA §502.501 and §502.501A, Defendants sold to the investors securities by means of written communication.

601. Said written communication included offering written materials which contain misstatements and omissions of material fact.

602. Defendants also made investment recommendations to the investors that were unsuitable for the investors.

603. Defendants lacked a reasonable basis to believe that their recommendations to the investors were suitable.

604. Such violations of the Iowa Uniform Securities Act was a proximate and actual cause of Plaintiff's damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of compensatory damages including

73

but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT X

### CONCERT OF ACTION BETWEEN DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, HALL, ARTAH HOLDINGS, INC., BOL, LLC, KLUIS AND TASCA

605.    Plaintiffs hereby replead and reassert Paragraphs 1 through 549 as though fully set forth herein.

606.    Defendants acted in concert with each other Defendant or pursuant to a common design to provide false or misleading information about GAI Funds to Plaintiffs.

607.    Each Defendant knew that the other's conduct constituted a breach of a duty and gave substantial assistance or encouragement to the other in providing false or misleading information to the Plaintiffs.

608.    Each defendant gave substantial assistance to the other in providing false or misleading information about GAI Funds to the Plaintiffs and each of the Defendants own conduct, separately considered, constitutes a breach of duty to the Plaintiffs.

609.    The Defendants' concert of action was a proximate cause of Plaintiff's damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of compensatory damages including but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT XI

### CONSPIRACY OF DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, BOL, LLC, KLUIS AND TASCA

74

610.     Plaintiffs hereby replead and reassert Paragraphs 1 through 549 as though fully set forth herein.

611.     Defendants committed the wrong of providing false or misleading information to GAI Fund investors in violation of Federal and State securities laws.

612.     Each Defendant knowingly and actively participated in a conspiracy with each of the other Defendants to provide false or misleading information to the Plaintiffs in violation of Federal and State securities laws.

613.     The Defendants conspiracy was the proximate cause of the Plaintiffs damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of compensatory damages including but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT XII

## RECISSION

614.     Plaintiffs hereby replead and reassert Paragraphs 1 through 549 as though fully set forth herein.

615.     Defendants made false representations in connections with the offer and sale of GAI Funds.

616.     Defendants' representations were material as those statements induced Plaintiff to invests in various GAI Funds.

617.     Defendants intended to induce Plaintiffs into investing in GAI Funds based on the aforementioned false representations.

618.     Plaintiffs were justified in relying on Defendants false representations.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against these Defendants, awarding the Plaintiffs recovery of compensatory damages including but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## JURY DEMAND

COME NOW the Plaintiffs and hereby request trial by jury on all issues.

Respectfully Submitted:

WHITFIELD & EDDY, P.L.C.
317 Sixth Avenue, Suite 1200
Des Moines, IA 50309-4195
Telephone: (515) 288-6041
Fax: (515) 246-1474
Email: reavely@whitfieldlaw.com


By: _____/s/Thomas S. Reavely_____
    Thomas S. Reavely      AT0006574

SANDY LAW FIRM, P.C.
304 18th St., Box 445
Spirit Lake, IA 51360
Telephone: (712) 336-5588
Fax: (712) 336-5589
Email: jmsandy@sandylawpractice.com

By: ____/s/John M. Sandy_____
    John M. Sandy      AT0010488

ATTORNEYS FOR PLAINTIFFS


CERTIFICATE OF SERVICE

The undersigned hereby certified that on the 11th of January, 2013, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which, pursuant to Local Rule 5.3(k)(1), will send notice of electronic filing to the following:

76

Robert M. O'Boyle
Strasburger & Price LLP
600 Congress Avenue, Suite 1600
Austin, TX 78701-3248
Telephone: (512) 499-3600
Fax: (512) 499-3660
Email: bob.oboyle@strasburger.com
ATTORNEY FOR DEFENDANTS GLOBAL
AGRICULTURAL INVESTMENTS, LLC, AND BOL, LLC

Jeff W. Wright
Heidman Law Firm, LLC
1128 Historic 4th Street
PO Box 3086
Sioux City, IA 51101
Telephone: (712) 255-8838
Fax: (712) 258-6714
Email: jeff.wright@heidmanlaw.com
ATTORNEY FOR ART A. HALL AND
ARTAH HOLDINGS, L.L.C.

Ethan H. Cohen
Ballard Spahr LLP
999 Peachtree Street, Suite 1000
Atlanta, GA 30309-3915
Telephone: (678) 420-9300
Fax: (678) 420-9301
Email: cohene@ballardspahr.com
ATTORNEY FOR DEFENDANTS
TYLER BRUCH AND BRUCHSIDE, INC.

Andrew C. Johnson
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
Telephone: (515) 246-5893
Fax: (515) 246-5808
Email: Johnson.andrew@bradshawlaw.com

Nathan W. Lamb
Ulmer & Berne LLP
500 West Madison Street, Suite 3600
Chicago, IL 60661
Telephone: (312) 658-6536
Fax: (312) 658-6537
Email: nlamb@ulmer.com

ATTORNEY FOR DEFENDANT
POPULAR SECURITIES, INC.

Sean P. Moore, AT0005499
Brown, Winick, Graves, Gross,
Baskerville & Schoenebaum, PLC
666 Grand Avenue, Suite 2000
Des Moines, IA 50309
Telephone: (515) 242-2400
Fax: (515) 283-0231
Email: moore@brownwinick.com
ATTORNEY FOR DEFENDNAT
BRUCHSIDE, INC.