IN THE UNITED STATE DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| DENNIS SAGEZ, DEAN AND BARB BUESING, DON AND ELIZABETH BUESING, DOUGLAS G. FINSTROM, CHRISTIAN FISHER, SUSAN GUGE, WALLY AND JODI HELGET, KEITH HEMESATH, MITCHELL HEMESATH, ADAM HEMESATH, JR FARMS, INC, DENNIS AND KAREN KASPARBAUER TRUST, KASSEL FARMS, INC., GREAT OAKS FARMS, INC., GEORGIA KASSEL, JIM KIBBIE, JOHN KIBBIE, PATRICK KIBBIE, NICK KILL, TODD LUNDGREN, EDWARD NOONAN, JOSEPH NOONAN, JACK REICHERT, HAROLD SCHROEDER, CATHERINE TIESZEN, CRAIG TIESZEN, ERIC AND AMY TIESZEN, REED AND MARY TIESZEN, DEAN AND AMY VER MULM, PETER VER MULM, WEBER FAMLY FARM INVESTMENTS, LLC, | Case No. 3:11-CV-03059-DEO |
| Plaintiffs, v. | AMENDED and SUBSTITUTED COMPLAINT AND JURY DEMAND |
| GLOBAL AGRICULTURAL INVESTMENTS, LLC, TYLER BRUCH, BRUCHSIDE, INC, ART A. HALL, ARTAH HOLDINGS, L.L.C., POPULAR SECURITIES, INC., BOL, LLC, | |
| Defendants. | |

**COME NOW** the Plaintiffs, and for their Complaint against the above-named

Defendants state the following:

## NATURE OF THE ACTION

1.      This cause of action arises from Defendants' fraudulent offer and sale of unregistered securities to the Plaintiffs in violation of the Securities Act of 1933 and the Securities Exchange Act of 1934.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa as this cause of action arises from the Defendants' violation of 15 U.S.C. §§ 77e(a) and (c) (Sections 5(a) and (c) of the Securities Act of 1933); and the Defendants' violation of 15 U.S.C. § 78j(b) (Sections 10(b) of the Securities Exchange Act of 1934) and 17 C.F.R. Section 240.10b-5 (Rule 10b-5)).

3.      Further, this Court has supplemental jurisdiction over the Plaintiffs' common law causes of action pursuant to 28 U.S.C. § 1367 as those causes of action arise out of the same common nucleus of operative facts as the federal securities violations.

4.      Venue is proper in the Northern District of Iowa pursuant to 15 U.S.C. § 77v(a) and 15 U.S.C. § 78aa because Defendants transacted business in this District and the offer and/or sale of securities relevant to this cause of action took place in this District.

## PARTIES

### PLAINTIFFS

5.      Plaintiff Dennis Sagez ("**Sagez**") was at all times material to this action a resident of St. Louis, Missouri.  Sagez invested $50,000 in Bruchside Fund II.

6.      Plaintiffs Dean and Barb Buesing were at all times material to this action residents of Granite Falls, Minnesota.  Dean and Barb Buesing invested $250,000 in Bruchside Fund III and $250,000 in BOL Fund.

2

7.     Plaintiffs Don and Elizabeth Buesing were at all times material to this action resident of Granite Falls, Minnesota.  Don and Elizabeth Buesing invested $250,000 in Bruchside Fund III and $250,000 in BOL Fund.

8.     Plaintiff Douglas G. Finstrom ("**Finstrom**") was at all times material to this action a resident of Kerkhoven, Minnesota.  Finstrom invested $100,000 in Bruchside Fund I.

9.     Plaintiff Christian Fisher ("**Fisher**") was at all times material to this action a resident of Alton, Iowa.  Fisher invested $75,000 in Bruchside Fund I and $131,000 in Bruchside Fund II.

10.    Plaintiff Susan Guge ("**Guge**") was at all times material to this action a resident of Estherville, Iowa.  Guge invested $100,000 in Bruchside Fund III.

11.    Plaintiffs Wally and Jodi Helget (the "**Helgets**") were at all times material to this action residents of Wind Lake, Wisconsin.  The Helgets invested $50,000 in Bruchside Fund III.

12.    Plaintiffs Keith Hemesath, Mitchel Hemesath, and Adam Hemesath (the "**Hemesaths**") were at all times material to this action residents of Decorah, Iowa.  Collectively, the Hemesaths invested $100,000 in Bruchside Fund III.

13.    Plaintiff JR Farms, Inc. ("**JR Farms**") is an Iowa corporation that at all times material to this action had its principal place of business in Emmetsburg, Iowa.  JR Farms invested $25,000 in Bruchside Fund I and $35,750 in Bruchside Fund II.

14.    Plaintiff Dennis and Karen Kasparbauer Trust ("**Kasparbauer Trust**") whose beneficiaries are Dennis and Karen were at all times material to this action residents of Manning, Iowa.  The Kasparbauer Trust invested $100,000 in Bruchside Fund I, $100,000 in Bruchside Fund II, $125,000 in Bruchside Fund III and $10,000 in the Cotton Gin Fund.

15.     Plaintiff Kassel Farms, Inc. ("**Kassel Farms**") is an Iowa corporation that at all times material to this action had its principal place of business in Emmetsburg, Iowa.  Plaintiff Great Oak Farms, Inc. ("**Great Oak Farms**") is Iowa corporation that at all times material to this action had its principal place of business in Emmetsburg, Iowa.  Collectively, Kassel Farms and Great Oak Farms invested $250,000 in Bruchside Fund I, $550,000 in Bruchside Fund II and $600,000 in Bruchside Fund III.

16.     Plaintiff Georgia Kassel ("**G. Kassel**") was at all times material to this action a resident of Emmetsburg, Iowa.  G. Kassel invested $50,000 in Bruchside Fund II and $160,000 in Bruchside Fund III.

17.     Plaintiffs Jim Kibbie, John Kibbie, and Patrick Kibbie (the "**Kibbies**") were at all times material to this action residents of Emmetsburg, Iowa.  Collectively, the Kibbies invested $100,000 in Bruchside Fund II and $90,000 in Bruchside Fund III.

18.     Plaintiff Nick Kill ("**Kill**") was at all times material to this action a resident of Morris, Minnesota.  Kill invested $350,000 in Bruchside Fund II, $370,000 in Bruchside Fund III, $30,000 in BOL Fund and $100,000 in the Cotton Gin Fund.

19.     Plaintiff Todd Lundgren ("**Lundgren**") was at all times material to this action a resident of Emmetsburg, Iowa.  Lundgren invested $50,000 in Bruchside Fund II and $50,000 in the Cotton Gin Fund.

20.     Plaintiff Edward Noonan and Joseph Noonan (the "**Noonans**") were at all times material to this action residents of Ayrshire, Iowa.  The Noonans invested $200,000 in Bruchside Fund II and $100,000 in Bruchside Fund III.

21.    Plaintiff Jack Reichert ("**Reichert**") was at all time material to this action a resident of Winter Park, Colorado.  Reichert invested $50,000 in Bruchside Fund II.  Reichert also invested $25,000 in the Global Ag Biodiesel Fund.

22.    Plaintiff Harold Schroeder ("**Schroeder**") was at all time material to this action a resident of Becker, Minnesota.  Schroeder invested $50,000 in Bruchside Fund III and $10,000 in BOL Fund.

23.    Plaintiff Catherine Tieszen was at all time material to this action a resident of Canistota, South Dakota.  Catherine Tieszen invested $100,000 in Bruchside Fund II and $100,000 in Bruchside Fund III.

24.    Plaintiff Craig Tieszen was at all time material to this action a resident of Rapid City, South Dakota.  Craig Tieszen invested $50,000 in Bruchside Fund II and $15,000 in Bruchside Fund III.

25.    Plaintiffs Eric and Amy Tieszen were at all time material to this action residents of Canistota, South Dakota.  Eric and Amy Tieszen invested $100,000 in Bruchside Fund I, $178,000 in Bruchside Fund II, $5,000 in the Cotton Gin Fund and $100,000 in Global Ag Biodiesel Fund.

26.    Plaintiffs Reed and Mary Tieszen were at all time material to this action residents of Canistota, South Dakota.  Reed and Mary Tieszen invested $200,000 in Bruchside Fund II, $200,000 in Bruchside Fund III and $50,000 in Global Ag Biodiesel Fund.

27.    Plaintiffs Dean and Amy Ver Mulm were at all time material to this action residents of Emmetsburg, Iowa.  Dean and Amy Ver Mulm invested $75,000 in Bruchside Fund I and $125,000 in Bruchside Fund II.

5

28.     Plaintiff Peter Ver Mulm was at all time material to this action a resident of Sioux Center, Iowa. Peter Ver Mulm invested $50,000 in Bruchside Fund II, $15,000 in Bruchside Fund III and $30,000 in the Cotton Gin Fund.

29.     Plaintiff Weber Family Farm Investments, LLC ("**Weber Family Farm**") is a South Dakota limited liability company that at all time material to this action had its principal place of business in Sioux Falls, South Dakota.  Weber Family Farm invested $100,000 in Bruchside Fund II and $300,000 in Bruchside Fund III.

<u>DEFENDANTS</u>

30.     Defendant Global Agricultural Investments, LLC ("**GAI**") was at all times material to this action a Texas limited liability company that sold securities to Plaintiffs.  GAI offered, sold, and/or made representations about the securities at issue in this case to Plaintiffs.

31.     Defendant Tyler Bruch ("**Bruch**") was at all times material to this action a resident of Emmetsburg, Iowa.  Bruch offered, sold, and/or made representations regarding the securities at issue in this case to Plaintiffs.

32.     Defendant Bruchside, Inc. was at all time material to this action a Texas corporation.  Bruchside, Inc. was at all times material to this action a general partner in GAI.  At all times material to this action, Bruch was the sole shareholder, sole director, and president of Bruchside, Inc.

33.     Defendant Art A. Hall ("**Hall**") was at all times material to this action a resident of San Antonio, Texas.  Hall offered, sold, and/or made representations regarding the securities at issue in this case to Plaintiffs.

34.     Defendant Artah Holdings, LLC ("**Artah Holdings**") was at all times material to this action a Texas limited liability company.  Artah Holdings was at all times material to this

6

action a general partner in GAI. At all times material to this action, Hall was the president, sole director, and one of two shareholders of Artah Holdings.

35.    Defendant BOL, LLC ("**BOL**") was at all times material to this action an Iowa limited liability company. Bruch owned BOL at all times material to this action.

<u>OTHER INDIVIDUALS AND ENTITIES RELEVANT TO THIS MATTER</u>

36.    Bruch registered BOL Fund II, LLC ("**BOL II**") as an Iowa limited liability company on April 26, 2010. Bruch offered BOL II promissory notes to investors, but no Plaintiffs purchased the same. The purpose of BOL II was to obtain additional money from investors. Bruch owns BOL II.

37.    Don and Jane Bruch are Bruch's parents, and farmers in Emmetsburg, Iowa. Don and Jane owned a farm in Brazil at/or around the time that Funds were operational. Global Agricultural Investments Brazil transferred money to Jane Bruch.

38.    Justin Bruch is Bruch's brother. Justin Bruch has operated farms in the Ukraine called Bruchside Farms Ukraine. Defendants made unauthorized loans and/or payments from investor contributions to Bruchside Farms Ukraine.

39.    Lance Bruch is Bruch's brother. Lance Bruch assisted Bruch with his Brazilian farming operations.

40.    Heather Slifka is Bruch's sister. Heather Slifka assisted Bruch with GAI paperwork and operations in Emmetsburg, Iowa.

41.    Bruchside Farms, Inc. is a farming corporation that Don and Jane Bruch own. Bruchside Farms, Inc. operates farms in Iowa.

7

42. Global Agricultural Investments Brazil ("**GAI Brazil**") also known as Brazil Co. and Global AG Agropecuaria do Brazil Ltda is the Brazilian company Bruch formed to do business for the GAI farming operations in Brazil.

43. Global Ag Investimentos Do Brazil LTDA is another Brazilian company Bruch formed to do business in Brazil.

44. Iowa Trust and Savings Bank is the bank where investors' funds were deposited and then transferred to Brazil.

45. Kathy Gunderson served as GAI's secretary and collected investment money from certain Plaintiffs.

## BACKGROUND FACTS

### BRUCH'S INITIAL BRAZILIAN FARMING OPERATIONS

46. In January of 2003, Bruch traveled to Brazil in order to obtain college credit for a bachelor's degree. During his time in Brazil, Bruch studied Brazilian agriculture and worked on Brazilian farms. In August of 2003, Bruch finished his bachelor's degree online.

47. After completing his degree, Bruch's family helped him purchase 2,000 acres of land, which Bruch called Bruchside Farm.

48. In November of 2003, Bruch planted a rice crop on his Brazilian farm, which he attempted to harvest in the spring of 2004. Bruch has referred to that 2004 rice crop as "a disaster."

49. In the fall of 2004, Bruch planted soybeans to be harvested in the spring of 2005. Bruch has represented that his harvest in the spring of 2005 was very successful.

8

## ENTITIES ASSOCIATED WITH GAI SECURITIES SALES

50.     As set forth above, Artah Holdings was a general partner in GAI.  Hall registered Artah Holdings as a Texas corporation on December 1, 1999.

51.     Bruchside, Inc. was also a general partner in GAI.  Hall registered Bruchside, Inc. as a Texas corporation on January 20, 2005.

52.     Bruch and Hall formed GAI in early 2000 with the alleged primary purposes of establishing and operating a profitable farming operation in Brazil that offered its limited partners an opportunity to diversify their investment risk and generate excellent returns with a set liquidation date.

53.     Hall registered GAI in Texas on February 16, 2005.

## RELEVANT GAI SECURITIES

54.     **Bruchside Fund I, LP**: On February 16, 2005, Hall registered Bruchside Fund I in Texas.  Bruch and Hall began offering Bruchside Fund I securities in 2005.  The first investment in Bruchside Fund occurred on March 28, 2006.  The final investment in Bruchside Fund I occurred on July 28, 2006.  Bruchside Fund I had investments totaling $1.39 million.  Plaintiffs' investments totaled $725,000.

55.     **Global Ag Biodiesel, LLC** (sometimes referred to as "**Biodiesel Fund**"): On February 12, 2007, Hall registered the Biodiesel Fund in Texas.  Bruch and Hall began offering equity interests the Biodiesel Fund in 2007.  Plaintiffs' investments totaled $175,000.

56.     **Bruchside Fund II, LP**:  On May 17, 2007, Hall registered Bruchside Fund II in Texas.  Bruch and Hall began offering Bruchside Fund II securities in February of 2007.  Bruchside Fund II accepted invested through January 2008.  Investments in Bruchside Fund II totaled $5,819,475.  Plaintiffs' investments totaled $2,469,765.

9

57.     **Cotton Gin Investments, LP** (sometimes referred to as "**Gin Fund**"): On April 15, 2008, Hall registered the Gin Fund in Texas.  Bruch and Hall began offering Gin Fund investments in October 2007 and continued through July 2008.  Investments in the Gin Fund totaled $1,045,000.  Plaintiffs' investments totaled $195,000.

