IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| DENNIS SAGEZ, DEAN AND BARB BUESING, DON AND ELIZABETH BUESING, DOUGLAS G. FINSTROM, CHRISTIAN FISHER, FOUR WAY FARMS, LLC, SUSAN GUGE, WALLY AND JODI HELGET, JR FARMS, INC, DENNIS AND KAREN KASPARBAUER TRUST, KASSEL FARMS, INC., GREAT OAKS FARMS, INC., GEORGIA KASSEL, JIM KIBBIE, JOHN KIBBIE, PATRICK KIBBIE, NICK KILL, TODD LUNDGREN, EDWARD NOONAN, JOSEPH NOONAN, JACK REICHERT, HAROLD SCHROEDER, CATHERINE TIESZEN, CRAIG TIESZEN, ERIC AND AMY TIESZEN, REED AND MARY TIESZEN, DEAN AND AMY VER MULM, PETER VER MULM, WEBER FAMLY FARM INVESTMENTS, LLC<br><br>Plaintiffs,<br><br>v.<br><br>GLOBAL AGRICULTURAL INVESTMENTS, LLC, TYLER BRUCH, BRUCHSIDE, INC, ART A. HALL, ARTAH HOLDINGS, L.L.C., POPULAR SECURITIES, INC., BOL, LLC, ALAN KLUIS, ELIA TASCA,<br><br>Defendants. | Case No. 3:11-cv-03059-DEO<br><br>**COUNTERCLAIM FOR INDEMNITY** |

## COUNTERCLAIM FOR INDEMNITY

COME NOW the Counterclaimants Tyler Bruch and Bruchside, Inc. (collectively,

"Counterclaimants"), and for their Counterclaim against the Counter-Defendants Eric Tieszen,

Nick Kill, and Joseph Noonan (collectively, "Counter-Defendants") allege the following:

1

## NATURE OF THE ACTION

1. This cause of action arises from Counter-Defendants' negligence affecting and/or the negligent misrepresentations they made to multiple Plaintiffs in the above-referenced action who relied on said material acts and statements in connection with the offer and sale of agricultural based securities, as alleged in the operative Amended Complaint.

## JURISDICTION AND VENUE

2. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) as the claims herein are so related to other claims in this action that they form part of the same case or controversy under Article III of the United States.

3. Venue is proper in the Northern District of Iowa because this is a Counterclaim arising, in part, from allegations in the Amended Complaint filed in the above-referenced action and pursuant to 15 U.S.C. § 78aa(a) as alleged in said Amended Complaint in order to enforce liability or duty on the Counter-Defendants because the Counter-Defendants transacted business in this District.

## PARTIES

### Counterclaimants

4. Counterclaimant Tyler Bruch ("Tyler")[1], one of the original defendants in the above-referenced action, was at all times material to this action a resident of Emmetsburg, Iowa.

5. Counterclaimant Bruchside, Inc. ("Bruchside"), one of the original defendants in the above-referenced action, was at all times material to this action a Texas corporation.

### Counter-Defendants

6. Counter-Defendant Eric Tieszen ("Eric"), an individual and one of the original

---

[1] The Counterclaimants do not mean any disrespect by referring to parties by their first name. The first names are being used for ease of reference given the number of parties with the same or related last names in the above-referenced action.

plaintiffs named in the above-referenced action, was at all times material to this action a resident of Canistota, South Dakota.

7. Counter-Defendant Nick Kill ("Nick"), an individual and one of the original plaintiffs named in the above-referenced action, was at all times material to this action a resident of Morris, Minnesota.

8. Counter-Defendant Joseph Noonan ("Joseph"), an individual and one of the original plaintiffs named in the above-referenced action, was at all times material to this action a resident of Ayrshire, Iowa.

9. Counterclaimants are unaware of the true names and capacities of Counter-Defendants sued herein as DOES 1-20, inclusive, and therefore sues these defendants by such fictitious names. Counterclaimants will amend this complaint to allege their true names and capacities when ascertained. Counterclaimants are informed and believe and thereon allege that, if Counterclaimants are liable to certain Plaintiffs as alleged in the Amended Complaint in this action, each of the fictitiously named Counter-Defendants is jointly or jointly and severally liable with Counterclaimants to the Plaintiffs for Plaintiffs' damages as set forth therein. Each reference in this Counterclaim to "Counter-Defendant," "Counter-Defendants," or a specifically named Counter-Defendant refers also to all Counter-Defendants sued under fictitious names.