58.     **Bruchside Fund III, LP**: On April 28, 2008, Hall registered Bruchside Fund III in Texas.  Bruch and Hall began offering Bruchside Fund III securities in 2008.  Bruch and Hall continued to accept investments in Bruchside Fund III in January 2009.  Investments in Bruchside Fund III totaled $9,574,500.  Plaintiffs' investments totaled $2,777,000.

59.     **BOL Fund I, LLC**: On July 24, 2009, Bruch registered BOL in Iowa.  Bruch and Hall began offering BOL investments in 2009.  Investments in BOL totaled $750,000.  Plaintiffs' investments totaled $540,000.

60.     The foregoing funds will sometimes be collectively referred to as "**GAI Funds**" or "**Funds**."

<u>BRUCH AND HALL OFFER AND SELL GAI SECURITIES TO PLAINTIFFS</u>

**OFFER AND SALE OF BRUCHSIDE FUND I SECURITIES**

61.     Bruchside Fund I investors were comprised, predominately, of Bruch's family friends, neighbors, and other acquaintances who trusted Bruch.

62.     In early 2005, Bruch and Hall began soliciting investments in Bruchside Fund I.  As part of their efforts, they created and distributed a PowerPoint presentations entitled "Global Ag Investment, LLC presents Bruchside Fund I, LP" ("**BFI PowerPoint**").

63.     The BFI PowerPoint focused on the low costs associated with farming in Brazil and the resulting high profits and returns Bruch could obtain for each investor.  However, unbeknownst to investors, the projections and expenses in the BFI PowerPoint were inherently

10

flawed. In addition, Bruch projected low costs without having contracts in place for farming operations and/or having purchased needed materials, especially needed amounts of fertilizer, which was crucial to the rough land areas being farmed.

64.     The BFI PowerPoint represented that Bruchside Fund I would have a fund size of $5 to $10 million. This fact was significant because Bruch's cost and profit calculation were based upon an offering that would raise between $5 to $10 million, but Bruch and Hall only raised approximately $1.3 million dollars before beginning Bruchside Fund I's Brazilian farming operations – in total disregard for the representations they made to each Bruchside Fund I investor.

65.     The BFI PowerPoint represented that Bruch was an expert in Brazilian farming operations, but the BFI PowerPoint failed to include accurate and complete disclosures of the risks associated with Brazilian farming operations or the losses Bruch suffered in his prior Brazilian farming operations.

66.     The risks Bruch and Hall disclosed were: political risk, currency fluctuation, and weather. However, the BFI PowerPoint minimized these risks by stating that: (1) Brazil was stable and pro-agriculture; (2) Brazil actively controlled currency fluctuations; and (3) temperature was never a factor because of the region's location. Although rain was a risk factor, Defendants never discussed any weather factors other than temperature.

67.     The BFI PowerPoint also represented RSM McGladrey would be Bruchside Fund I's U.S. accountants and that Ciel Accounting was Bruchside Fund I's Brazilian accountants. None of these entities were actually retained by Bruch, Hall, or GAI at the time Bruch and Hall made these representations, and none of the entities performed any accounting work for Bruchside Fund I.

68.     The BFI PowerPoint represented that investors' initial returns would be of principal.  As such, those returns would not be taxed.  Bruch and Hall represented that this system would continue until investors' entire principal was returned, at which point, investors would begin to incur income tax.  In reality, investors received K-1's based on their initial returns.

69.     The BFI PowerPoint stated that GAI managed its own 1,500 hectare farm.  In reality, GAI did not own or manage any land at the time.  Rather, Bruch was referencing land that he had purchased with this family, which did not belong to GAI.

70.     The BFI PowerPoint also included a reference to "current commitments" of $2.5 million, Bruch and Hall did not disclose what those "commitments" were or the financial effect of the commitments.

71.     The BFI PowerPoint projected an expected return on investment of 25% to 40%. In reality, Bruch and Hall paid Bruchside Fund I's 40% "returns" with Bruchside Fund II investment contributions.

72.     In Bruch's June 2006 letter to investors, Bruch stated that he and Hall were "confident that we will still be able to provide our projected 24-40% returns."  At the time Bruch made these representations, there had been no accounting for the expenses incurred by Bruchside Fund I's farming operations.

73.     In Hall's February 19, 2007 letter to investors, Bruch and Hall represented that investors would receive returns of "36% or more."  Bruch and Hall sent this letter to investors in an effort to stoke interest in Bruchside Fund II.

74.     In furtherance of their efforts to attract Bruchside Fund II investors, Bruch and Hall continued to project high profits without a basis for such projections.  In that same February

19, 2007 letter, Bruch and Hall represented the "potential for increased returns above 50%-60% per year."

75.    On August 19, 2007, Bruch wrote investors and informed them that the payout for Bruchside Fund I was going to be 40%. In that letter, Bruch stated: "Our first year success has been above expectations and as long as we can continue to produce good crops our success should continue for the next several years."

76.    In September 2007 – as Bruch and Hall were soliciting investment for Bruchside Fund II, the Biodiesel Fund, and the Gin Fund – GAI paid Bruchside Fund I investors what Bruch and Hall represented were 40% returns of profit on Bruchside Fund I's Brazilian farming operation.

77.    In a September 19, 2007 letter, Bruch stated: "I hope that you feel, as I do, that 40% ROI is a good rate of return. I hope it is the first of many, and that this is the smallest one you will see." Bruch made these representations regarding 40% returns without relying on any report or accounting to determine that actual financial condition of Bruchside Fund I.

78.    In reality, these returns were paid with Bruchside Fund II investor contributions, which became a regular practice for Bruch.

79.    In October 2008, as Bruch and Hall were soliciting investments for Bruchside Fund III, GAI paid Bruchside Fund I investors what Bruch and Hall represented to be a portion of a 22% return of profit, with the remainder to follow at the end of the year.

80.    In reality, these returns were paid with Bruchside Fund III investor contribution.

81.    The Plaintiffs who have invested in Bruchside Fund I have not received any additional returns.

OFFER AND SALE OF BRUCHSIDE FUND II SECURITIES

82.     In February 2007, after exhausting the money invested by Bruchside Fund I investors, Bruch and Hall sent a letter to investors seeking additional funds for Bruch's Brazilian farming operations.

83.     In that February 2007 letter, Hall enticed Bruchside Fund I investors to invest in Bruchside Fund II by projecting a "36% or more" return for Bruchside Fund I.  Even prior to the 2007 spring harvest, Hall asked for Bruchside Fund I investors to invest in Bruchside Fund II.

84.     In a February 14, 2007 letter to investors regarding an Investor Trip to Brazil, Bruch represented that Al Kluis would be present to cover grain and energy markets for 2007/2008; Bruch would be present to cover production and sales for 2006/2007 and projected yields 2007/2008, and Hall would be present for any legal questions.

85.     As further evidence of Bruch deception, the BFI PowerPoint represented that GAI had Brazilian legal counsel, but there is no mention of Brazilian legal counsel in Bruch's February 14, 2007 newsletter.

86.     Further, in an April 2007 Corn and Soybean article, Bruch represented that "We're trying to expand because we know from an economic standpoint where our numbers are and what our returns are; and we're locking in fantastic profits."

87.     In that April 2007 article, Bruch also represents that "We're locking in high profits and generating great returns . . . We don't want to hit the homerun because we can't afford to strike out.  So we're just locking in consistent returns and that's where we're getting our growth base.  We do our marketing and business off a spreadsheet – absolutely zero emotion involved."

88.     To date, despite numerous requests, investors have not been provided with these "spreadsheets."

89.     On June 26, 2007, Defendants held an investor meeting at the Wild Rose Casino in Emmetsburg, Iowa during which Defendants sought additional investors for Bruchside Fund II by providing, among other things, updates regarding crop production and yields for the 2006/2007 crop year – these 2007 crop production and yields served as the basis for Hall's February 2007 representations regarding a 36% return.

90.     During the meeting, Bruch and Hall also made representations regarding in house accounting and tax benefits/structures.  Bruch and Hall's presentation also included spreadsheets that continued to present inherently flawed projections.  These projections were part of Defendants' Bruchside Fund II PowerPoint presentation ("**BFII PowerPoint**").

91.     In a letter dated July 21, 2007, Bruch and Hall represented that they had finally "hired our own in-house accountant, and the advantages are already paying off for us.  He is able to keep our accounting up to speed everyday, and he brings more financial expertise to the company."

92.     To date, despite numerous requests, investors have not seen the accounting records from that accountant.

93.     On or about August 19, 2007, Defendants sent a letter to investors indicating that Bruchside Fund II was closed.

94.     Importantly, the August 19, 2007 letter indicates that Bruchside Fund I investors should be receiving their payout on September 15, 2007.  Specifically, Defendants represented that "[o]ur payout is going to be 40% and on the basis that the cotton is 260 arrobas we will have about another 6% retained earnings."

15

95.     In reliance on Bruch and Hall misrepresentations about the success of existing farming operations and their promises of high returns, the large majority of Bruchside Fund I investors reinvested in Bruchside Fund II.

96.     Bruch and Hall sold the majority of Bruchside Fund II's limited partnership interests to Bruchside Fund I investors or to Bruchside Fund I investors' families, friends, and acquaintances.

97.     The BFII PowerPoint stated that the amount of investment the fund "needed" was $2.8 million.

98.     As with Bruchside Fund I, the projected return of profits on investment for Bruchside Fund II was 40%.  Bruchside Fund II investors invested almost exclusively in reliance on the promise or payment of Bruchside Fund I 40% returns.

99.     The BFII PowerPoint also stated that Bruchside Fund II had the possibility of an additional 10% profit, which would result in a 50% annual payout.

100.    Bruch and Hall did not disclose to potential Bruchside Fund II investors that GAI regularly commingled investors' funds and that GAI regularly moved assets as a loan to GAI Brazil.

101.    Bruch and Hall did not disclose to potential Bruchside Fund II investors that GAI, rather than the Bruchside Fund II, owned the assets, particularly the farming equipment, that were purchased with money invested in Bruchside Fund II.  Bruch and Hall had always represented that the investors would own the Funds' equipment and crops.

102.    Total investments in the Bruchside Fund II were $5,819,475, which was four times the amount raised for the Bruchside Fund I.

16

103.    In October 2008, Bruchside Fund II investors received what Bruch and Hall represented were partial returns on an 18% return of profit, with the remainder to be paid by the end of the year.  Defendants never made these additional payments.

104.    Further, Bruch and Hall did not tell investors that their returns were actually paid with investment contribution to Bruchside Fund III.

105.    At the time that returns were being paid on Bruchside Fund I and Bruchside Fund II, the Defendants were actively soliciting investor for other GAI Funds.  In fact, when Bruch and Hall promised the 25% return, they were conducting an offering of Bruchside Fund III. Bruch and Halls' promised 25% return, among other things, enticed investors to invest in Bruchside Fund III.

**OFFER AND SALE OF BIODIESEL AND GIN FUND SECURITIES**

BIODIESEL FUND

106.    In the fall of 2007, while riding the wave of investor interest sparked by Bruchside Fund I dubious returns, Bruch and Hall offered and sold Global Ag Biodiesel Fund securities.

107.    The Defendants represented that they planned to get all approvals from Brazil and then to sell their Biodiesel company.

108.    The Defendants represented that investors' principal would be returned in two years and that investors would ultimately received double the money invested as a return on their investment.

109.    Defendants represented that land was purchased in a Brazilian industrial park for biodiesel operations; however, Defendants never began a biodiesel operation.

17

110.     Plaintiffs Eric and Amy Tieszen and Reed and Mary Tieszen purchased their interests in Global Ag Biodiesel in October 2007 after Defendants represented that Bruchside Fund I paid a 40% return on investment.  Likewise, Jack Reichert purchased his interest in Global Ag Biodiesel in December 2007 after Defendants represented that Bruchside Fund I paid a 40% return on investment.

GIN FUND SECURITIES

111.     In a letter dated October 1, 2007, which was less than three weeks after GAI had paid Bruchside Fund I investors their 40% return, Bruch and Hall informed investors that the Gin Fund would be open for investment.

112.     In order to entice rapid commitment, Defendants informed investors that any responses must be received by October 15, 2007.

113.     As further enticement, Bruch and Hall, boldly represented that they could add an additional 10% to returns using the existing business model.  Specifically, Defendants represented that "[p]urchasing a cotton gin . . . should increase investor ROI in Funds I and II by close to an additional 10%."

114.     Since Bruch was not receiving Gin Fund "buy-in" he wanted, Defendants followed-up the October 15 letter with an October 23, 2007 letter containing projections about the Gin Fund's expected returns.  In that letter, Bruch told investors he was "personally" putting in the first $50,000 investment in the Gin Fund.

115.     The October 23, 2007 letter further deceives investors by representing that Bruchside Funds I and II are closed "thus no additional investment can be made."

116.     To the contrary, Bruchside Fund I accepted an investment from Katie Thompson in or about 2009 and Bruchside Fund II accepted investments from Dunnavant Enterprises on

18

October 26, 2007, Nick Kill on October 30, 2007, Four Way Farms on November 2, 2007, Bruch

on November 3, 2007, Elia Tasca on December 28, 2007, and Hall on December 31, 2007.

117.    In reliance on Bruch and Hall's representation regarding the Gin Fund's likely

returns and Bruchside Fund I's 40% returns, select Plaintiffs invested in the Gin Fund.

OFFER AND SALE OF BRUCHSIDE FUND III

118.    In early 2008, in order to begin luring investors for the upcoming offering of

Bruchside Fund III, Defendants scheduled tours to Brazil.

119.    During those investor tours, which occurred in February 2008, investors recall

Bruch stating that he could "do [Bruchside Fund I] returns again."

120.    On March 19, 2008, shortly after investor tours to Brazil, prospective investors

met in Hancock, MN to discuss investing in GAI Funds.  That meeting included, among others,

Nick Kill – who participated in the February trip to Brazil with Bruch, Dean Buesing, Don

Buesing, and Doug Finstrom.

121.    In April 2008, as Defendants' cash needs became more dire, Defendants began

offering and accepting investments in Bruchside Fund III.  As an added incentive to invest in

Bruchside Fund III, Defendants informed investors that not only would their investments provide

returns on operations, but investors would also gain an interest in the Gin Fun.  Defendants

represented that approximately 20% of their investment in Bruchside Fund III would be invested

in the Gin Fund.

122.    In a newsletter to investors dated June 20, 2008, Defendants informed investors

that Price Waterhouse Coopers ("**PWC**") would conduct a full audit of GAI's Brazilian

Operations.  However, due to Defendants lack of information, records, and documentation, PWC

19

was only able to conduct a limited review – not a full audit. PWC did not complete its limited review until December 31, 2008.

123.    Also on June 20, 2008, Defendants held an investor meeting at the Wild Rose Casino in Emmetsburg, Iowa during which Bruch and Hall presented information regarding production and sales of Brazilian farming operations.

124.    During that meeting, not only did Bruch and Hall mislead investors regarding the status and viability of the Funds, but Defendants made efforts to conceal the fact that they had commingled investors Funds, since the inception of Bruchside Fund II, in direct contradiction of their representation that the money and assets for the respective Funds' were segregated.