**BACKGROUND FACTS**

10. On or about November 8, 2011, approximately 34 plaintiffs (now 33), a group of farmers and/or investors, several of whom have roots in the Midwest, filed a complaint in the above-referenced action against Counterclaimants seeking damages stemming from not seeing the returns they expected on their investments in farming/agricultural operations in the South American country of Brazil that Plaintiffs allegedly sustained as a result of Counterclaimants' purported securities fraud.

11. If Plaintiffs sustained damages as alleged in their operative Amended Complaint, these damages were caused, entirely or in part, by Counter-Defendants as set forth herein.

12. At the time and place alleged in Plaintiffs' Amended Complaint, Counter-Defendants, several of whom were family members, friends, and/or acquaintances of Plaintiffs, informed Plaintiffs about the subject securities and recommended that Plaintiffs invest in these securities.

13. The securities at issue are: (1) Bruchside Fund I, LP ("Bruchside Fund I"), (2) Bruchside Fund II, LP ("Bruchside Fund II"), (3) Bruchside Fund III, LP ("Bruchside Fund III"), (4) Global Ag Biodiesel, LLC ("Biodiesel Fund"), (5) Cotton Gin Investments, LP ("Cotton Gin"), and (6) BOL Fund I, LLC ("BOL") (collectively, "the Funds").

14. Approximately 14 percent of the total amount invested in Bruchside Fund I by Plaintiffs is attributable to the acts and/or express statements of the Counter-Defendants that induced these purchases ($100,000 out of $725,000).

15. Approximately 50 percent of the total amount invested in Bruchside Fund II by Plaintiffs is attributable to the acts and/or express statements of the Counter-Defendants that induced these purchases ($1,228,000 out of $2,469,765).

16. Approximately 62 percent of the total amount invested in Bruchside Fund III by Plaintiffs is attributable to the acts and/or express statements of the Counter-Defendants that induced these purchases ($1,735,000 out of $2,777,000).

17. Approximately 86 percent of the total amount invested in Biodiesel Fund by Plaintiffs is attributable to the acts and/or express statements of the Counter-Defendants that induced these purchases ($150,000 out of $175,000).

18. Approximately 51 percent of the total amount invested in Cotton Gin by Plaintiffs is attributable to the acts and/or express statements of the Counter-Defendants that induced these purchases ($100,000 out of $195,000)

19. Approximately 93 percent of the total amount invested in BOL by Plaintiffs is attributable to the acts and/or express statements of the Counter-Defendants that induced these purchases ($500,000 out of $540,000).

20. At all material times, Counter-Defendants negligently made untrue, express statements about one or more of the Funds to Plaintiffs so as to cause Plaintiffs to proceed to invest in one or more of the Funds, thereby causing Plaintiffs' injuries as alleged in the Amended Complaint, if Plaintiffs have, in fact, been so injured.

### Eric Tieszen

21. Eric Tieszen, Amy Tieszen, Catherine Tieszen, Craig Tieszen, Reed Tieszen, Mary Tieszen (collectively, "the Tieszens"), George Weber, and Linda Weber (collectively, "the Webers") are family members.

22. The Tieszens and Webers were induced to invest in one or more of the Funds by the fact that their relative, Eric Tieszen, a seasoned agronomist[2], would be "on the ground" in Brazil assisting Counterclaimants with GAI's farming operations. This gave the Tieszens' great comfort with investments in the Funds.

23. In 2005, Eric was recruited to be hired at the Brazilian operations by (a) Debbie Kassel ("Debbie"), the Vice President of the board of Global Agricultural Investments, LLC ("GAI") , and (b) Craig Kassel ("Craig"), Debbie's husband. Craig and Debbie are related to Plaintiff Georgia Kassel, and Roger and Susan Guge.