125.    At the conclusion of the meeting, investors were hastily advised that they needed to sign updated partnership agreements and instructed to leave the completed documents at the back of the room as they exited.

126.    Through these "updated" partnership agreements, Bruch and Hall sought investor approval to commingle the respective Funds' money, add additional fees, and change the scope of Fund operations. In reality, Defendants request was a ruse intended to cover past misdeed as Defendants had been commingling the respective Funds' money since Bruchside Fund II's inception.

127.    To date, Plaintiffs are unaware of whether the requisite number of votes was achieved to accomplish changes the Defendants sought to further facilitate their fraudulent business practices.

128.    In a letter dated June 30, 2008, which is ten days after the June 20 investor meeting, Defendants identify their recommended operational and structural changes, which allow commingling of the respective Funds' money and assets.

20

129.     As set forth above, Bruch and Hall began offering and selling Bruchside Fund III securities in 2008.

130.     The offering began in April 2008 and reportedly ended in December 2008. However, three investors wired money into Fund III in January 2009.

131.     Bruchside Fund III's total investments amounted to $9,574,500, more than twice that in Bruchside Fund II.

**OFFER AND SALE OF BOL SECURITIES**

132.     In a letter dated July 10, 2009, after informing investors about the general inability to secure credit, noting that "the supplier credit market that we have always had at our disposal no longer exists and, if it does, the costs are not feasible for our operation . . . ," Bruch informed investors that the BOL Fund was available for investment.

133.     Bruch represented that the BOL Fund was an operating line that would "pay 1 percent interest per month, or 18% for the life of the short fund."

134.     Bruch also represented that this money would "replace the credit market that no longer exists."

135.     To reassure investors that this was a legitimate investment, Bruch also represented that the "collateral for the line of credit will be based off of our registered commodity contracts that we forward sold on the market and assets of the Brazilian operating company which is estimated at US$13 million."

136.     Bruch further represented that "[w]e will also be using PriceWaterhouseCopper [sic] to continue with our audits, and CitiBank will be the custodian/manager of this account."

137.     In reliance on Bruch's representations that this investment was secured by sufficient collateral, select Plaintiffs invested in BOL Fund I.

138.    To date, Plaintiffs have not received any return or promised return other than what is identified above and below, and neither Bruch, Hall, nor GAI have returned investors' principal.  Rather, investors have repeatedly received inconsistent K-1s from Defendants, which, to this day, have not been completed resolved.

## ADDITIONAL FACTUAL BACKGROUND

139.    Bruch and Hall represented that the proceeds from Plaintiffs' investments, in the Funds, were to be used in Brazil for farming, farming equipment, and/or farming product processing.

140.    At the times they were soliciting investments for Bruchside Fund, I, II, II, the Gin Fund, and the Biodiesel Fund, Bruch and Hall never told the Plaintiffs the respective Funds' money or assets would be commingled.  Bruch and Hall had always represented that investor money and assets for the respective Funds would be segregated into separate bank accounts and into separate farming operations.

141.    At the times they were soliciting investments for Bruchside Fund, I, II, II, the Gin Fund, and the Biodiesel Fund, Bruch and Hall never told the Plaintiffs that the assets purchased with their investment money would become GAI's property.  Rather, Bruch and Hall always told investors that they owned the respective Funds' assets.

142.    The Brazilian Department of Agriculture ("**BDOA**") is a governmental agency that functions similarly to the United States Department of Agriculture ("**USDA**") in that the BDOA collects historical data to assist Brazilian farmers in estimating future costs of production and estimating net profit for future farming operations in Brazil.

143.    Brazilian farmers regularly rely upon the BDOA information and estimates to budget and manage their own farming operations.

22

144.    BDOA estimates contemplate a number of expenses that must be incorporated into any information provided to investors considering investments involving Brazilian farming operations.

145.    The expenses contemplated by the BDOA for inclusion in investment information include:

     a.  Insurance;
     b.  Handling, cleaning, drying, storage;
     c.  Interest on operating loans;
     d.  Depreciation of machinery;
     e.  Depreciation of improvements and infrastructure;
     f.  Technical assistance;
     g.  Interest;
     h.  Maintenance of machinery;
     i.  Social charges; and
     j.  Insurance of the fixed capital.

146.    Bruch and Hall failed to incorporate these necessary and essential expenses into any of the net profit projections they provided to potential investors.

147.    In addition to ignoring all of the expenses above, Bruch and Hall's computations failed to disclose that rent would be paid as an expense.  This omission is material because the BDOA does not recognize this expense as it presumes the costs associated with farming are for Brazilian farmers who own their land.

148.    None of the Funds owned their own land.  The Funds paid rent through a yield crop share arrangement whereby the Funds would deliver a specific number of bags to the landlord in exchange for rent.

149.    Bruch and Hall included the bags used for rent as profit and did not deduct the bags from its computation of yield as profit.

150.    Moreover, the Defendants have continued to make material misrepresentations to the Plaintiffs as evidenced by the K-1's that the Plaintiffs have received for tax year 2010.

23

**PLAINTIFF INVESTORS - REPRESENTATIONS,
RELIANCE, INVESTMENT AND LOSS**

DEAN AND DON BUESING

151.     Paragraphs 1 through 150 are incorporated by this reference.

152.     Dean Buesing and Don Buesing (the "**Buesings**") are brothers.  They invested in Bruchside Fund III and BOL, LLC in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, segregation of Fund money, segregation of Fund operations, and segregation and ownership of Fund assets.

153.     The Buesings learned about GAI through Nick Kill, who also invested in GAI Funds.  On March 12, 2008, Nick Kill emailed Dean regarding GAI's investment opportunities. Nick's email indicated that past returns have been up to 40% and that he expected to receive at least 25% return on his October 2007 investment to be paid in July 2008.

154.     Based on Nick's March 12, 2008 email, the Buesings, along with other potential investors, met with Nick Kill on March 19, 2008 at Buddies Bar & Grill, a restaurant in Hancock, Minnesota, to discuss GAI investment opportunities.

155.     During that meeting, there was a PowerPoint slide presentation created based on information that Nick Kill had received from Bruch.  The slide show contained, among others, the following representations that investors relied upon:

   a. We manage our clients' investment in the same way that we mange our own.  We have built a company around U.S. and local specialists including agronomists, financial forecasters, and commodity brokers.
   b. Bruchside Fund I & II are composed of $7 million dollars and a 10,100 hectare farming operation.
   c. Projected ROI for 2007/2008: 27%
   d. Fund I and II will not be diluted by Fund III
   e. 80% of Fund III will be production equity
   f. 20% of Fund III will be paid in fixed income at 18.8 IRR (initial rate of return)
   g. Original capital investment is not subject to withholding tax
   h. Make sales based off spreadsheet

24

       i.  Lock in solid ROI's for our investors
       j.  Expected production ROI of 25% to 40%
      k.  Annual payback
      l.  Project return of capital in 2.5 years
     m.  Experienced management team

156.    During that meeting, the Buesings learned that Bruchside Fund I had paid a 40% return, and that Bruchside Fund II was expected to pay a 25% return.

157.    On April 7, 2008, Nick Kill faxed Dean a copy of the PowerPoint slideshow that was presented during the March 2008 meeting of potential investors in Hancock, Minnesota.

158.    On April 10, 2008, Dean received an email from Kathy Gunderson containing Bruchside Fund III contribution information.  The contribution information represented that Bruchside Fund III would close "at the end of the business day on the 18th."

159.    Kathy's email also contained a memorandum explaining how Fund III would work.  That memorandum included, among others, the follow representations:

     a.  "The goal of GAI is to provide investors with an annual average operating return of 25-40%.  Fund I paid out 40% ROI in it's first year and Funds I and II look to pay out 25% or better in 2007/2008[.]"

     b.  "In order to keep our first funds from being diluted by our third fund we have a simple strategy that will allow a fair and transparent objective for everyone. Fund III will more than likely have a higher rent price per ha. than Fund I and Fund II, therefore the difference in price will be subtracted from the ROI of the Fund III investors."

     c.  "The cotton gin is a must for our farming operation. It allows us to gin our cotton in a timely manner and add nearly 10% to our bottom line.  It also gives us a hard asset that we can use as collateral for purchasing fertilizer, opening operating lines of credit from Cargill and potential revolving lines of credit Rabo Bank and Standard Bank. The 20% of the capital from Fund III will be applied to purchasing the gin and providing working capital. This 20% will be paid as a fixed income yielding 18.8 IRR over the life of the fund."

160.    On April 17, 2008, after the March 2008 meeting, Dean made efforts to contact Bruch regarding investing in Bruchside Fund III.  On that same day, Dean received an email

25

from Bruch regarding Fund III investment opportunities. The purpose of Dean's email to Bruch was to verify his understanding of the Fund III and its payouts. Dean received Bruch's response prior to investing in Bruchside Fund III.

161.    In his email to Bruch, one of the questions Dean asked Bruch was "What will happen if you fall short on your goal in Fund 3?" In response, Bruch stated "I don't think that is going to be a problem, we have a waiting list of people over (20) plus that want in and are on hold at this moment."

Bruchside Fund III

162.    Together, the Buesings invested $500,000 in Bruchside Fund III in April 2008.

163.    While Defendants were soliciting the Buesings' investment in Bruchside Fund III, Defendants never represented that the Funds' money or assets would be commingled.

164.    Defendants also told the Buesings that they would be part owners of the cotton gin.

165.    Bruch told the Buesings that the purpose of the cotton gin was to accommodates the Funds' high production capacity as third-party ginning had become too expensive. In addition, Bruch represented ginning cotton from other farms would cover the costs of the gin.

166.    The Buesings were never received any returns on their investment in Bruchside Fund III. Based on Defendants' representations, the Buesings understood that no returns were paid in October/November of 2009 because the weather destroyed the crops.

BOL, LLC.

167.    In February 2009 Dean traveled to Brazil, with other investors, to visit GAI's operations. Buesing was really impressed with the operation after going to Brazil, and gave a presentation to other regarding his trip upon his return. At no point did Bruch reveal, or did

26

Dean sense, the dire conditions of the Funds. Rather, Bruch made it seem that all was well, and that the Funds were operating as planned.

168. Together, the Buesings invested $500,000 in BOL, LLC., in December of 2009.

169. The Buesings invested because Defendants told them that they would receive an 18% return.

170. Defendants told the Buesings that the "crops" were the security for their BOL investment, and that payment for their BOL investment would have a priority over payments to the other GAI Fund investors.

171. Defendants told the Buesings that they would receive their first BOL interest payment no later than December 30, 2010. They did not sign any paperwork prior to investing in BOL.

172. The Buesings relied on Bruch's promise that they would receive high returns.

173. The Buesings have not received any returns on their investment in BOL.

DOUGLAS G. FINSTROM

174. Paragraphs 1 through 173 are incorporated by this reference.

175. Finstrom invested in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil and expected or received returns on investment.

176. Specifically, Finstrom invested in Bruchside Fund III after attending a March 19, 2008 meeting of investors at Buddies Bar & Grill in Hancock, Minnesota.

177. During this meeting, Nick Kill showed pictures and provided information regarding the Defendants' Brazilian farming operations and the Funds.

178. Finstrom recalls discussions regarding Bruchside Fund I's 40% return and Bruchside Fund II's projected 25% return.

27

Bruchside Fund III

179.    In April or May of 2008, after attending the meeting at Buddies, Finstrom invested $100,000 in Bruchside Fund III.

180.    Finstrom invested in Bruchside Fund III in reliance on Defendants' representations regarding Bruchside Fund I's returns and Defendants' promises of returns for Bruchside Funds II and III.

181.    Finstrom never received any return on his investment or a return of his principal.

## CHRISTIAN FISHER

182.    Paragraphs 1 through 181 are incorporated by this reference.

183.    Fisher invested in Bruchside Fund I and II in reliance on representations regarding: past or expected farming successes of Bruch in Brazil, expected  returns on investment, promised receipt of financial statements, segregation of Fund money, segregation of Fund operations, segregation and ownership of assets.

184.    Fisher learned about this investment through Dean Ver Mulm.

185.    In the winter of 2006, Fisher attended Bruch's presentation of "Global Ag Investment, LLC presents Bruchside Fund I, LP" at the Ramkota Inn in Sioux Fall, South Dakota.

186.    During that meeting, attendees were given a copy of Bruch's "Global Ag Investments, LLC presents Bruchside Fund I, LP" PowerPoint handouts.  Those handout made the following false representations:

   a. Defendants misrepresented the Fund size as $5-10 million dollars when Defendants only raised approximately $1.3 million.
   b. Defendants misrepresented the investment period of seven to ten years.
   c. Defendant misrepresented that return on investment would be 25% to 40%.
   d. Defendants misrepresented that Bruchside Fund I would farming 3,000 – 8,000 hectares when the Fund was actually only farming 2,300 hectares.

28

  e. Defendants represented that Bruchside Fund I had commitments of $2.5 million, but the Fund only raised approximately $1.3 million.

  f. Defendants misrepresented that RSM McGladrey was the Fund's U.S. accountant and that Ciel Accounting was the firm's Brazilian accountant.

187. During that meeting, Bruch told Fisher that Bruchside Fund I was structured in such a way that investors would not be taxed for initial returns, as the first returns would be return of principal, and, as such, investor would not have to pay taxes on those returns.  Rather than not being taxed as Bruch represented, investors' 40% returns were immediately taxed, which was inconsistent with Bruch initial representations.

Bruchside Fund I

188. Fisher invested $75,000 in Bruchside Fund I in March 2006.

189. Fisher invested because documents that Defendants projected return of 36% to 40%.  Fisher also invested because of the Defendants representations regarding tax structure.

190. Defendants never told Fisher that they would begin farming operations in Brazil after raising only $1.3 million rather than the full $5-$10 million that they had represented. Fisher invested in reliance on the fact that farming operations would not begin until the $5-$10 million offering amount had been achieved.

191. In September 2007, Fisher received a 40% return on his investment.

Bruchside Fund II

192. Fisher invested $131,000 in Bruchside Fund II, through three wire transfers beginning in April 2007.

193. Fisher was induced to invest in Fund II based on the projected returns for Fund I and Defendants' representations regarding Fund II.  Fisher continued to invest based on correspondence that he received from Defendants projecting high return, such as Hall's August 2007 letter.

194.    Defendants never told Fisher that the respective Funds' money and assets would be commingled while they were soliciting Fisher's investment.  Rather, based on Defendants' representations, Fisher also understood and relied upon the understanding that the respective Funds' would be segregated.

195.    In October 2008, Defendants told Fisher that he would receive a 22.43% return on his investment, but he only received a portion of that return with the promise that the remainder would be paid by the end of the year.

196.    Fisher has not received any additional returns on his investment.

<u>SUSAN GUGE</u>

197.    Paragraphs 1 through 196 are incorporated by this reference.

198.    Guge invested in Bruchside Fund III in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on GAI investments, promised receipt of financial statements, segregation of Fund money, segregation of Fund operations, segregation and ownership of assets.