24. Eric was one of the first individuals to visit in the Brazilian farms in 2005.

---

[2] An agronomist is a professional in scientific agriculture.

25. Eric was one of the first investors in the Brazilian operations in 2006.

26. In July 2007, Eric began working in Brazil, lived on-site in Bahia, Brazil, and was on contract with GAI. Eric's title was GAI's Superintendent and Field Operations and Technology Specialist.

27. Eric's job entailed multiple tasks including, without limitation:

   i. Eric was retained as a precision agricultural agronomist in order to facilitate expansion of GAI's Brazilian operations, focusing on fertility and farm manager to make decisions to help the Brazilian farms stay profitable.

   ii. Eric focused on implementing a better technology base there.

   iii. Eric interviewed and hired six college interns from the United States in the fall of 2009, and was responsible for overseeing their work at the Brazilian operations.

   iv. Eric spoke at annual conferences at GAI's Brazilian operations.

   v. Eric wrote and/or posted blogs about Brazil as well as GAI's Brazilian operations and its activities.

   vi. Eric led GAI's farm tours at the Brazilian operations.

   vii. Eric met with prospective and current investors of the Funds to raise money for GAI.

28. In or about 2009, Eric was a General Partner and six percent owner of GAI.

### Catherine Tieszen

29. Catherine Tieszen ("Catherine"), an individual and one of the original Plaintiffs named in the above-referenced action, was at all times material to this action a resident of Canistota, South Dakota.

30. Catherine is Reed Tieszen's mother and Eric's grandmother.

31. Catherine invested in Bruchside Fund II and Bruchside Fund III in reliance on representations by Eric regarding prior or expected farming successes of GAI in Brazil and expected or received returns on these investments.

32. Catherine invested in Bruchside Fund II based on Eric's express recommendation, which included discussions regarding Bruchside Fund I's high promised returns and Bruchside Fund II's high projected returns.

33. On or about August 15, 2007, Catherine (on behalf of John Tieszen and/or the John Tieszen Trust) invested approximately $100,000 in Bruchside Fund II.

34. The next year, on or about May 23, 2008, Catherine (on behalf of John Tieszen and/or the John Tieszen Trust) invested approximately $100,000 in Bruchside Fund III.

### Craig Tieszen

35. Craig Tieszen ("Craig"), an individual and one of the original Plaintiffs named in the above-referenced action, was at all times material to this action a resident of Rapid City, South Dakota.

36. Craig is Eric's uncle, Reed Tieszen is Craig's brother, John Tieszen is Craig's father, and Catherine is Craig's mother.

37. Craig invested in Bruchside Fund II and Bruchside Fund III in reliance on representations by Eric regarding prior or expected farming successes of GAI in Brazil and expected or received returns on these investments.

38. Prior to investing in Bruchside Fund II and Bruchside Fund III, Craig learned from Eric that Bruchside Fund I had paid a 40% return to Bruchside Fund I investors.

39. Craig understood from discussions with Eric that Bruchside Fund II anticipated future high returns and that GAI would be expanding the Funds' Brazilian farming operations.

40. Prior to investing, Craig knew that Eric, Reed, John, and Catherine were investors.

41. In or about December 28, 2007, Craig invested approximately $50,000 in Bruchside Fund II.

42. In or about May 21, 2008, Craig invested approximately $15,000 in Bruchside Fund III.

### Reed Tieszen and Mary Tieszen

43. Reed Tieszen ("Reed") and Mary Tieszen ("Mary"), individuals and two of the original Plaintiffs named in the above-referenced action, were at all times material to this action residents of Canistota, South Dakota.

44. Reed and Mary invested in Bruchside Fund II, Bruchside Fund III, and the Biodiesel Fund in reliance on representations by Eric regarding prior or expected farming successes of GAI in Brazil and expected or received returns on investment in the Funds.

45. Reed and Mary learned about investment opportunities in the Funds through their son, Eric, who worked in Brazil at GAI's farms and spoke to them about these farming operations.

46. Reed was interested in GAI investment opportunities and Bruchside Fund I as a result of Eric's influence and their one on one discussions.