<u>Bruchside Fund III</u>

199.    Guge invested $100,000 in the Bruchside Fund III on or about July 21, 2008 based on her understanding that Bruchside Fund I had made 40% returns.

200.    Initially, Guge learned about GAI investments from her brother Craig Kassel.

201.    Guge recalls that she had money in the stock market in 2008, which she lost, and that she learned about this investment opportunity at about that same time, which made it all the more enticing.

202.    Prior to Guge investing in Bruchside Fund III, Defendants represented that Bruchside Fund III had limited room for investment and that the Fund's closing deadline was

30

looking. As such, Guge felt pressured to invest quickly to ensure she was included in this investment opportunity.

203.    As noted above, Guge invested after learning about the 40% return that Defendants paid investors in Bruchside Fund I.

204.    Guge trusted Bruch because she knew him in the community, she knew his family's reputation in the community, and because Bruch and Craig Kassel had been such good friends.

205.    Guge was also impressed by GAI opening an office in Emmetsburg, Iowa.

206.    Defendants provided Guge with documents making representations that part of the money she invested in Bruchside Fund III would be used to purchase a cotton gin, and that she would receive income from the gin.

207.    Defendants also represented that she would receive a 40% return on her investment in Bruchside Fund III.

208.    Defendants further represented that Guge would have a priority payment of 15% interest because of Bruchside Fund III's investment in the gin.

209.    Defendants never told Guge that GAI regularly commingled investor's money across GAI Funds.

210.    Guge never received any return on her investment in Bruchside Fund III or the return of the principal she invested.

<u>WALLY AND JODI HELGET</u>

<u>Bruchside Fund III</u>

211.    Paragraphs 1 through 210 are incorporated by this reference.

31

212.     The Helgets invested $50,000 in the Bruchside Fund III in April of 2008 in reliance on representations regarding: Bruch's prior or expected farming successes in Brazil, expected or received returns on investment, segregation of Fund money, segregation of Fund operations, and segregation and ownership of assets.

213.     Wally learned about GAI investments, in March 2008, through Nick Kill. At that time, Nick had a large investment position over multiple GAI Funds, and had been to Brazil to observe the Funds' farming operations. During their discussions, Nick told Wally about the high returns that he had received.

214.     After speaking with Nick Kill, Wally wanted to invest, but the Funds were not open to new investors. At that time, the Funds were only open existing investors.

215.     On April 12, 2008, Nick Kill, who had been communication with Bruch on Wally's behalf, received an email from Bruch indicating that new investors could obtain access to Bruchside Fund III with a minimum investment of $50,000. Nick then emailed Kathy Gunderson to inform her to send Wally information regarding Bruchside Fund III.

216.     On April 17, 2008, Kathy Gunderson emailed Wally based on Nick Kills' email. As part of her email, Kathy provided Wally with information regarding Bruchside Fund III. At that point, Wally interacted with Kathy Gunderson to finalize his investment in Bruchside Fund III.

217.     Wally reviewed the information that Kathy Gunderson provided prior to investing in Bruchside Fund III.

218.     The Helgets invested because of their understanding that Bruchside Fund I had paid high returns. Wally's investment decision was also influenced by his discussions with Nick Kill and the fact that Nick Kill had traveled to Brazil to see the Funds' farming operations first

hand. In addition, Wally remembers the GAI documents that he reviewed stating investors would have their principal investment back inside of six years, and still have investment remaining in Brazil.

219. Defendants told to the Helgets that each GAI Fund would be segregated and have its own management fee. Defendants never told the Helgets that investment money from the respective Funds would be commingled or that Bruchside Fund III's crops and equipment would be commingled with other funds crops and equipment.

220. Defendants also represented that Bruchside Fund III investors would have an interest in a cotton gin. Defendants also made representations that the Funds needed a cotton gin because of the Funds' high production capacity and the lack of ginning capacity in the area.

221. The Helgets have never received any income or the return of their capital.

## KEITH, MITCHEL, AND ADAM HEMESATH

222. Paragraphs 1 through 221 are incorporated by this reference.

223. In the fall of 2008, Mitchel traveled to Brazil to work as an intern with Bruch. As an intern, Mitchel worked in the field operating farming equipment. Mitchel had no exposure to, and had no knowledge of, the Funds' books or accounting information.

224. During his time as an intern, Mitchell was able to develop and rapport with Bruch. During his conversations with Bruch, Bruch told Mitchel about Fund I's 40% returns in 2007, Fund I's approximately 22% return in 2008, and Fund II's approximately 18% return in 2008.

225. In addition, Mitchel was able to observe Bruch's lifestyle, which gave the appearance that Bruch was very well off, which Mitchel associated with the Funds' success.

33

226.     At no point did Bruch tell Mitchell the true status of the Funds, and at no point did Mitchel observe anything that caused him to believe the Funds, or Bruch's Brazilian farming operations, were not viable.

227.     Based on Bruch's representations to Mitchel regarding Bruchside Fund I and Fund II's returns, Mitchel recommended to Keith and Adam that they all invest in Bruchside Fund III.

Bruchside Fund III

228.     In early December of 2008, the Hemesaths' invested $100,000 in Bruchside Fund III.  Specifically, Keith invested $50,000; Mitchel invested $25,000; and Adam invested $25,000.

229.     The Hemesaths' have not received any returns from their Bruchside Fund III investments.

JR FARMS, INC.

230.     Paragraphs 1 through 229 are incorporated by this reference.

231.     Rick and Julie Elberts (the "**Elberts**"), through J.R. Farms, invested in Bruchside Fund I and Bruchside Fund II in reliance on representations regarding: Bruch's farming successes in Brazil and expected returns on investment.

Bruchside Fund I

232.     The Elberts invested a total of $25,000 in Bruchside Fund I.

233.     In the Spring/Summer of 2006, Rick had several conversations with Bruch regarding his Brazilian farming endeavors.  Bruch told Rick that his Brazilian farming endeavors were very successful, that he was accepting investments to further those endeavors, and solicited

investments from Rick.  During these conversations, Bruch told Rick that his return on investment would be 25% to 40%.

234.    In the April/May timeframe of 2006, Rick received a Bruchside Fund I prospectus from Bruch.

235.    On May 29, 2006, the Elberts signed a Subscription Agreement for Bruchside Fund I in the amount $25,000.

236.    In June of 2006, Defendants mailed Bruchside Fund I investors a letter indicating that Defendants were "confident" that they would still be able to provide 25% to 40% returns.

237.    Based on Bruch's representations, the Elberts invested $12,500 in Bruchside Fund I on June 13, 2006 and another $12,500 in Bruchside Fund I on August 17, 2006.

238.    In September of 2007, the Elberts received what Defendants represented was a 40% return on their investment in Bruchside Fund I; however, that return was paid with investments money for Bruchside Fund II.

239.    In October 2008, the Elberts received what Defendants represented was an additional return of $1,401.88 for Bruchside Fund I, but that "return" was paid from Bruchside Fund III investment money.

Bruchside Fund II

240.    Prior to April 20, 2007, the Elberts received a letter from Defendants indicating that 50% of Bruchside Fund II investors' initial investment was due on April 21, 2007 at the initial closing.  That letter also indicated that Bruchside Fund II investors' remaining investment was due on August 1, 2007.

241.    On April 20, 2007, the Elberts signed a Subscription Agreement to invest $35,750 in Bruchside Fund II.

242.     On that same day, the Elberts made their first investment of $18,750 in Bruchside Fund II.

243.     On August 19, 2007, Defendants sent a letter to investors indicating that Bruchside Fund II was closed and representing that Bruchside Fund I investors would receive a 40% return on investment.

244.     On September 26, 2007, the Elberts made a second investment in Bruchside Fund II of $17,000, which was after Defendants represented Bruchside Fund II would be closed.

245.     Defendants' representations regarding returns induced the Elberts to make their investments in Bruchside Fund II.

246.     In a letter dated October 3, 2008, Defendants told the Elberts that they would receive a 22.43% return on their Bruchside Fund II investment.  Instead, the Elberts received $1,647.18 – only a portion of what Defendants had promised.  Moreover, this "return" was paid with Bruchside Fund III investment money.  Defendants told the Elberts that the remainder of their 22.43% return would be paid at a later date, but the Elberts have never received it.

247.     The Elberts lost their principal and the use of the money they invested in the GAI Funds.

<u>DENNIS AND KAREN KASPARBAUER TRUST</u>

248.     Paragraphs 1 through 247 are incorporated by this reference.

249.     Dennis ("**Denny**") and Karen Kasparbauer (the "**Kasparbauers**"), through the Dennis and Karen Kasparbauer Trust, invested in the Bruchside Fund I, the Bruchside Fund II, the Bruchside Fund III and the GAI Cotton Gin Fund in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on

investment, promised receipt of financial statements, segregation of Fund money, segregation of Fund operations, segregation and ownership of assets.

250.    In 2006, Denny traveled to Brazil with Kruse Family as part of Brazil Iowa. Brazil Iowa was a group that was doing business in Brazil.  At the time, Denny was interested in invested in Brazilian farming so he traveled to Brazil to evaluate the available opportunities. Specifically, Denny was interested in purchasing land in Brazil.

251.    While Denny was in Brazil, he happened to meet Lance Bruch in a restaurant. During the conversation that ensued, Lance indicated that Bruch was starting a farming operation in Brazil where Bruch would rent land rather than own land.  The fact that Bruch was renting his land was significant to Denny because renting land eliminated the need to purchase land and/or sell the purchased land in the future.

252.    Shortly after returning to Iowa, Denny met Bruch in a restaurant in Pocahontas, Iowa to discuss Bruch's Brazilian operation.  During that meeting, Bruch told Denny that he had farmed in Brazil for the last three years.  Bruch stated that his land had been profitable in 2005. Bruch also stated that he had purchased and was paying off his own farm in Brazil based on his 2005-2006 profits.  Bruch made the representations despite the fact that his rice crop being a disaster in 2005.

253.    During this meeting, Burch also told Denny that he could expect returns between 25% to 40% and that investors would own Fund's equipment and crops.

254.    Denny was also drawn to Bruchside Fund I based on Bruch's representations that initial returns would not be taxed.  Based on Bruch's representations, Denny understood his initial returns would be returns of investment rather than returns on investment.  Despite Bruch's representations, Denny received a K-1 after his first return.

37

255.    Bruch also told Denny that he wanted high initial cash contribution from investors to ensure the his operations could pay cash for equipment, and avoid loans.  Denny found Bruch representation that his operations would not have any loan to be significant.

256.    Denny was also impressed and reassured by Bruch's representations that he was an expert in Brazilian farming.

Bruchside Fund I

257.    The Kasparbauers invested $100,000 in the Bruchside Fund I in March 2006.

258.    The Kasparbauers invested because of Bruch's representations of high returns and that the operation would not own the property it farmed.  Denny was also influenced by the fact that initial returns would be non-taxable.

259.    In addition, Defendants told the Kasparbauers that they would receive quarterly financials and a yearly audit and that all aspects of the respective GAI Funds would be segregated.

260.    The Kasparbauers received what Defendants' represented was a 40% return on their investment in Bruchside Fund I in September 2007.  In reality, Defendants paid this return using money from Bruchside Fund II investor contributions.

261.    In October 2008, the Kasparbauers received what Defendants represented was 25% of a 22.43% return.  In reality, Defendants paid this return using money from Bruchside Fund III investor contributions.

262.    Defendants also represented that the Kasparbauers would be receive the remainder of their 22.43% return by December 2008.

263.    The Kasparbauers have not received the remainder of their 22.43% return.

Bruchside Fund II

264.     The Kasparbauers invested $100,000 in the Bruchside Fund II in May and August 2007.

265.     The Kasparbauers invested in Bruchside Fund II because of returns Defendants promised for Bruchside Fund I.

266.     In October 2008, the Kasparbauers received what Defendants represented was a portion of their return on their Bruchside Fund II investment.  In reality, Defendants paid this return using money from Bruchside Fund III investor contributions.

267.     Defendant represented that the Kasparbauers would be paid the remainder of their 25% return in December 2008.

268.     The Kasparbauers have not received the remainder of their return.

Bruchside Fund III

269.     The Kasparbauers invested $125,000 in Bruchside Fund III in April 2008.

270.     The Kasparbauers invested in Bruchside Fund III because of the 40% returns they received on their Bruchside Fund I investment.

GAI Cotton Gin Fund

271.     The Kasparbauers invested $10,000 in the GAI Cotton Gin Fund in November 2007.

272.     The Kasparbauers invested in the GAI Cotton Gin Fund because of the 40% return they received from their investment in Bruchside Fund I.

273.     The Kasparbauers also invested because of Defendants' representations that Gin Fund investors would own GAI's gin.

39

274. Bruch told the Kasparbauers that purchasing a gin would improve returns and GAI could earn high returns by ginning other farmers' cotton.

275. In January 2009, the Kasparbauers received an interest payment on their Gin Fund investment, but the Kasparbauers have not received any additional returns.

## KASSEL FARMS AND GREAT OAK FARMS

276. Paragraphs 1 through 275 are incorporated by this reference.

277. Craig and Deborah ("**Debbie**") Kassel invested in Bruchside Fund I, II, and III, through Kassel Farms, Inc. and Great Oaks Farms, Inc., in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund money, segregation of Fund operations and ownership of assets, and taxation of returns.

278. Debbie and Craig have known Bruch and his family for decades. Debbie and Craig first learned about Bruchside Fund I, in 2006, from Bruch after a fourth of July concert at the Wild Rose Casino in Emmetsburg, Iowa. During that conversation, Bruch indicated that he was going to begin farming operations in Brazil that would provide a unique investment opportunity.

279. Within a week after the concern, Debbie and Craig invited Lance and Burch to their home. During that meeting, Bruch showed them the "Global Ag Investment, LLC presents Bruchside Fund I, LP" PowerPoint handouts. Those handout made the following false representations:

   a. Defendants misrepresented the Fund size as $5-10 million dollars when Defendants only raised approximately $1.3 million.
   b. Defendants misrepresented the investment period of seven to ten years.
   c. Defendant misrepresented that return on investment would be 25% to 40%.
   d. Defendants misrepresented that Bruchside Fund I would be farming 3,000 – 8,000 hectares when the Fund was actually only farming 2,300 hectares.

40

    e.   Defendants represented that Bruchside Fund I had commitments of $2.5 million, but the Fund only raised approximately $1.3 million.

    f.   Defendants misrepresented that RSM McGladrey was the Fund's U.S. accountant and that Ciel Accounting was the firm's Brazilian accountant.

<u>Bruchside Fund I</u>

280.    Craig and Debbie Kassel invested $250,000 in Bruchside Fund I because Defendants represented they would receive high returns each September after the harvest.

281.    Craig and Debbie Kassel also invested because Defendants told them that they would receive quarterly financials and a yearly audit for the Fund.

282.    Defendants told Craig and Debbie Kassel that the returns they would receive would not be taxable until the amount of their return was more than the amount of their original investment.

283.    Defendants told Craig and Debbie Kassel that each Fund would own its crops and equipment.

284.    Craig and Debbie Kassel received a 40% return on their investment in September of 2007.

285.    In October 2008, Craig and Debbie Kassel also received what Defendants represented was a partial return on their Bruchside Fund I investment.  In reality, this "return" was paid using investor contribution from Bruchside Fund II.