47. On or about August 14, 2007, Reed and Mary invested approximately $250,000 in the Bruchside Fund II.

48. On or about January 14, 2008, Reed and Mary invested approximately $50,000 in the Biodiesel Fund.

49. On or about May 22, 2008, Reed and Mary invested approximately $200,000 in the Bruchside Fund III.

### Amy Tieszen

50. Amy Tieszen ("Amy"), an individual and one of the original Plaintiffs named in the above-referenced action, was at all times material to this action a resident of Canistota, South Dakota.

51. Amy is Eric's wife.

52. Amy invested in Bruchside Fund I, Bruchside Fund II, and the Biodiesel Fund in reliance on representations by Eric regarding prior or expected farming successes of GAI in Brazil and expected or received returns on investment.

53. On or about May 15, 2006, Amy and Eric invested approximately $100,000 in Bruchside Fund I.

54. On or about April 23, 2007, Amy and Eric invested approximately $178,000 in Bruchside Fund II.

55. In or about October 2007, Amy and Eric invested approximately $100,000 in the Biodiesel Fund.

### Weber Family Farm: George Weber and Linda Weber

56. George and Linda Weber (collectively, "the Webers"), through Weber Family Farm, one of the original Plaintiffs in the above-referenced matter, invested in Bruchside Fund II and Bruchside Fund III in reliance of representations by Eric regarding prior or expected farming successes of GAI in Brazil and expected or received returns on investment.

57. On or about June 26, 2007, the Webers attended a Bruchside Fund I and Bruchside Fund II presentation in Emmetsburg, Iowa pursuant to the recommendation of their son-in-law, Eric, who had worked with GAI and knew about the Brazil operations and Funds therein.

58. In July 2007, Eric moved to Bahia, Brazil to work for GAI in its Brazilian farming operations. Since then, Eric kept the Webers informed about the progress of the Funds.

59. Based on Eric's representations about the value of investing in the Funds, on or about August 7, 2007, the Webers invested approximately $100,000 in Bruchside Fund II on behalf of the Weber Family Farm.

60. Based on Eric Tieszen's representations about the value of investing in the Funds, on March 25, 2008, the Webers invested $300,000 in Bruchside Fund III on behalf of the Weber Family Farm.

**Nick Kill**

61. Nick Kill ("Nick") created American Investment Resources LLC, a company he used to raise money that was based out of the State of Minnesota.

62. Several individuals who invested in the Funds did so based on representations from Nick about returns on the Funds and as a result of initially choosing to invest in American Investment Resources, LLC.

63. Nick traveled to Brazil to see GAI's farming operations on several occasions.

64. On or about September 19, 2007, Nick invested approximately $350,000 in Bruchside Fund II.

65. Nick's visit to Brazil in or about February 2008 convinced him to invest in additional Funds. His decision was based on his personal observations that the operation looked to be in "great" working order and the crops looked to be in "great shape". Based on his personal observations, Nick noted that GAI's office seemed to be "legitimate". During this visit, Nick saw GAI's cotton gin.

66. After his first trip to Brazil, Nick created a PowerPoint presentation that he shared with potential investors of the Funds at a March 19, 2008 meeting at Buddies Bar & Grill in Hancock, Minnesota. During this meeting, Nick showed pictures and provided information regarding GAI's Brazilian farming operations and the Funds.

67. On or about May 27, 2008, Nick invested approximately $320,000 in Bruchside Fund III.

68. At the end of 2008, Nick did not receive the expected payout on Bruchside Fund II.

69. Notwithstanding, approximately a year later, in or about March 2009, Nick made another trip to Brazil. During this trip, Nick visited the fields and the cotton gin. At the time, Nick noticed that GAI was building a new office for the Brazil farming operations. Based on his personal observations, Nick determined that GAI's operations were in good order.

70. Nick was one of the initial investors in the Cotton Gin.

71. Nick Kill invested approximately $100,000 in the Cotton Gin Investments.

72. Nick Kill invested approximately $100,000 in BOL Fund I, LLC.

## Dean Buesing and Don Buesing

73. Dean Buesing and Don Buesing (collectively, "the Buesings") are brothers.

74. The Buesings invested in Bruchside Fund III and BOL, LLC in reliance on representations by Nick regarding prior or expected farming successes of GAI in Brazil and expected or received returns on investment.