286.    Defendant also promised that Craig and Debbie would receive the remainder of their return by the end of 2008.  Craig and Debbie have not received the remainder of this promised return.

287.    Craig and Debbie Kassel have not received any returns from their Bruchside Fund I investment since 2008, nor have they been repaid their principal.

41

Bruchside Fund II

288.     Craig and Debbie Kassel invested a total of $550,000 in the Bruchside Fund II.

289.     Craig and Debbie Kassel invested in Bruchside Fund II because Defendants promised a 40% return on their investment in Bruchside Fund I.  Further, Defendants told Craig and Deborah Kassel that they would receive the same return on their Bruchside Fund II investment.

290.     Bruch represented that Craig and Debbie would receive these returns during the February 2007 investor tour to Brazil and, again, at the June 26, 2007 Annual Investor Meeting at the Wild Rose Casino in Emmetsburg, Iowa.  Bruch made each of these representations while he was soliciting investments for Bruchside Fund II.

291.     Defendants also represented that Bruchside Fund II money would be used to expand, and that Bruchside Fund II's money and assets would not be commingled with Fund I's money and assets.

292.     In October of 2008, Craig and Debbie received what Defendants represented to be portion of their return on their Bruchside Fund II investment.  In reality, Craig and Debbie's "return" was paid using investor contributions from Bruchside Fund III.

Bruchside Fund III

293.     In April 2008, Craig and Debbie Kassel invested $600,000 in Bruchside Fund III.

294.     Craig and Debbie invested in Bruchside Fund III because of the "returns" that Defendants had paid for  Bruchside Fund I and Defendants promised returns for Bruchside Fund II.

295.     When Craig and Debbie invested in Bruchside Fund III, they only wanted to put money in farming.  Craig and Debbie did not realize they would be investing in the cotton gin as

42

Defendants made no indication that their money would go toward the gin until after Craig and Debbie had invested.

296.     Once Craig and Debbie learned their money would be invested in the gin, Bruch represented the gin would pay for itself through ginning other farmers' cotton.

297.     Craig and Debbie Kassel have not received any returns their Bruchside Fund III investment.

GEORGIA KASSEL

298.     Paragraphs 1 through 297 are incorporated by this reference.

299.     G. Kassel invested in Bruchside Fund II and Bruchside Fund III in reliance on representations regarding: Bruch's prior or expected farming successes in Brazil and expected or received returns on investment.

Bruchside Fund II

300.     On September 19, 2007, Defendants paid what they represented were 40% returns on investment to Bruchside Fund I investors.  These "returns" were actually paid with money from Bruchside Fund II investments.

301.     On October 12, 2007, G. Kassel invested $50,000 in Bruchside Fund II based on information she received from Craig Kassel regarding the returns that Defendants paid for Bruchside Fund I.

302.     Based on her conversations with Craig Kassel, G. Kassel understood Defendants had represented that Bruchside Fund II investors would receive the same returns on their investments that Bruchside Fund I investors had received.

303.     Prior to investing in Bruchside Fund II, G. Kassel reviewed the GAI investment documents that indicated Bruchside Fund I investors would received a 25% to 40% return.

43

304.    G. Kassel's Bruchside Fund II investment paid a return in October 2008, which was actually paid from Bruchside Fund III investors contributions.  Defendants represented that this amount was a portion of her actual return.  Defendants promised that she would receive the balance of her return by December 2008, but G. Kassel has not received the balance of the Bruchside Fund II return.

Bruchside Fund III

305.    G. Kassel invested $160,000 in Bruchside Fund III.

306.    On or about February 9, 2008, Craig Kassel traveled to Bahia, Brazil with Bruch, Hall, and several other Fund investors.  During this trip, Bruch represented that Bruchside Fund I had made a 40% return on investment and that Bruchside Fund II would make a 20% to 35% return on investment.

307.    Prior to investing in Bruchside Fund III, G. Kassel joined Bruch for dinner at Craig and Debbie's home.  During dinner, G. Kassel asked general questions regarding the status of each Fund.  Not once did Bruch ever suggest any issues with the solvency of the Funds or the viability of his Brazilian farming operations.  As Bruch left dinner, he kissed G. Kassel on the cheek.

308.    On April 15, 2008, G. Kassel invested $60,000 in Bruchside Fund III.

309.    On September 22, 2008 G. Kassel invested $100,000 in Bruchside Fund III.

310.    G. Kassel invested in Bruchside Fund III because of the "success" of Bruchside Fund I and the partial returns on her investments in Bruchside Fund II.

311.    G. Kassel did not attend the investor meetings at the Wild Rose Casino in Emmetsburg, Iowa.  Rather, Bruch would make trips to her home, and bring fish from his

44

Alaskan fishing trips when he was in Emmetsburg.  This occurred on at least two separate

occasions.

312.    G. Kassel has never received any return on her investment in Bruchside Fund III.

313.    G. Kassel has not been repaid the principal on her investments in Bruchside Fund

II or Bruchside Fund III, and has not received a return on any GAI investment since October

2008.

PATRICK, JIM, AND JOHN KIBBIE

314.    Paragraphs 1 through 313 are incorporated by this reference.

315.    The Kibbies invested in GAI Funds together and separately in reliance on

representations regarding: prior success or expected success of farming in Brazil and expected or

received returns on investment.

<u>Bruchside Fund II</u>

316.    In March of 2006, after Pat Kibbie had hosted a cook-out at his home, Bruch and

Pat discussed Bruch's farming operations in Brazil, but the Kibbies declined to invest at that

time.

317.    In early 2007, the Kibbies learned about the projected 40% returns for Bruchside

Fund I.  After learning this information, Pat Kibbie contacted Bruch directly about any existing

investment opportunities.

318.    Shortly thereafter in the Spring of 2007, Bruch sent Pat Kibbie a set of

PowerPoint slides discussing Bruchside Fund I's success and the projections for Bruchside Fund

II.

319.    On or about June 18, 2007, about a week before attending the June 26, 2007

investor meeting at the Wild Rose Casino in Emmetsburg, Iowa, the Kibbies, collectively,

45

invested $100,000 in the Bruchside Fund II. The Kibbies signed one set of investment documents, but each Kibbie wrote a check for $33,000.00.

320. The Kibbies invested collectively because of Defendants' representations regarding the looming August 1, 2007 deadline for submitting funds to Bruchside Fund II and Bruch's representations about the difficulties in creating three separate investments in the remaining time before the Bruchside Fund II closed. Despite Defendants representations that Bruchside Fund II was closing on August 1, 2007, which were intended to hasten investment, Bruchside Fund II was still receiving investments in January 2008.

Bruchside Fund III

321. In June 2007 and in June 2008, the Kibbies attended the Defendants' investor meetings at the Wild Rose Casino in Emmetsburg, Iowa. During these meetings, Bruch represented that the 2005-2006 crop had been great.

322. Bruch also represented that Bruchside Fund I made 60% returns, but kept back 20% for equipment and expansion, and paid Bruchside Fund I investors the remaining 40% return on investment.

323. The Kibbies also recall Bruch discussing Bruchside Fund II's projected 25% return and the returns that Bruchside Fund I investors had received.

324. The Kibbies were also induced to invest based on GAI's apparent success. The Kibbies noticed that GAI was renting office space in Emmetsburg, Iowa with a sign the prominently displaying GAI's name. The office had pictures of Bruch in Soybean Digest and other pictures of Bruch in Brazil.

46

325.     On one occasion that Pat Kibbie met with Bruch at GAI's office in Emmetsburg, Iowa, Bruch represented that he intended to obtain an additional farm that included over 10,000 acres.

326.     On or about May 23, 2008, the Kibbies traveled to GAI's office in Emmetsburg, Iowa, where they each invested $30,000 ($90,000 collectively) in the Bruchside Fund III.

327.     In October 2008, the Kibbies received $4,607, which was a portion of the 25% return that Defendants promised on Bruchside Fund II.  That "return" was actually paid with investments money from Bruchside Fund II investors.  Defendants told the Kibbies that the remainder of the 28% return would be paid later; however, they never received any further returns from this investment.

328.     The Kibbies never received any returns on their investment in Bruchside Fund III.

NICK KILL

329.     Paragraphs 1 through 328 are incorporated by this reference.

330.     Kill invested in Bruchside Fund II, Bruchside Fund III, the Cotton Gin Fund, and BOL, LLC in reliance on representations regarding: prior success or expected success of farming in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund money, and the segregation of Fund operations and ownership of assets.

331.     Nick became familiar with Bruch through his writings in the Corn and Soybean Digest in 2007 and prior to 2007.  Nick learned of the 40% returns through Dan Mahone who worked at Midwest Travel, while visiting with him in his office.  Midwest Travel was the agency Bruch used for his travel arrangements.

332.     In the late Summer of 2007, after learning about the 40% returns, Kill sent Bruch an email regarding investment opportunities.  Bruch got back to Nick in late September or early October of 2007.

333.     When Nick talked with Bruch in September and/or October, Bruch represented that Bruchside Fund II was still open.  During this conversation, Bruch represented that he had paid Bruchside Fund I investors a 40% return on investment.  Bruch also stated that one of the major reasons for his high returns was the "big money" that he had made on cotton.

334.     The majority of the information that Kill used to make his investments came directly from conversations that Kill had with Bruch, or his interactions with Bruch during his trips to Brazil in February 2008 and March 2009.

335.     Bruch's success in Bruchside Fund I led Kill to believe that Bruch would be successful in Bruchside Funds II, III, and the Gin Fund.

Bruchside Fund II

336.     Kill invested $350,015 in the Bruchside Fund II in September and October 2007.

337.     During Kill's February 2008 visit to Brazil, Bruch made representations that Bruchside Fund II would make a 26% return.

338.     This trip convinced Kill to invest because the operation looked to be in great working order, and the crops looked to be in great shape.

339.     Kill received $16,126.25 in October 2008 as a return on his investment.

340.     Defendants represented this payment to be a portion of the return that he would receive that year.

341.     Further, Defendants represented that the remaining return was to be paid by December of 2008.  However, he never received any further return on this investment.

48

Bruchside Fund III

342.    In February 2008, Bruch hosted an investor tour to Brazil.  During that tour, Defendants discussed Bruchside Fund I's 40% return, projected 26% returns for Bruchside Fund II, and took investors on tours of the Funds' farm ground and the cotton gin.

343.    During Kill's visit he saw gin, and noted that GAI's office seemed to be legitimate process.

344.    After harvest, Defendants told Kill that his return for Bruchside Fund II had been reduced from 26% to 18%, but Kill was still please with this return.

345.    Kill invested $370,000 in the Bruchside Fund III in April and October 2008 based what Kill observe during the February 2008 investor tour in Brazil and based on Defendants representations during the investor trip.

346.    Kill never received any returns on his Bruchside Fund III investment and Kill's principal has not been returned.

Cotton Gin Fund

347.    Kill was one of the initial investors in the Gin Fund.  Kill invested $100,000 in the Gin Fund on October 29, 2007 based on Bruch's representations that there was a 40% return on Bruchside Fund I, and Bruch's representations that those returns were largely due to "big money" raising cotton.

348.    Bruch reinforced purported high returns during a fishing trip of the coast of Brazil during the February 2008 investor trip to Brazil.  During that time, Bruch representation to Kill that not only would Kill get 15% on his cotton gin investment, but Kill would receive an additional 3% because he was one of the initial Gin Fund investors.

49

349.     Kill received $17,515.46 from his investment in January of 2009, but has not received any further return on his investment or a return of his principal.

BOL Fund

350.     In March 2009, Kill made a trip to Brazil.  During this trip the investors, which included Kill, visited the fields, the cotton gin, and Defendants were building a new office for the Brazil farming operations.  Each of these facts led Kill to believe the operations were in good order.

351.     Kill invested $30,000 in BOL Fund I on or about December 1, 2009.

352.     Defendants told Kill that this fund would raise $3 to $4 million.

353.     Defendants told Kill that he was guaranteed an 18% return on his investment because the security was the first priority on the funds from the sale of crops.

354.     Defendants told Kill that the money were necessary in order for other GAI Funds to be successful.

355.     Kill relied Defendants representations because Bruchside Fund I had paid investors a 40% return.

356.     Kill never received any interest from his investment in the BOL Fund I.

TODD LUNDGREN

357.     Paragraphs 1 through 356 are incorporated by this reference.

358.     Lundgren invested in the Bruchside Fund II and the Gin Fund in reliance on representations regarding: Bruch's prior success or expected success of farming in Brazil and expected or received returns on investment.

359.     Lundgren learned about GAI's investment opportunities through Craig and Debbie Kassel and his personal banker Rick Jones.

50

360.     In approximately March of 2007, Craig Kassel introduced Lundgren to Bruch at Dublin's Restaurant in Emmetsburg, Iowa.

361.     During this meeting, Bruch explained, among other things, that his Brazilian farming operations (which Bruch represented had lower expenses, cheaper inputs, and cheaper labor) would produce a big return on investment. Bruch also discussed the returns from Bruchside Fund I and the amount of money that had been raised for Bruchside Fund II.

362.     On or before March 29, 2007, after Lundgren's initial meeting with Bruch, Lundgren reached out to Bruch for more information regarding the Funds and potential GAI investment opportunities.

363.     On or about March 29, 2007, Bruch responded to Lundgren with information regarding the opening Bruchside Fund II.

Bruchside Fund II

364.     In June 2007, Lundgren invested $50,000 in Bruchside Fund II based largely on the Defendants representations regarding 40% returns for Bruchside Fund I.

365.     In October 2008, Defendants paid Lundgren what they represented was a partial return on his Bruchside Fund II investment. In reality, Lundgren's "return" was paid from Bruchside Fund III investor contributions.

366.     Defendants also told Lundgren that he would receive the remainder his Bruchside Fund II return by December 2008, but never received the balance of his return.

Gin Fund

367.     Lundgren invested $50,000 in the Gin Fund based on Defendants' representations regarding 40% returns for Bruchside Fund I.

368.     In addition, Defendants told Lundgren the Gin Fund would pay 18% per year.

51

369.     Defendants told Lundgren that he would be part owner of the gin and that when the cotton gin was liquidated, his principal would be returned.

370.     Lundgren's Cotton Gin Fund investment paid $6,882.65 in January 2009, but he has not received any further interest on his investment or a return of his principal.

371.     On three occasions, between April 2010 and July 2010, Lundgren's aviation company (AFAB) flew Bruch to different destinations.  During these flights, Bruch and Lundgren had lengthy conversations.  Lundgren recalls Bruch talking about how well the company was prospering and the bright future of Global Ag.  Bruch would also discuss how he and Lundgren should "partner up" and buy a larger airplane to help Bruch get to his destinations quicker.

372.     During the flights Bruch would boast about the high returns on investment of his Funds and the excellent farming operations in Brazil.