75. The Buesings learned about GAI through Nick, who also invested in Funds.

76. On March 12, 2008, Nick emailed Dean regarding GAI's investment opportunities. Nick's email indicated that past returns have been up to 40% and that he expected to receive at least 25% return on his October 2007 investment to be paid in July 2008.

77. Based on Nick's March 12, 2008 email, the Buesings, along with other potential investors, met with Nick on March 19, 2008 at Buddies Bar & Grill, a restaurant in Hancock, Minnesota, to discuss GAI investment opportunities, at which time Nick made representations that induced the Buesings to invest in the Funds.

78. On or about March 27, 2008, the Buesings invested approximately $500,000 in Bruchside Fund III.

79. At the end of 2008, although Nick did not receive the expected payout on Bruchside Fund II, Nick urged the Buesings to invest in the Funds.

80. On or about December 15, 2009, the Buesings invested approximately $500,000 in BOL.

### Douglas C. Finstrom

81. Douglas G. Finstrom ("Douglas"), an individual and one of the original Plaintiffs in the above-referenced action, invested in reliance on representations by Nick regarding prior or expected farming successes of GAI in Brazil and expected or received returns on investment.

82. Douglas invested in Bruchside Fund III after attending a March 19, 2008 meeting of investors at Buddies Bar & Grill in Hancock, Minnesota which Nick hosted.

83. Douglas had discussions with Nick regarding Bruchside Fund I's 40% return and Bruchside Fund II's projected 25% return. Douglas relied on said representations when deciding to invest in the Funds.

84. On or about June 6, 2008, Douglas invested approximately $100,000 in Bruchside Fund III.

### Wally Helget and Jodi Helget

85. Wally Helget ("Wally") and Jodi Helget ("Jodi") (collectively, "the Helgets") invested in Bruchside Fund III in reliance on representations by Nick regarding GAI's prior or expected farming successes in Brazil and expected or received returns on investment.

86. In or around May 2008, Wally learned about GAI investments through Nick. At that time, Nick had a large investment position over multiple GAI Funds and had been to Brazil to observe GAI's farming operations. During their discussions, Nick told Wally about the high returns that he had personally received.

87. The Helgets decided to invest in the Funds because of their understanding from representations by Nick that Bruchside Fund I had paid high returns.

88. Wally's investment decision in the Funds was also influenced by the fact that Nick Kill had discussed positive, personal observations from his travels to Brazil to see GAI's farming operations first hand.

89. After speaking with Nick, Wally wanted to invest in the Funds, but Wally understood that none of the Funds were open to new investors. Wally understood that at that time, the Funds were only open to existing investors.

90. On or about April 12, 2008, Nick, who had been communicating with Tyler on Wally's behalf, received an email from Tyler indicating that new investors could obtain access to Bruchside Fund III with a minimum investment of $50,000.

91. Nick then emailed Kathy Gunderson ("Kathy") to inform her to send Wally information regarding Bruchside Fund III.

92. On or about April 17, 2008, Kathy emailed Wally based on Nick's email. As part of her email, Kathy provided Wally with information regarding Bruchside Fund III. At that point, Wally finalized his investment in Bruchside Fund III.

93. On or about May 27, 2008, the Helgets invested approximately $50,000 in Bruchside Fund III.

### Harold Schroeder

94. Harold Schroeder ("Harold") invested in Bruchside Fund III and BOL in reliance on representations by Nick regarding prior or expected farming successes of GAI in Brazil and expected or received returns on investment.

95. Harold's discussions with Nick regarding Nick's involvement with GAI influenced Schroeder's decision to pursue GAI investment opportunities.

96. On or about May 21, 2008, Schroeder invested approximately $50,000 in Bruchside Fund III based on his discussions with Nick that the related investment, Bruchside Fund I, had been "highly successful" and made "very high" returns.

97. On or about November 23, 2009, Schroeder invested approximately $50,000 in BOL.

### Joseph Noonan

98. Joseph Noonan ("Joseph") was neighbors with Craig and Debbie from childhood through college for approximately 20 years.