373.     Lundgren recalls that Bruch would always say he went from "zero to Hero."

EDWARD AND JOSEPH NOONAN

374.     Paragraphs 1 through 373 are incorporated by this reference.

375.     Edward ("**Ed**") and Joseph Noonan invested in Bruchside Fund II and in Bruchside Fund III in reliance on representations regarding: prior success or expected success of farming in Brazil and expected or received returns on investment.

Bruchside Fund II

376.     The Noonans invested $200,000 in the Bruchside Fund II.  Ed Noon invested $100,000 of his money on his own behalf and his son Joseph took at a $100,000 loan to invest for which Ed co-signed.

377.    Although Ed was enticed by the 40% returns from Bruchside Fund I, he was convinced to invest based on the information Defendants provided in the June 26, 2007 PowerPoint presentation at the Wild Rode Casino in Emmetsburg, Iowa.

378.    The Noonans invested in Bruchside Fund II on July 27, 2007, after having attended the June 26, 2007 PowerPoint presentations during which Bruch discussed Bruchside Fund I's 40% return.

379.    Ed invested in Bruchside Fund II because he believed he would get at least a 25% return on his Bruchside Fund II investment based on Bruchside Fund I's success.

380.    The Noonans each received $4,607.50 from their investments in Bruchside Fund II.  Defendants represented that this payment was 25% of a 24% investment in Bruchside Fund II, but these "returns" were actually paid from investors Bruchside Fund III investments.

381.    Defendants told the Noonans that they would be paid the remainder of the funds in December 2008, but the Noonans have never received the rest of the return they were promised.

Bruchside Fund III

382.    In mid to late 2008, Ed received a letter from Defendants regarding returns to be paid on Bruchside Fund II.  This letter regarding Bruchside Fund II caused Ed to invest in Fund III on his behalf and his son's behalf.

383.    The Noonans invested $100,000 in Bruchside Fund III in April 2008.

384.    The Noonans never received a return on their investments in Bruchside Fund III.

JACK REICHERT

385.    Paragraphs 1 through 384 are incorporated by this reference.

53

386.	Reichert invested $50,000 in the Bruchside Fund II, and $25,000 in the Biodiesel Fund in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund money, segregation of Fund operations, segregation and ownership of assets.

387.	On June 11, 2007, Todd Lundgren faxed Reichert GAI's handout entitled "Global Ag Investments, LLC presents Bruchside Fund I, LP," which made the following false representations:

   a.	Defendants misrepresented the Fund size as $5-10 million dollars when Defendants only raised approximately $1.3 million.
   b.	Defendants misrepresented the investment period of seven to ten years.
   c.	Defendant misrepresented that return on investment would be 25% to 40%.
   d.	Defendants misrepresented that Bruchside Fund I would farming 3,000 – 8,000 hectares when the Fund was actually only farming 2,300 hectares.
   e.	Defendants represented that Bruchside Fund I had commitments of $2.5 million, but the Fund only raised approximately $1.3 million.
   f.	Defendants misrepresented that RSM McGladrey was the Fund's U.S. accountant and that Ciel Accounting was the firm's Brazilian accountant.

388.	Upon receipt of GAI's handout entitled "Global Ag Investments, LLC presents Bruchside Fund I, LP," Reichart reviewed the handout and made detailed notes regarding the representations in the documents.

389.	In June 2007, after receiving and reviewing GAI's handout entitled "Global Ag Investments, LLC presents Bruchside Fund I, LP," Reichart spoke with Bruch on the phone regarding the GAI's handout entitled "Global Ag Investments, LLC presents Bruchside Fund I, LP."  Based on this phone, call Reichart believed that Bruch had specialized expertise and knowledge regarding Brazilian farming operations and interacting with the Brazilian government.

54

390. Between July 9, 2007 and December 18, 2007, Reichart recalls meeting with Bruch at GAI's offices in Emmetsburg, Iowa regarding the biodiesel fund. Based on this meeting, Reichart understood that the investments in the Biodiesel Fund would be used by Bruch to obtain the necessary permits and complete the necessary legal work for the Biodiesel plant.

391. Bruch created in Reichart that understanding that permits were very difficult to obtain and that Bruch had specialized knowledge, expertise, and contacts for getting this done.

392. During this meeting, Bruch also represented that the first returns would be principal, which would be non-taxable and that after all principal had been returned, any remaining returns would be taxable.

393. Bruch further represented that Biodiesel investors' principal would be returned in two years and, in addition, Biodiesel investors would receive a substantial return on investment that would meet or exceed the returns on Bruchside Fund I.

394. Reichart recalls having a second meeting with Bruch at GAI's office in Emmetsburg, Iowa. During that meting, which occurred after December 18, 2007, he discussed the current status of the Biodiesel farming operations. During that meeting, Bruch represented that all investments were doing well and performing as expected. Bruch made no representations indicating the Funds were underperforming.

Bruchside Fund II

395. On July 9, 2007, Reichert invested $50,000 in Bruchside Fund II.

396. Reichart's investment in Bruchside Fund II was influenced by: (1) GAI's handout entitled "Global Ag Investments, LLC presents Bruchside Fund I, LP," (2) Bruch's family's reputation as being trustworthy and honest, and (3) Reichart understanding of Bruch's expertise based on their phone conversation.

397.     Reichert invested after he learned that the investors in Bruchside Fund I had received a 40% return on their investment.

398.     Reichert invested because Defendants represented that Bruchside Fund II would receive similar returns to Bruchside Fund I.

399.     Defendants told Reichert that each Fund's money and assets would be segregated and that each Fund would pay separate administrative fees.  Specifically, he recalls that the Funds' assets and money were not to be commingled.

400.     Defendants represented that Reichert would receive quarterly financials and a yearly audit, which never received.

401.     In October 2008, Reichert received $2,304, which Defendants represented to be 25% of a 24% return from Bruchside Fund II.  However, these "returns" were actually paid from Bruchside Fund III investor contributions.

402.     Defendants represented that Reichert would receive the remainder of his return by December 2008.  However, he never received any further return on his investment.

Biodiesel Fund

403.     On December 18, 2007, Reichert invested $25,000 in the Biodiesel Fund.

404.     The following factors induced Reichart to invest in the Biodiesel Fund: (1) Tyler's success with Bruchside Fund I; (2) Bruch's apparent expertise/knowledge of the Brazilian government and Brazilian farming operations, and (3) Bruch's representations that the Biodiesel Fund would have a "quick" return on investment.

405.     Bruch told Reichart that the sole purpose of the money invested in the Biodiesel Fund was for Bruch to obtain the proper permits and legal work to build a Biodiesel Plant.

56

406.     Bruch also told Reichart that he would then sell the permits and legal work to a third-party who would build the Biodiesel plant, which would result in quick repayment of Reichart's principal investment plus a significant return on investment that would exceed Bruchside Fund I's return on investment.

407.     Based on Bruch's representations, Reichart expected to reinvest his "quick" returns from Biodiesel Fund in subsequent GAI investments.  Further, Reichart's trust in Bruch was key factor in Reichart's Biodiesel investment.

408.     Reichert also invested because Defendants represented that Global Ag was going to start up a biodiesel company and there was a large market for Biodiesel fuel in Brazil.

409.     Defendants told Reichert that Biodiesel would "break ground" in a month.

410.     Reichert has not received his principal or a return on his investment.

DENNIS SAGEZ

Bruchside Fund II

411.     Paragraphs 1 through 410 are incorporated by this reference.

412.     On or about July 23, 2007, Sagez invested $50,000 in Bruchside Fund II.

413.     Sagez initially interacted with Bruch through Sagez' efforts to purchase farmland in Brazil.  As part of those efforts, Sagez traveled to Brazil in July of 2007 to view the farmland, but he was unable to purchase that farmland.

414.     During his time in Brazil in July of 2007, Sagez had an opportunity to meet with Bruch, tour his Brazilian operations, see Bruch's purported farm manager, and meet with Bruch's purported accountant.

415.     During this trip, Bruch told Sagez that his 2006 and 2007 farming operations in Brazil had been profitable.  Bruch also represented that he was paying his investors 35% returns.

57

416.    Sagez also recalls Bruch stating he had an "off-shore account" in the Mediterranean.

417.    On July 23, 2007, shortly after meeting with Bruch in Brazil, Sagez invested $50,000 in Bruchside Fund II based on his observations of Bruch's Brazilian operations, Bruch's representations regarding his profitability, and his 35% returns.  Sagez also relied upon a document that Bruch gave him titled "B Plan for Fund II July 2007."

418.    In addition to the foregoing representations, Bruch told Sagez that he would receive his principal back first, which would not be taxed, then Sagez would receive returns that were taxable, but Sagez' returns were taxed immediately.

419.    Defendants also promised Sagez quarterly and annual audited reports, which he did not receive.

420.    Sagez received $2,303.75 in October of 2008, which Defendants represented was a return of capital, but this "return" was actually paid by money from investors Bruchside Fund III investments.

421.    Sagez has received no further returns – either as a return of principal or a return on investment.

422.    Sagez has repeatedly asked for financial information, but has never received any information.

423.    Bruch did not disclose to Sagez that the farming operations in Brazil were not profitable in 2006 and 2007, or that Defendants regularly commingled investors' money across GAI's Funds.

<u>HAROLD SCHROEDER</u>

424.    Paragraphs 1 through 423 are incorporated by this reference.

58

425.     Schroeder invested in the Bruchside Fund III and BOL, LLC in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil and expected or received returns on investment.

426.     Schroeder was aware of Brazilian agricultural investment opportunities through his travels to Brazil and Schroeder's involvement in Brazil Iowa.

427.     Schroeder's discussions with Nick Kill and Nick Kill's involvement with GAI were factors that influenced Schroeder's decisions to pursue GAI investment opportunities. Schroeder was also influenced by his review of GAI's website and the information contained on that website.

Bruchside Fund III

428.     On April 15, 2008, Schroeder invested $50,000 the Bruchside Fund III based on the information that Harold obtained from GAI's website.

429.     Schroeder also invested based on his understanding that Bruchside Fund I had been highly successful and made very high returns.

430.     Schroeder has never received any return on his Bruchside Fund III investment.

BOL, LLC

431.     On November 24, 2009, Schroeder invested $10,000 in BOL based on the information that Schroeder obtained from GAI's website.  In addition, Schroeder was influenced to invest in BOL by the June 27, 2009 investor meeting at the Wild Rose Casino in Emmetsburg, Iowa.

432.     Schroeder invested because Defendants told him that he would receive an 18% annual return.

433.     Defendants told Schroeder that BOL needed to raise three to four million dollars.

434.     Defendants also told Schroeder that crops would provide security for the loan and that payment for his BOL investment would have a priority over payments to the other GAI Fund investors.

435.     Defendants told Schroeder that he would receive his first BOL interest payment no later than December 30, 2010.

436.     Schroeder has not received income on his investment in BOL, LLC.

<u>CATHERINE TIESZEN</u>

437.     Paragraphs 1 through 436 are incorporated by this reference.

438.     Catherine Tieszen invested in the Bruchside Fund II and the Bruchside Fund III in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil and expected or received returns on investment.

439.     Catherine Tieszen is Reed Tieszen mother and Eric and/or Reed Tieszen's grandmother.  Catherine invested in Bruchside Fund II based on Eric's recommendation, which included discussions regarding Bruchside Fund I's high promised returns and Bruchside Fund II's  high projected returns.

<u>Bruchside Fund II</u>

440.     In August 2007, Catherine Tieszen invested $100,000 in the Bruchside Fund II.

441.     Catherine Tieszen invested based on her understanding, resulting from Defendants representations, that Bruchside Fund I had made a 60% profit in the first year and that Bruchside Fund I investors would be receiving a 40% return only because some funds were being reinvested in the company.

442.     Catherine Tieszen also invested because Defendants represented that Bruchside Fund II investors would receive returns between 25% and 40%.

60

443.     In October 2008, Catherine received what Defendants represented was a portion of her return on her Bruchside Fund II investment.  In reality, Defendants paid Catherine's "return" using money from Bruchside Fund III contributions.  Further, although Defendants promised Catherine that she would receive the remaining amount of her return by the end of 2008, she has never received it.

444.     Catherine has not received any additional returns from Bruchside Fund II or a return of her principal.

Bruchside Fund III

445.     In April 2008, Catherine Tieszen invested $100,000 in the Bruchside Fund III.

446.     Catherine Tieszen invested in Bruchside Fund III based on Defendants' representations regarding the success of Bruchside Fund I and Fund II.

447.     Catherine Tieszen never received any return on her investments in Bruchside Fund III.

CRAIG TIESZEN

448.     Paragraphs 1 through 447 are incorporated by this reference.

449.     Craig Tieszen invested in the Bruchside Fund II and the Bruchside Fund III in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil and expected or received returns on investment.

450.     Reed Tieszen is Craig's brother, Eric Tieszen is Craig's nephew, and John Tieszen is Craig's father.  Prior to investing, Craig knew that Reed, Eric, and John were investors.  Further, Craig knew that Eric would be "on the ground" in Brazil assisting Bruch with farming operations as an agronomist, which gave Craig great comfort with the investment.

451.    Prior to investing, Craig learned that Bruchside Fund I had paid 40% returns to Bruchside Fund I investors.  He also understood that Bruchside Fund II anticipated future high returns, and that Bruch would be expanding the Funds' Brazilian farming operations.

Bruchside Fund II

452.    In September 2007, Craig Tieszen invested $50,000 in the Bruchside Fund II.

453.    As noted above, Craig Tieszen invested after learning about the 40% returns from Bruchside Fund I.

454.    Defendants also told Craig Tieszen that the return on Bruchside Fund II would be between 25% and 40%.

455.    In a letter dated October 3, 2008, Defendants told Craig Tieszen that he would receive a 22.43% return on Bruchside Fund II, but, instead, Craig Tieszen received $2,303.75. The funds Craig received were not returns from the Fund II.  Rather, these "returns" were paid with money invested in Bruchside Fund III.  Although Defendants promised that he would receive the remaining amount of the return, he has never received it.

456.    Craig Tieszen lost his principal and the use of his funds invested in the GAI Funds.

Bruchside Fund III

457.    In April 2008, Craig Tieszen invested $15,000 in the Bruchside Fund III.

458.    Craig Tieszen invested based on the returns that Bruchside Fund I paid its investors and his understanding that Bruch intended to use the money from Bruchside Fund III investments for expansion of operations to ensure future returns.

459.    Craig Tieszen never received any return on his investments in Bruchside Fund III.

62

460.     Craig Tieszen lost his principal and the use of his funds invested in the GAI

Funds.

ERIC AND AMY TIESZEN

461.     Paragraphs 1 through 460 are incorporated by this reference.

462.     The Tieszens invested in the Bruchside Fund I, II, and the Biodiesel Fund in

reliance on representations regarding: prior or expected farming successes of Bruch in Brazil,

expected or received returns on investment, promised receipt of financial statements, segregation

of Fund money, segregation of Fund operations, segregation and ownership of assets, and

taxation of returns when they invested in Bruchside Fund I, II and the Biodiesel Fund.

Bruchside Fund I

463.     In April or May 2006, the Tieszens invested $100,000 in the Bruchside Fund I.

464.     The Tieszens invested because Defendants told them that the returns on their

investment would be 25% to 40%.