99. Joseph's father, Edward Noonan, encouraged Joseph to work for GAI as an intern. During the summer of 2007, Joseph interned for GAI on-site in Brazil. During his time with GAI, Joseph focused on commodity market research for the company.

### Edward Noonan

100. Edward Noonan ("Edward"), an individual and one of the original Plaintiffs named in the above-referenced action, was at all times material to this action a resident of Ayrshire, Iowa.

101. Edward is Joseph's father.

102. With his son Joseph, Edward invested approximately $200,000 in Bruchside Fund II and approximately $100,000 in Bruchside Fund III on reliance of representations by Joseph regarding the commodity market in relation to the farms in Brazil and GAI.

### COUNT I:
### EQUITABLE INDEMNIFICATION
### AGAINST ALL COUNTER-DEFENDANTS

103. An actual controversy has arisen and now exists between Counterclaimants and Counter-Defendants in that Counterclaimants contend, and Counter-Defendants deny, the following:

i. That, as between Counterclaimants and Counter-Defendants, responsibility, if any, for the damages claimed by Plaintiffs referenced in this Counter-Complaint rests entirely or partially on Counter-Defendants; and

ii. That, as a result, Counter-Defendants are obligated to partially or fully indemnify Counterclaimants for any sums that Counterclaimants may be compelled to pay as the result of any damages, judgment, or other awards recovered by the Plaintiffs referenced in this Counter-Complaint against Cross-Claimants.

104. Counterclaimants desire a judicial determination of the respective rights and duties of Counterclaimants and Counter-Defendants with respect to the damages claimed in the operative Amended Complaint of the Plaintiffs referenced in this Counter-Complaint. In particular, Counterclaimants desire a declaration of the comparative liability of Counterclaimants and Counter-Defendants for these damages, and a declaration of Counter-Defendants' responsibility for comparative indemnity to Counterclaimants for any sums that Counterclaimants may be compelled to pay and for which Counter-Defendants are determined responsible, entirely or in part.

105. Such a declaration is necessary and appropriate at this time in order that Counterclaimants may ascertain their respective rights and duties with respect to the Plaintiffs' claim for damages as articulated in this Counter-Complaint.

106. Furthermore, the claim of these Plaintiffs and the claim of Counterclaimants arise out of the same transaction, and determination of both in one proceeding is necessary and appropriate in order to avoid the multiplicity of actions that would result if Counterclaimants are required now to defend against the claim of Plaintiffs and then bring a separate action against Counter-Defendants for indemnification of sums that Counter- Claimants may be compelled to pay as the result of any damages, judgment, or other awards recovered by Plaintiffs against Counterclaimants.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaimants pray for judgment against Counter-Defendants as follows:

1. For a judicial determination of the comparative fault of Counterclaimants and Counter-Defendants for the damages claimed by the certain Plaintiffs referenced herein, if any are found to exist;

2. For a declaration of the amount that Counter-Defendants are obligated to indemnify Counterclaimants if Counterclaimants are compelled to pay any sum as the result of any damages, judgment, or other awards recovered by these Plaintiffs against Counterclaimants;

3. For costs of suit herein incurred; and

4. For such other and further relief as the court may deem proper.

## JURY DEMAND

Defendants Tyler Bruch and Bruchside, Inc. demand a jury trial on all issues.

Dated: December 23, 2015.

Respectfully submitted,

*/s/ Steven P. Wandro*
Steven P. Wandro AT0008177
David Swinton
Kara M. Simons AT0009876
WANDRO & ASSOCIATES, P.C.
2501 Grand Avenue
Des Moines, Iowa 50312
Telephone: 515/281-1475
Facsimile: 515/281-1474
swandro@2501grand.com
dswinton@2501grand.com
ksimons@2501grand.com

Elizabeth M. Del Cid
*Admitted Pro Hac Vice*
MURPHY & McGONIGLE, P.C.
1185 Avenue of the Americas
21st Floor
New York, New York 10036
Telephone: 212/880-3982
Facsimile: 212/880-3998
edelcid@mmlawus.com

ATTORNEYS FOR DEFENDANTS,
TYLER BRUCH and BRUCHSIDE, INC.