465.     At the time the Tieszens invested in Fund I, Defendants' represented that the

Tieszens would be equity owners in the Fund.

466.     Defendants told the Tieszens that they would be provided with quarterly

financials and a yearly audit.

467.     In July 2007, Eric began working for Bruch in Brazil as an agronomist.  Bruch

wanted an American agronomist to come down in order to facilitate expansion of Bruch's

Brazilian operations.  As an agronomist, Eric had no access to any of the Funds financial

information.  Rather, Eric operated solely as a precision agricultural agronomist focusing on

fertility.

63

468.     Based on Eric's conversation with Bruch, Bruch's initial plan was to solicit investments from Wall Street investors, but when that plan fell through, Bruch turned to investors in Emmetsburg, Iowa.

469.     In September 2007, prior to paying Bruchside Fund I returns, Eric specifically recalls Bruch stating that he was waiting for Bruchside Fund II money to arrive in order to pay Bruchside Fund I returns.  During this call, Bruch also made the representation that Bruchside Fund I had made a profit.

470.     Eric recalls making the specific statement to Bruch that his proposed payment structure appears to be a pyramid scheme, but Bruch assured Eric that no such scheme existed.

471.     In September of 2007, the Tieszens received what Defendants represented was a 40% return on their investment in Bruchside Fund I.  In reality, the Tieszens' "returns" had been paid by investor contributions to Bruchside Fund II.

472.     Defendants represented that the remainder of the Tieszens' return would be paid by the end of the year, but the Tieszen never received the balance of their return.

473.     In October 2008, the Defendants paid the Tieszens what they represented was a portion of their 22% return on their investment in Bruchside Fund I.  In reality, the Tieszens' "returns" had been paid by investor contributions to Bruchside Fund III.

474.     The Tieszen have not received any additional returns for Bruchside Fund I.

Bruchside Fund II

475.     In April and August 2007, the Tieszens invested a total of $178,000 in Bruchside Fund II.

476.     The Tieszens invested in Bruchside Fund II because of the returns Defendants promised on their Bruchside Fund I investment.

64

477. In October 2008, the Defendant paid the Tieszens what they represented was a portion of their on their investment in Bruchside Fund II. In reality, the Tieszens' "returns" had been paid by investor contributions to Bruchside Fund III.

478. Defendants represented that the remainder of the Tieszens' return would be paid by the end of the year, but the Tieszen have never received the balance of their return.

479. The Tieszens lost their principal and the use of their funds invested in the GAI Funds.

Biodiesel Fund

480. In October 2007, the Tieszens invested $100,000 in the Global Ag Biodiesel Fund.

481. The Tieszens invested based on Defendants representations that Global Ag was going to start up a biodiesel company and that there was a large market for Biodiesel fuel in Brazil.

482. Bruch told the Tieszens that the goal of Global Ag Biodiesel was to acquire and execute all of necessary "legal approvals, permits, and documents" in Brazil so as to sell the operation to another organization.

483. Bruch repeatedly told the Tieszens that the Biodiesel facility would "break ground" in a month. But, to date, no construction on the Biodiesel plant has begun, and there is not indication that Bruch obtained the legal approvals, permits, and documents that he represented he would obtain with the Tieszens' investment.

484. Defendants told the Tieszens that they would receive their principal back in two years and then they would receive double that amount as a return on their investment.

485.     The Tieszens have not received any returns or payment from their Biodiesel investment.

<u>REED AND MARY TIESZEN</u>

486.     Paragraphs 1 through 485 are incorporated by this reference.

487.     Reed and Mary Tieszen invested in the Bruchside Fund II, the Bruchside Fund III, and the Biodiesel Fund in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund money, segregation of Fund operations, segregation and ownership of assets, and taxation of returns.

488.     Reed and Mary learned about these investment opportunities through their son Eric Tieszen who worked for Bruch in Brazil.

489.     In January 2006, Reed attended a Bruchside Fund I fundraising meeting at the Ramkota Inn in Sioux Fall, South Dakota.  During that meeting, Bruch presented the "Global Ag Investment, LLC presents Bruchside Fund I, LP" PowerPoint presentation and Reed received a handout of the same.

490.     Although Reed decided not to invest at that time, Reed remained interested in GAI investment opportunities.

491.     In February 2007, Reed participated in the February 2007 investor tour to Brazil notwithstanding the fact that he did not invest in Bruchside Fund I.  Reed participated in the trip based on his interest in Bruchside Fund I.

492.     During the February 2007 trip, Defendants promised a 40% return on Bruchside Fund I.  Further, Defendants represented that Bruchside Fund II investors would receive the same returns on their Bruchside Fund II investment.

66

493. In the Spring of 2007, Eric told Reed that Bruchside Fund I was going to pay a 40% return on investment, which confirmed Bruch's representations during the February 2007 investor tour.

<u>Bruchside Fund II</u>

494. In June and August 2007, Reed and Mary Tieszen invested a total of $200,000 in the Bruchside Fund II.

495. Reed and Mary Tieszen invested because of Defendants' representations that Bruchside Fund I had made a 60% profit in the first year and that Bruchside Fund I investors would receive a 40% return.

496. Reed and Mary also invested based on Defendants' representations that Bruchside Fund II would pay returns between 25% and 40%.

497. Further, Reed and Mary invested based on Defendants' representations that the respective Funds' money would not be commingled and that the respective Funds' crops would be segregated. Specifically, Reed understood that he would own equity in Bruchside Fund II and that he would own the crops in Fund II.

498. In October 2008, Defendants paid Reed and Mary Tieszen what they represented to be a portion of their Bruchside Fund II return. In reality, Defendants paid Reed and Mary's "return" using Bruchside Fund III investors' contribution. Although Defendants promised Reed and Mary that they would be paid their remaining return, they have never received it.

499. Reed and Mary Tieszen lost their principal and the use of their funds invested in the GAI Funds.

<u>Bruchside Fund III</u>

500. In February 2008, Reed and Mary attended a second investor tour in Brazil.

501.    In April 2008, Reed and Mary Tieszen invested $200,000 in the Bruchside Fund III based on the returns Defendants paid Bruchside Fund I investors and Defendants' projected returns for Bruchside Fund II.

502.    In addition, Defendants represented that, as a Bruchside Fund II investors, Reed and Mary would have a partial investment in the Gin Fund that paid and 18% return.

503.    Reed and Mary Tieszen have never received a return on their investments in Bruchside Fund III.

Biodiesel Fund

504.    In or about October 2007, Reed and Mary Tieszen invested $50,000 in the Global Ag Biodiesel Fund.

505.    Defendants represented that that Global Ag was going to start up a biodiesel company and that there was a large market for Biodiesel fuel in Brazil.

506.    Reed and Mary invested based on Defendants representations that their money would be returned quickly – in two year or less.

507.    Defendants told Reed and Mary Tieszen that the goal of Global Ag Biodiesel was to acquire and execute all of the necessary "legal approvals, permits and documents" in Brazil so as to sell the operation to another organization. Defendants represented that Reed and Mary's Biodiesel investment would be used to buy legal permits necessary to build the Biodiesel plant, which would then be sold to make a profit. Defendants represented that through this process, Reed and Mary's investment would be doubled.

508.    Reed and Mary Tieszen have repeatedly inquired as to the status of the Biodiesel Fund and have not been given any answer regarding the status of the operation.

68

509.    Reed and Mary Tieszen have not received their principal or a return on their investment.

DEAN AND AMY VER MULM

510.    Paragraphs 1 through 509 are incorporated by this reference.

511.    Dean and Amy Ver Mulm invested in Bruchside Fund I and Bruchside Fund II in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund money, segregation of Fund operations, segregation and ownership of assets, and taxation of returns.

512.    Dean knew Bruch and Bruch's family through various interactions in the community.

513.    Dean approached Bruch regarding GAI investments after hearing, through the community, that Bruch was starting a fund.  During Dean's initial discussions with Bruch, Bruch stated that he intended to buy land in Brazil, and then use the investments to get a great return.

514.    Dean also knew that Bruch's family had been involved in Brazilian farming for several years prior to this time.  Bruch's family's history, experience, and knowledge of Brazilian farming operations were very important to Dean.

515.    In mid to late 2006, Dean attended a meeting at the Ramada Inn in Sioux Falls, South Dakota regarding Bruchside Fund I.

516.    During that meeting, Bruch gave attendees a presentations using PowerPoint handouts entitled "Global Ag Investments, LLC presents Bruchside Fund I, LP."  Those handout made the following false representations:

    a.  Defendants misrepresented the Fund size as $5-10 million dollars when
        Defendants only raised approximately $1.3 million.

69

b.  Defendants misrepresented the investment period of seven to ten years.
c.  Defendant misrepresented that return on investment would be 25% to 40%.
d.  Defendants misrepresented that Bruchside Fund I would farming 3,000 – 8,000 hectares when the Fund was actually only farming 2,300 hectares.
e.  Defendants represented that Bruchside Fund I had commitments of $2.5 million, but the Fund only raised approximately $1.3 million.
f.  Defendants misrepresented that RSM McGladrey was the Fund's U.S. accountant and that Ciel Accounting was the firm's Brazilian accountant.
g.  This information was also very important to Dean as it showed Bruch's purported "expertise" in Brazilian farming operations.

517.     During that meeting, Bruch told Dean that Bruchside Fund I was structured in such a way that investors would not be taxed for initial returns, as the first returns would be return of principal, and, as such, investor would not have to pay taxes on those returns.  Rather than not being taxed as Bruch represented, investors' 40% returns were immediately taxed, which was inconsistent with Bruch initial representations.

518.     During that meeting, Dean also recalls Bruch stating that Bruchside Fund I would return 40%.  Dean further understood that he was to be a partial owner, with other investors, of the crops, the farm, and the farm's machinery.

519.     Dean also recalls Bruch making representations about how wonderful the Funds Brazilians operations were going.  Dean never recalls Bruch making any negative statements regarding the Funds or the Brazilian operations while he was soliciting Dean's investment.

Bruchside Fund I

520.     In March 2006, Dean and Amy Ver Mulm invested $75,000 in the Bruchside Fund I.

521.     Dean and Amy Ver Mulm invested because Defendants told them that the return on their investment would be 40% to 60%.

70

522.     Defendants told Dean and Amy Ver Mulm that each fund was separate because the assets of each fund were supposed to be liquidated after five years and also that each fund would have separate management fees.

523.     Defendants also told Dean and Amy Ver Mulm that they would be provided with quarterly financials and a yearly audit.

524.     Dean and Amy Ver Mulm received a 40% return on their investment in Bruchside Fund I, $30,000, in September of 2007.  They received a return of $5,607.50 in October of 2008 on Bruchside Fund I.

525.     After Bruch paid Bruchside Fund I investors what represented was a 40% return on their investment and Bruchside Fund II investors their returns, Bruch represented that Bruchside Fund II would continue to produce 38% or 40% return which would not be paid all at one time, but would be split out over three or four payments.

<u>Bruchside Fund II</u>

526.     In April 23, 2007, August 2, 2007, and September 5, 2007 Dean and Amy Ver Mulm invested a total $125,000 in the Bruchside Fund II.

527.     Dean and Amy Ver Mulm invested in the Bruchside Fund II because Defendants promised certain returns on their Bruchside Fund I investment.

528.     They invested the third time in Bruchside Fund II because they had received the 40% return on their Bruchside Fund I investment.

529.     Dean also understood, based on Defendants' representations regarding Bruchside Fund II's structure, that Bruchside Fund II's money and assets would not be commingled with Bruchside Fund I's money and assets.  Dean later learned from Defendants that assets had always been commingled.

530.    In a letter dated October 3, 2008, Defendants told Dean and Amy Ver Mulm that they would receive a 22.43% return on Bruchside Fund II but, instead, Dean and Amy Ver Mulm received $5,607.50.  Although Defendants promised Dean and Amy Ver Mulm that they would pay the remaining amount of the return, Dean and Amy Ver Mulm have never received it.

531.    Dean and Amy Ver Mulm lost their principal and the use of their funds invested in the GAI Funds.

## PETER VER MULM

532.    Paragraphs 1 through 531 are incorporated by this reference.

533.    Peter Ver Mulm invested in the Bruchside Fund II, the Bruchside Fund III, and the Cotton Gin Fund in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil, expected or received returns on investment, promised receipt of financial statements, segregation of Fund money, segregation of Fund operations, segregation and ownership of assets, and taxation of returns when he invested in Bruchside Fund II, III and the Cotton Gin Fund.

534.    Peter Ver Mulm relied on his son, Dean Ver Mulm – who also invested in GAI Funds, for information regarding the Funds.

### Bruchside Fund II

535.    In October 2007, Peter Ver Mulm invested $50,000 in the Bruchside Fund II – nearly a month after Defendants paid his son what they represented to be a 40% return on his Bruchside Fund I investment.

536.    In October 2008, Defendants paid Peter what they represented to be a portion of the return for Peter's Bruchside Fund II investment.  In reality, Defendants paid Peter's "return"

using Bruchside Fund III investor contributions. Although Defendants promised Peter he would receive the remainder of his return by the end of 2008, he has never received it.

537. Peter Ver Mulm lost his principal and the use of his funds invested in the GAI Funds.

Bruchside Fund III

538. In April 2008, Peter Ver Mulm invested $15,000 in the Bruchside Fund III.

539. Peter Ver Mulm never received any return on his investments in Bruchside Fund III.

540. Peter Ver Mulm lost his principal and the use of his funds invested in the GAI Funds.

GAI Cotton Gin Fund

541. In December 2007, Peter Ver Mulm invested $30,000 in the GAI Cotton Gin Fund.

542. Peter Ver Mulm invested in the Gin Fund just months after Defendants paid his son what they represented to be a 40% return on his Bruchside Fund I investment

543. Defendants represented that Peter Ver Mulm would own part of the cotton gin and that he would receive 18% per year in income.

544. In January 2009, Peter Ver Mulm received $4,692 as an interest payment on his investment in the GAI Cotton Gin Fund.

545. Since January of 2009, Peter Ver Mulm has received no further interest payment for his investment in the GAI Cotton Gin Fund.

WEBER FAMILY FARM

546. Paragraphs 1 through 545 are incorporated by this reference.

547.    George and Linda Weber (the "**Webers**"), through Weber Family Farm, invested in the Bruchside Fund II and the Bruchside Fund III in reliance on representations regarding: prior or expected farming successes of Bruch in Brazil and expected or received returns on investment.

Bruchside Fund II

548.    The Webers invested $100,000 in Bruchside Fund II.

549.    The Webers attended Defendants' Bruchside Fund I and Bruchside Fund II presentation on June 26, 2007 in Emmetsburg, Iowa based on a recommendation from their son-in-law Eric Tieszen who had worked with Bruch at an elevator in Emmetsburg, Iowa.

550.    Bruch had told Eric Tieszen that Bruchside Fund I had received a 40% return on investment. Bruch had also told Eric Tieszen that Bruchside Fund II and Bruchside Fund III should have similar returns. These representations encouraged the Webers to attend the June 26, 2007 PowerPoint presentation at the Wild Rose Casino.

551.    On June 26, 2007, the Webers also received a hard copy of the PowerPoint presentation for Bruchside Fund I and Bruchside Fund II.

552.    On August 7, 2007, the Webers invested $100,000 in Bruchside Fund II based on the Defendants' representations during the June 26, 2007 presentation.

553.    The Webers invested in Bruchside Fund II based on representations by Defendants during the PowerPoint presentations that Bruchside Fund I had made 60% returns in the first year and representations that the investors would be receiving a return of only 40% because some funds were being reinvested in the company.

554.    The Webers also invested based on Defendants representation during the PowerPoint presentations that Bruchside Fund II's return would be between 25% and 40%.

555.    In July 2007, their son-in-law, Eric Tieszen, moved to Bahia, Brazil to work for Bruch in his Brazilian farming operations.

556.    In a letter dated October 3, 2008, Defendants represented that the Webers would receive a 22.43% return on Bruchside Fund II but, instead, the Webers received $4,607.50, which was actually paid using investments money from Bruchside Fund III.  Although Defendants promised the Webers that they would receive the remaining amount of their return, they have never received it.

557.    The Webers lost their principal and the use of their funds invested in Bruchside Fund II.

Bruchside Fund III

558.    The Webers invested $300,000 in the Bruchside Fund III.

559.    In December of 2007, the Webers visited Bruch's Brazilian farming operations. During that visit, Bruch repeatedly made representations regarding the success of the Brazilian operations and his intentions to expand the operations.  At no point did Bruch make any representations or provide any information about the dire financial conditions of the Funds.

560.    Upon their return to the United States, the Webers were coerced to invest because of Defendants' representations that Bruchside Fund III's close was imminent.

561.    On March 25, 2008, the Webers took their $300,000 payment to GAI's offices in Emmetsburg, Iowa where they met with Bruch.  During that meeting with Bruch, he showed the Webers pictures of the crops and the land in Bahia, Brazil, pictures of the machinery and operations, and made additional representations regarding the profitability and returns for the Funds.

562.    The Webers invested based on Bruch's projections and representations of the high returns for Bruchside Fund II.

563.    The Webers never received any return on their investments in Bruchside Fund III.

## COUNT I

### DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, HALL, ARTAH HOLDINGS, ,, BOL, LLC, ARE LIABLE TO PLAINTIFF PURSUANT TO SECTION 12(a)(2) OF SECURITIES ACT OF 1933

564.    Plaintiffs hereby reassert, and incorporate by this reference, paragraphs 1 through 563 as though fully set forth herein.

565.    The interests in GAI Funds that Defendants offered and sold to Plaintiffs are securities as defined by 15 U.S.C. § 77b(a)(1).

566.    Defendants offered and sold GAI Funds' securities to the Plaintiffs.

567.    As set forth above, Defendants made untrue statements of fact and/or omitted material facts in connection with the respective GAI Funds' securities they sold to the respective Plaintiffs.

568.    Defendants used the mails and/or facilities of interstate commerce to sell GAI Funds' securities to Plaintiffs.

569.    Defendants conduct was a proximate cause of the Plaintiffs' damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against the Defendants in an amount that will fully and fairly compensate Plaintiffs for their damages, including, but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

76

**COUNT II**

**DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, ART A. HALL, ARTAH HOLDINGS, L.L.C., BOL, LLC'S, VIOLATION OF SECTION 10(b) OF THE 1934 ACT AND RULE 10b-5 THEREUNDER**

570.     Plaintiffs hereby reassert, and incorporate by this reference, paragraphs 1 through 569 as though fully set forth herein.

571.     The interests in GAI Funds that Defendants offered and sold to Plaintiffs are securities as defined by 15 U.S.C. § 78c(a)(10).

572.     Defendants offered and sold GAI Funds' securities to the Plaintiffs.

573.     Defendants used the mails or facilities of interstate commerce to sell GAI Funds' securities to Plaintiffs.

574.     Defendants knowingly or with reckless disregard for the truth employed devices, schemes, and artifices to defraud; made untrue statements of material fact and omitted material facts; and engaged in acts, practices, and courses of business which operated as a fraud and deceit upon the Plaintiffs in connection with their sale GAI Funds' securities to Plaintiff.

575.     Defendants intended to deceive the Plaintiffs into continually investing in the respective GAI Funds' Securities.

576.     As set forth above, the respective Plaintiffs invested in GAI Funds' securities in reliance on the truth of the Defendants' representations regarding GAI Funds' securities, and Plaintiffs were justified in relying on those representations.

577.     Defendants' conduct was a cause of Plaintiffs' damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against the Defendants in an amount that will fully and fairly compensate Plaintiffs for their damages, including, but not limited to: loss of initial investment, loss of return of past, present,

77

and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT III

### CONVERSION BY DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, HALL, ARTAH HOLDINGS, INC., BOL, LLC

578.     Plaintiffs hereby reassert, and incorporate by this reference, paragraphs 1 through 577 as though fully set forth herein.

579.     Defendants obtained money from the Plaintiffs and used, or possessed, said money in a manner that Plaintiffs had not intended and/or in a manner that was inconsistent with Defendants' representations regarding how the Plaintiffs' money would be used.

580.     Defendants exercised control over the Plaintiffs' money in a manner that was inconsistent with, and in derogation of, the uses for which the Plaintiffs agreed that their money should be used.

581.     Defendants used Plaintiffs' investment money to make unauthorized loans or payments to people, entities, and/or for travel to/operations in the Ukraine.

582.     Defendants used Plaintiffs' investment money to make unauthorized loans or payments to people, entities, and/or for travel to/operations in Cyprus.

583.     Defendants used Plaintiffs' investment money to make unauthorized loans or payments to friends and family members, including Jane Bruch.

584.     Defendants used Plaintiffs' investment money to make unauthorized purchases of Section 1256 contracts.

585.     Defendants used Plaintiffs' investment money to "buyout" investors in contravention of the Funds' partnership agreements.

78

586.    Defendants commingled investor contribution across the various Funds in contravention of their representations that money from the respective funds would be segregated.

587.    Defendants' conversion of Plaintiffs money was a cause of the Plaintiffs' actual financial losses, and it was done with willful and wanton disregard for the Plaintiffs rights and property.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against the Defendants in an amount that will fully and fairly compensate Plaintiffs for their damages, including, but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

**COUNT IV**

**NEGLIGENT MISREPRESENTATIONS & NONDISCLOSURES OF DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, HALL, ARTAH HOLDINGS, INC., BOL, LLC**

588.    Plaintiffs hereby reassert, and incorporate by this reference paragraphs, 1 through 587 as though fully set forth herein.

589.    Defendants negligently supplied information and failed to disclose material information about the GAI Funds' returns, financial condition, status, business, endeavors, contracts, and/or customers.

590.    Defendants had a financial interest in supplying and/or not disclosing information about the respective GAI Funds.

591.    Defendants intended to supply and/or not disclose information about the GAI Funds for their own benefit and to the detriment of the Plaintiffs; and/or Defendants knew that

79

the recipients of such information about the GAI Funds intended to supply it for the benefit and guidance of Plaintiffs.

592.     Defendants intended the information about the GAI Funds to influence the respective Plaintiffs to invest in GAI Funds;

593.     As set forth above, the respective Plaintiffs acted in reliance on the truth of the information about GAI Funds supplied by Defendants, and Plaintiffs were justified in relying on that information.

594.     As set forth above, Defendants' representations were false.

595.     Defendants' negligently supplied information or failure to provide accurate information was a proximate cause of Plaintiffs' damages.

596.     Defendants' conduct was willful and wanton.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against the Defendants in an amount that will fully and fairly compensate Plaintiffs for their damages, including, but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT V

### FRAUDULENT MISREPRESENTATIONS AND OMISSIONS OF DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, BOL, LLC, ART A. HALL, ARTAH HOLDINGS, L.L.C.

597.     Plaintiffs hereby reassert, and incorporate by this reference paragraphs, 1 through 596 as though fully set forth herein.

598.     Defendants intentionally misrepresented and/or omitted information regarding GAI Funds' returns, financial condition, status, business, endeavors, contracts, and/or customers.

80

599. As set forth above, Defendants' representation were false.

600. As set forth above, Defendants' false representations and/or omissions were material to Plaintiffs' respective investment decisions.

601. Defendants knew the representations were false.

602. Defendants intended to deceive the Plaintiffs and induce the Plaintiffs to invest money in the respective GAI Funds.

603. As set forth above, the respective Plaintiffs invested in reliance on Defendants' misrepresentations, and Plaintiffs were justified in relying on those misrepresentations and/or omissions.

604. Defendants' misrepresentations and/or omissions were a proximate cause of Plaintiffs' damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against the Defendants in an amount that will fully and fairly compensate Plaintiffs for their damages, including, but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT VI

## DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, HALL, ARTAH HOLDINGS, INC., BOL, LLC'S VIOLATED IOWA CODE § 502.501

605. Plaintiffs hereby reassert, and incorporate by this reference, paragraphs 1 through 604 as though fully set forth herein.

606. The interests in GAI Funds that Defendants offered and sold to Plaintiffs are securities as defined by Iowa Code § 502.102(28).

81

607.     Defendants offered and sold GAI Funds' securities to the Plaintiffs.

608.     As set forth above, Defendants directly or indirectly employed a device, scheme, or artifice to defraud Plaintiffs in connection with Defendants' sale of GAI Funds' securities to Plaintiffs.

609.     As set forth above, Defendants directly or indirectly made untrue statements of material fact or omitted material facts necessary to make Defendants statements not misleading in connection with Defendants' sale of GAI Funds' securities to Plaintiffs.

610.     As set forth above, Defendants directly or indirectly engaged in acts, practices, or courses of business that operate or would operate as fraud or deceit upon Plaintiffs in connection with Defendants' sale of GAI Funds' securities to Plaintiffs.

611.     Defendants' violations of Iowa Code § 502.501 was a proximate and actual cause of Plaintiff's damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against the Defendants in an amount that will fully and fairly compensate Plaintiffs for their damages, including, but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT VII

## CONCERT OF ACTION BETWEEN DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, HALL, ARTAH HOLDINGS, INC., BOL, LLC

612.     Plaintiffs hereby reassert, and incorporate by this reference, paragraphs 1 through 611 as though fully set forth herein.

613.    The respective Defendants acted in concert with each other or pursuant to a common design to provide false or misleading information about the GAI Funds to Plaintiffs.

614.    Each Defendant knew that the other's conduct constituted a breach of a duty and gave substantial assistance or encouragement to the other in providing false or misleading information to the Plaintiffs.

615.    Each defendant gave substantial assistance to the other in providing false or misleading information about the GAI Funds to the Plaintiffs, and each of the Defendants' own conduct, separately considered, constitutes a breach of duty to the Plaintiffs.

616.    The Defendants' concert of action was a proximate cause of Plaintiff's damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against the Defendants in an amount that will fully and fairly compensate Plaintiffs for their damages, including, but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

## COUNT VIII

## <u>CONSPIRACY OF DEFENDANTS GLOBAL AG INVESTMENTS, LLC, BRUCHSIDE, INC., BRUCH, BOL, LLC</u>

617.    Plaintiffs hereby reassert, and incorporate by this reference, paragraphs 1 through 616 as though fully set forth herein.

618.    Defendants provided false or misleading information to the Plaintiffs in violation of Federal and State securities laws and Iowa and/or Texas law.

619.    Each Defendant knowingly and actively participated in a conspiracy with each of the other Defendants to provide false or misleading information to the Plaintiffs in violation of Federal and State securities laws and Iowa and/or Texas law.

83

620.    The Defendants conspiracy was the proximate cause of the Plaintiffs damages.

**WHEREFORE**, the Plaintiffs pray that the Court enter judgment, jointly and severally, against the Defendants in an amount that will fully and fairly compensate Plaintiffs for their damages, including, but not limited to: loss of initial investment, loss of return of past, present, and future investments, costs, attorney fees, and any and other such relief the court may deem equitable.

### JURY DEMAND

COME NOW the Plaintiffs and hereby request trial by jury on all issues.


Respectfully Submitted:

WHITFIELD & EDDY, P.L.C.
317 Sixth Avenue, Suite 1200
Des Moines, IA 50309-4195
Telephone: (515) 288-6041
Fax: (515) 246-1474


By: _____/s/Thomas S. Reavely_____
        Thomas S. Reavely          AT0006574
        Email: reavely@whitfieldlaw.com

By:_____/s/ William C. Scales, Jr._____
        William C. Scales, Jr        AT0011052
        Email: scales@whitfieldlaw.com

SANDY LAW FIRM, P.C.
304 18th St., Box 445
Spirit Lake, IA 51360
Telephone:  (712) 336-5588
Fax:   (712) 336-5589
Email: jmsandy@sandylawpractice.com

By: _____/s/John M. Sandy_____
        John M. Sandy              AT0010488

ATTORNEYS FOR PLAINTIFFS

84

CERTIFICATE OF SERVICE

The undersigned hereby certified that on the 30th of September, 2014, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which, pursuant to Local Rule 5.3(k)(1), will send notice of electronic filing to the following:

Robert M. O'Boyle
Strasburger & Price LLP
600 Congress Avenue, Suite 1600
Austin, TX 78701-3248
Telephone: (512) 499-3600
Fax: (512) 499-3660
Email: bob.oboyle@strasburger.com
ATTORNEY FOR DEFENDANTS GLOBAL
AGRICULTURAL INVESTMENTS, LLC, AND BOL, LLC

Jeff W. Wright
Heidman Law Firm, LLC
1128 Historic 4th Street
PO Box 3086
Sioux City, IA 51101
Telephone: (712) 255-8838
Fax: (712) 258-6714
Email: jeff.wright@heidmanlaw.com
ATTORNEY FOR ART A. HALL AND
ARTAH HOLDINGS, L.L.C.

Ethan H. Cohen
Ballard Spahr LLP
999 Peachtree Street, Suite 1000
Atlanta, GA 30309-3915
Telephone: (678) 420-9300
Fax: (678) 420-9301
Email: cohene@ballardspahr.com
ATTORNEY FOR DEFENDANTS
TYLER BRUCH AND BRUCHSIDE, INC.

Andrew C. Johnson
Bradshaw, Fowler, Proctor & Fairgrave, P.C.
801 Grand Avenue, Suite 3700
Des Moines, IA 50309-8004
Telephone: (515) 246-5893

Fax: (515) 246-5808
Email: Johnson.andrew@bradshawlaw.com

Nathan W. Lamb
Ulmer & Berne LLP
500 West Madison Street, Suite 3600
Chicago, IL 60661
Telephone: (312) 658-6536
Fax: (312) 658-6537
Email: nlamb@ulmer.com
ATTORNEY FOR DEFENDANT
POPULAR SECURITIES, INC.

Sean P. Moore, AT0005499
Brown, Winick, Graves, Gross,
Baskerville & Schoenebaum, PLC
666 Grand Avenue, Suite 2000
Des Moines, IA 50309
Telephone: (515) 242-2400
Fax: (515) 283-0231
Email: moore@brownwinick.com
ATTORNEY FOR DEFENDNAT
BRUCHSIDE, INC.